**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ROBERT L. BROOKS JR., in his capacity as
Administrator of the ESTATE OF ROBERT L.
BROOKS SR.,

                Plaintiff,

                v.

ANTHONY FARINA, MATTHEW GALLIHER,
NICHOLAS ANZALONE, DAVID KINGSLEY,
NICHOLAS KIEFFER, ROBERT KESSLER,
MICHAEL FISHER, CHRISTOPHER WALRATH,
MICHAEL ALONG, SHEA SCHOFF, DAVID
WALTERS, MICHAEL MASHAW,
GLENN TROMBLEY, KYLE DASHNAW,
ABEDIN MEHMEDOVIC, DANIELLE MEDBURY,
DANIEL MARTUSCELLO III, and other as yet
identified individuals.

                Defendants.

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

9:25-cv-68 (AMN/ML)

---

       Plaintiff ROBERT L. BROOKS JR., in his capacity as Administrator of the ESTATE OF

ROBERT L. BROOKS SR., by his undersigned counsel, complains against Defendants

ANTHONY FARINA, MATTHEW GALLIHER, NICHOLAS ANZALONE, DAVID

KINGSLEY, NICHOLAS KIEFFER, ROBERT KESSLER, MICHAEL FISHER,

CHRISTOPHER WALRATH, MICHAEL ALONG, SHEA SCHOFF, DAVID WALTERS,

MICHAEL MASHAW, GLENN TROMBLEY, KYLE DASHNAW, ABEDIN MEHMEDOVIC,

DANIELLE MEDBURY, DANIEL MARTUSCELLO III, and other as yet identified individuals

as follows:

## INTRODUCTION

1.      This is a case about the deadly use of force by New York State Department of Corrections and Community Supervision ("NYSDOCCS") staff on Robert L. Brooks Sr. ("Robert"). On December 9, 2024, prison staff at Marcy Correctional Facility ("Marcy") repeatedly punched, kicked, and otherwise physically attacked Robert while he was at all times handcuffed, restrained, and completely defenseless. Robert's fatal beating by the people charged with protecting him—a prolonged beating so severe and grotesque that it shocks the conscience—occurred because of the ongoing tolerance of staff violence against people incarcerated at Marcy and other prisons throughout the NYSDOCCS system. Robert's attackers systematically and casually beat him to death. Other Defendants assisted in the fatal beating by further restraining Robert when he was already handcuffed and then also later shackled. Still other Defendants simply stood by and observed the fatal beating as if it were a normal and common occurrence at Marcy. On information and belief—it was exactly that.

2.      Robert had done nothing to justify the use of any force against him, much less deadly force.

3.      Robert's killers were unaware that some of their own body-worn cameras ("BWC"s) passively recorded much of the attack on video. As Marcy staff brutalized Robert, they believed that their actions would never see the light of day.

4.      None of the Defendants reported the attack. Instead, after killing Robert, they concocted lies to attempt to cover up their actions and then went about their daily business as usual.

5.      The video footage showing Robert's fatal assault reveals a chilling scene. It depicts several large white law enforcement officers torturing a bloodied Black man who is restrained, helpless, and struggling to maintain consciousness. The perpetrators' brutality goes on and over the course of roughly ten minutes. It continues past several initial rounds of beatings. It continues

beyond one officer hammering Robert repeatedly with the heel of a shoe and another officer lifting Robert by the neck using a chokehold. The brutality continues even beyond Robert losing the ability to sit upright and well after Robert falls into a state of semiconsciousness.

6.      Almost as disturbing as the video's depiction of violence perpetrated on Robert by at least six Defendants is the demeanor of at least nine other Defendants who all stood by watching Robert's killing. Rather than making any effort to end the inhumane brutality, every staff member who was present casually observed Robert's prolonged attack as if it were a routine activity. All remained calm and utterly unfazed by what was happening. Some appear bored. Others appear amused, visibly smiling or laughing at what seems to have been a spectator sport to them. The brutal attack on Robert was very obviously business-as-usual for all involved.

7.      The video is frightening and very difficult to watch, but it reflects the dark and dangerous reality that individuals incarcerated at Marcy face on a regular basis. It reveals precisely what Marcy staff do to those incarcerated in the prison when they believe no one is watching. It evidences the rampant abuses that New York prisoners as well as the Correctional Association of New York ("CANY")[1] have reported and warned about for years. As CANY recognized, "Mr. Brooks's death cast a harsh light on the grim realities of life within our state prisons, realities that have been documented by [CANY] for decades." For far too long, CANY's warnings that the lives of people in NYSDOCCS are profoundly at risk and those individuals' pleas for help and protection have been met with profound silence.

---

[1] CANY is the State of New York's legal designee for providing independent oversight and monitoring of New York's prisons.

8.      After viewing the video of Robert's killing, state leaders and prison officials decried the officers' actions and publicly acknowledged the existence of systemic problems in New York's prisons.

9.      Governor Kathy Hochul, after viewing the video, stated that she was "outraged and horrified" by what she saw. She described Roberts's killing as "senseless" and later acknowledged that "Mr. Brooks and his family did not deserve this . . . . The system failed Mr. Brooks[.]"

10.     NYSDOCCS Commissioner Daniel Martuscello III also issued a public statement that watching the video made him feel "deeply repulsed and nauseated." In the same statement, Martuscello acknowledged that there was "no excuse" for the officers' actions, and he recognized the need for "institutional change" to prevent future similar occurrences.

11.     The overdue need for institutional change has been known to NYSDOCCS leaders, including Defendant Martuscello, for far too long. In the wake of Robert's killing, CANY issued a telling reminder that it had been sounding alarms for years about the culture of violence at Marcy and the risk to Robert Brooks and others there: "The body-worn camera footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility and other prisons in the state."

12.     There can be no doubt that responsibility for Robert's killing extends beyond the Marcy staff present at the scene of his fatal beating. Robert's killers did not act in a vacuum. Their actions were the entirely foreseeable result of NYSDOCCS leaders knowingly maintaining an utterly broken system that condones, tolerates, or turns a blind eye to violence on incarcerated people, as those leaders have done for decades.

13.    Robert's beating and death occurred precisely because of that broken system, which is undergirded by a sustained acceptance of brutal staff violence from the highest level of NYSDOCCS. It has caused Defendants and others who work at Marcy and other New York prisons to systemically engage in violence, including the violence that killed Robert.

14.    With this lawsuit, Robert's Estate, on behalf of his children, seeks to hold accountable every individual responsible for his killing.

## JURISDICTION AND VENUE

15.    This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Robert Brooks' civil rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution.

16.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

17.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## PARTIES

18.    Robert L. Brooks Jr. is the duly appointed Administrator of the Estate of Robert L. Brooks Sr. He is the son of Robert, who was a 43-year-old domicile of Monroe County, New York. At all times relevant to this Complaint, Robert was in the care and custody of NYSDOCCS.

19.    Defendants Anthony Farina, Matthew Galliher, Nicholas Anzalone, David Kingsley, Nicholas Keiffer, Robert Kessler, Michael Fisher, Christopher Wallrath, Michael Along, Shea Schoff, David Walters, Michael Mashaw, Glenn Trombley, and Kyle Dashnaw (collectively, together with Defendant Mehmedovic, the "On-Scene Defendants") are current or former employees of the State of New York who worked at Marcy, all of whom were present on-scene while Robert's fatal beating occurred. Some of the On-Scene Defendants directly participated in carrying out Robert's fatal beating. Others stood by and did nothing to stop it.

5

20.    Defendant Abedin Mehmedovic was employed by an as-yet unknown private staffing agency to work at Marcy. Along with the other On-Scene Defendants, Mehmedovic was present on-scene while Robert's fatal beating occurred.

21.    At all times relevant to this Complaint, Defendant Danielle Medbury was the Acting Superintendent of the Marcy Correctional Facility. In this role, Defendant Medbury set policies, customs, and practices for Marcy, assumed responsibility for overseeing all aspects of day-to-day life at Marcy, and was responsible for ensuring the safety of people incarcerated at Marcy.

22.    At all times relevant to this Complaint, Defendant Daniel Martuscello III was Commissioner of NYSDOCCS. In this role, Defendant Martuscello set policies, customs, and practices for NYSDOCCS and was ultimately responsible for ensuring the safety of individuals in NYSDOCCS custody. Defendant Martuscello had expansive personal knowledge of issues affecting NYSDOCCS. Prior to becoming Commissioner, Martuscello had nearly three decades of experience working with NYSDOCCS in various capacities. For six years prior to becoming Commissioner, Martuscello served as second-in-command to Commissioner Anthony Annucci. When Defendant Martuscello became Commissioner of NYSDOCCS, he was widely recognized for his vast institutional knowledge of NYSDOCCS.

23.    At all times relevant to this Complaint, every Defendant named in the Complaint was acting within the scope of his or her employment and under color of law.

## FACTS

24.    On the evening of December 9, 2024, NYSDOCCS staff transported Robert from Mohawk Correctional Facility ("Mohawk") in Rome, New York, to Marcy in Utica, New York, approximately seventeen miles away.

25.    Video shows that sometime after his transport van arrived at Marcy, Robert was on the ground outside of a Marcy building with his hands handcuffed behind his back, while surrounded by Defendants Kieffer, Mashaw, Kessler and Kinglsey.

26.    After Defendants Trombly and Farina approached the group, two of the Defendants lifted Robert off the ground and began moving him toward the Marcy Infirmary Building with his arms extended above his head and his upper torso parallel to the ground (*see* Figure 1 below). The other four Defendants in the group followed.



*Figure 1*

27.    Approximately one minute later, at 9:22 p.m., Robert entered the Infirmary Building carried by three Defendants. Defendants Kessler and Anzalone each held Robert by his arms and Defendant Kingsley held Robert by both of his feet, carrying him in a contorted face-down position (*see* Figure 2 below).



*Figure 2*

28.    The Defendants proceeded to carry Robert into the open door of a medical examination room, in and around which other On-Scene Defendants were already gathered.

29.    On information and belief, the On-Scene Defendants knew that there were no surveillance cameras in Marcy's medical examination rooms and they deliberately took Robert to that location so there would be no recordings of what they intended to do to him.

30.    Inside the room, with the door left open, Defendants placed Robert on an examination table face down on his stomach. One Defendant used his knee and hands to forcibly restrain Robert's legs, while at least one other Defendant used his arms to forcibly restrain Robert's upper body (*see* Figure 3 below).



*Figure 3*

31.     Thereafter, over the course of approximately ten minutes, numerous On-Scene Defendants continued to viciously batter Robert in myriad ways without any provocation whatsoever on Robert's part. Robert's hands remained restrained behind his back the entire time, leaving him no means to defend himself against Defendants' attacks or soften their blows.

32.     The continued assault on Robert included, but was not limited to, the actions described in the following paragraphs, that were all recorded on video.

33.     Defendant Anzalone repeatedly punched Robert while Robert was on his back on the examination table, leaving his face visibly bloodied and swollen when Defendants then raised his upper torso (*see* Figure 4 below).



*Figure 4*

34.    Defendant Farina forcibly tried to shove a white cloth into Robert's mouth while Defendant Kinglsey kept both of his hands grasped around Robert's neck, impairing Robert's ability to breathe (*see* Figure 5 below).



*Figure 5*

35.     When Robert struggled to move his head for breath, Defendant Anzalone grabbed the front of Robert's shirt and Defendant Kingsley pulled back on Robert's neck as Defendant Farina rapidly punched Robert in the face and neck or shoulder area, with hard closed-fist blows, at least six times.

36.     After Defendant Farina's initial punches to Robert's face made Robert fall back onto the examination table, Defendant Anzalone punched Robert in the groin or leg area at least twice as Defendant Farina simultaneously continued to punch Robert's face or shoulder area.

37.     Seconds later, Defendant Kinglsey lifted Robert's upper torso back up off the table with one hand behind Robert's head, and another hand around Robert's neck, so that Robert was again in a sitting position on the edge of the table (*see* Figure 6 below).



*Figure 6*

38.    Defendant Kingsley then proceeded to position both of his hands around Robert's neck and lift Robert's buttocks up off the table two consecutive times by pulling up on Robert's neck (*see* Figure 7 below).



*Figure 7*

39.    Defendant Kingsley next repositioned himself by placing his right arm further around Robert's neck, in a chokehold, and once again forcefully raised Robert up off the examination table by his neck (*see* Figures 8 and 9 below).

40.    At the same time, Defendant Farina threw away the white cloth that he previously tried to shove into Robert's mouth, removed one of his gloves, and examined the hand he had just used to repeatedly strike Robert (*see* Figure 8 below). Defendant Farina then opened and closed his fingers and shook out his hand in an apparent effort to relieve the self-inflicted pain caused by his repeated blows to Robert's face and head.



*Figure 8*



*Figure 9*

41.    Defendant Kingsley then forcefully shoved Robert back down to a seated position on the examination table.

42.    Defendant Anzalone next proceeded to repeatedly beat Robert in the stomach with the back of one of Robert's shoes.

43.    Next, Defendant Anzalone and Defendant Kingsley pushed Robert's head and shoulders back down onto the examination table once again.

44.    Defendant Anzalone, Defendant Kingsley, and Defendant Galliher then restrained Robert's upper torso, while Defendant Farina kicked his foot into Robert's groin (*see* Figure 10 below).



*Figure 10*

45.    Defendant Farina shifted his weight to push his foot deeper into Robert's groin or lower stomach area for approximately 8 seconds while the three other Defendants surrounding Robert continued to restrain Robert's upper body.

46.    Defendant Walrath then joined the assault on Robert's groin area by holding at least one of Robert's legs to prevent him from closing them to protect himself.

47.    Thereafter, Defendant Anzalone proceeded to punch Robert in the stomach.

48.    Defendants Walrath and Farina then forcibly restrained Robert's legs and feet with their hands as Robert lay on his back on the examination table, while at the same time other Defendants, including Defendants Kingsley and Anzalone, applied pressure to Robert's upper body area for an extended period, further restricting his ability to breathe.

49.    When Robert's body began writhing, Defendant Farina punched Robert three times in the area between Robert's buttocks and upper thighs.

50.    While Defendant Farina was delivering those punches to Robert's right side, Defendant Walrath delivered multiple punches to Robert's left side (*see* Figure 11 below).



*Figure 11*

51.    While Robert remained on his back on the examination table, with his lower ribcage area visibly extended, Defendant Anzalone struck Robert's stomach twice with his hands, provoking no visible response from Robert.

52.    After being prompted by another Defendant, Defendant Anzalone then gave Robert a sternum rub.[2] Robert's stomach rose up, demonstrating that he was still responsive to pain.

53.    Defendants, including Defendant Galliher, then placed Robert's ankles in leg cuff restraints (also known as "leg irons") while Robert remained on his back on the examination table with his hands restrained behind him.

54.    For an extended time thereafter, Defendant Kingsley kept one of his hands on Robert's neck and his other hand on Robert's left arm, while Defendant Anzalone used one of his hands to restrain Robert's right shoulder. During this period, Robert's body writhed again with his ribcage visibly extended (*see* Figure 12 below), and Defendant Anzalone intermittently used his free hand to poke the side of Brooks' stomach and strike the side of Brooks' ribcage.



*Figure 12*

---

[2] A sternum rub is a technique typically used to assess whether an unconscious person is alive by applying a painful stimulus to the middle of the person's chest to test the person's responsiveness.

55.    Defendant Anzalone then shifted his weight to push his other hand down harder on Robert's right shoulder.

56.    Next, Defendants Kinglsey and Anzalone forcefully yanked Robert upright into a sitting position at the edge of the examination table by pulling up on his shoulders while Defendant Anzalone simultaneously dug his fist into Robert's lower stomach area.

57.    Defendant Kingsley and Defendant Anzalone held Robert by the back of his neck to allow Defendant Anzalone to deliver a hard, closed-fist punch to Robert's stomach (*see* Figure 13 below).



*Figure 13*

58.    Defendant Anzalone stopped supporting the right side of Robert's body as he stepped away to retrieve rubber gloves, leaving Robert to struggle to hold himself fully upright (*see* Figure 14 below).



*Figure 14*

59.     Defendant Anzalone approached Robert once again and grabbed the front of the neck hole of Robert's shirt with his now-gloved hand.

60.     Defendants Anzalone and Kingsley then forcefully yanked Robert into a standing position, lifted Robert's feet and body up off the ground by Robert's arms and shirt, shoved Robert into a closed window shade in the corner of the medical examination room, and pushed their knees into the back of his legs.

61.     Robert remained in the corner for an extended period, during which time Defendants Kinglsey, Kessler, and Anzalone continued to push Robert into the wall, apparently committing other abuses that are not visible on camera.

62.     Robert was eventually pushed down onto his knees, remaining in that position until Defendant Anzalone wrapped both of his arms around Robert's torso and violently jolted Robert's entire body up off the ground.

63.     Thereafter, Defendants moved Robert back to the examination table, where two Defendants removed Robert's pants as Defendant Anzalone gave Robert another sternum rub, which this time provoked no apparent response.

64.     By approximately 9:32 p.m., Robert lay motionless and apparently unresponsive, with his pants removed and his socks hanging halfway off his feet, and Defendants finally ended their beating.

65.     Robert was eventually transported to Wynn Hospital in Utica, New York, where he was pronounced dead in the early hours of December 10, 2024.

66.     Defendants' brutal assault, described above, was the sole cause of Robert's death.

**On-Scene Defendants Responsible for Robert's Fatal Beating**

67.     After Governor Hochul directed Defendant Martuscello to begin the termination process for state employees involved in Robert's killing, NYSDOCCS announced that Defendants Galliher, Anzalone, Kingsley, Keiffer, Kessler, Fisher, Wallrath, Along, Schoff, Walters, Farina, Mashaw, Trombley, and Dashnaw had all been suspended without pay or resigned.

68.     Those fourteen Defendants and Defendant Mehmedovic (a contractor), who together comprise the On-Scene Defendants in this case, all either actively participated in Robert's fatal beating, or stood by and watched it, or both.

69.     All On-Scene Defendants knew that Robert was being grievously harmed and was in obvious need of medical attention but took no action to stop the assault or help Robert.

70.     The On-Scene Defendants who were not actively beating Robert at any given time casually entered and exited the room where Robert's assault was underway, posted up in the open doorway of the room, or milled about in the hallway immediately outside the room, while nonchalantly watching Robert's beating, hearing Robert's abuse, and engaging in conversation with one another.

71.     In the video footage of Robert's fatal beating, the On-Scene Defendants at times appeared to be smiling or laughing and at other times appeared to be bored. Notably, none of the On-Scene Defendants in the footage appeared to be at all concerned at any time about what was being done to Robert or about the fact that Robert was plainly deteriorating to a state of unconsciousness.

72.     Despite seeing, hearing, and otherwise knowing that Robert was being beaten to death, all the On-Scene Defendants failed to intervene to stop Robert's assault at any time, despite having ample opportunity to do so.

73.     All the On-Scene Defendants were likewise deliberately indifferent to Robert's obvious need for critical medical care that could have saved his life.

### Defendants Martuscello, Medbury, and Other As Yet Known Supervisory Defendants Responsible for Robert's Fatal Beating

74.     The indisputable fact that over a dozen people casually carried out or watched Robert's fatal beating without even bothering to shut the door of the room where he was being killed reflects that institutional tolerance of staff brutality against incarcerated people permeates Marcy, and, on information and belief, other institutions in the NYSDOCCS system.

75.     As Governor Hochul acknowledged, the State's prison system failed Robert. She ordered Defendant Medbury to be removed from her position as Marcy's top leader soon after Robert's fatal attack.

76.     As Defendant Martuscello admitted, institutional change is required to prevent similar acts from happening in New York's prisons.

77.     As CANY reminded the public in the wake of Robert's killing: "The body-worn camera footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility and other prisons in the state."

78.     The responsibility for Robert's killing extends beyond the Marcy staff present at the scene of his fatal beating. Robert's killers did not act in a vacuum. Their actions were the entirely foreseeable result of maintaining an utterly broken system that tolerates staff violence against incarcerated people, as NYSDOCCS leadership has done for decades.

79.     Defendants Martuscello and Medbury (the "Supervisory Defendants") are liable for Robert's death because they were each aware of and deliberately indifferent to the substantial risk of serious harm to incarcerated individuals like Robert.

80.     On information and belief, in the period leading up to Robert's killing, a custom or practice existed across NYSDOCCS, and at Marcy specifically, of correctional officers subjecting incarcerated people to unprovoked excessive force—often with either the direct involvement or tacit approval of sergeants or other higher-ranking individuals—and then conspiring to cover up their misconduct.

81.     This custom or practice posed a substantial risk of harm to incarcerated individuals like Robert and was a moving force behind Robert's killing.

82.     At the time of Robert's killing, this custom was so well-settled and widespread that the On-Scene Defendants were emboldened, and indeed encouraged, to brutalize Robert with

impunity. The On-Scene Defendants were confident in the knowledge that their misconduct would be easily concealed and would not be subject to any meaningful scrutiny.

83.     On information and belief, the Supervisory Defendants were personally aware of this dangerous custom. As discussed in further detail below, it has been thoroughly documented, publicized, and confirmed by, among others, independent research organizations, federal and state prosecutors, criminal and civil juries, the news media, internal complaints by incarcerated people at Marcy, and a multitude of civil rights lawsuits.

84.     On information and belief, the Supervisory Defendants were also personally aware that this custom posed a substantial risk of serious harm to incarcerated individuals like Robert.

85.     At the time of Robert's killing, the Supervisory Defendants were each personally responsible for ensuring the safety of individuals in NYSDOCCS custody at Marcy. They each had the authority and responsibility to set policy, make rules, communicate expectations, and control the correctional officers who worked under their command.

86.     Despite their knowledge and authority, neither of the Supervisory Defendants took meaningful action to abate the risk of harm that this custom posed to incarcerated individuals like Robert.

87.     As a direct and proximate result of the Supervisory Defendants' deliberate indifference to this custom and practice, On-Scene Defendants brutalized and killed Robert.

**Rampant Abuse of Incarcerated People by Marcy Staff**

88.     Well before Robert was beaten to death, the Supervisory Defendants knew that people incarcerated at Marcy faced a substantial risk of serious harm at the hands of correctional officers.

89.    In October 2022, CANY conducted an in-depth two-day monitoring visit at Marcy. During the visit, CANY interviewed over 100 incarcerated people, met with executive staff, medical staff, and union representatives, and visually inspected the facility.

90.    In July 2023, CANY published a comprehensive "Post-Visit Briefing and Recommendations" report about Marcy ("**CANY Report**").[3]

91.    As reflected in the CANY Report, incarcerated individuals at Marcy reported "rampant abuse by staff, including physical assaults" and "a significant number of instances of racialized abuse." CANY found a "higher instance of staff abuse" at Marcy compared to other NYSDOCCS facilities.

92.    Specifically, the CANY Report indicates that a shocking 80 percent of respondents at Marcy reported having seen or been personally subjected to verbal, physical, or sexual abuse by staff, and 70 percent reported racial discrimination or bias.

93.    The CANY Report further documents that people "in general population units detailed experiencing or witnessing a range of abusive behaviors by staff, such as *physical assaults in locations where cameras are absent* including between the gates, in vans, and in showers. They also described staff engaging in verbal harassment and using pepper spray." (emphasis added).

94.    The CANY Report quotes one incarcerated person as saying, "Physical abuse is rampant; the CO told me when I got here this is a 'hands-on facility,' we're going to put hands on you if we don't like what you're doing."

95.    The CANY Report quotes another incarcerated person as saying, "Vibes in this jail with staff are off - they brag and intimidate us about the number of people they've beat or sprayed."

---

[3] *Post-Visit Briefing & Recommendations No.22-10: Monitoring Visit to Marcy Correctional Facility - October 11-12, 2022*, CANY, https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-10-marcy (last visited Jan. 10, 2025).

96.    The CANY Report reflects that Marcy's Incarcerated Liaison Committee reported a pattern of staff regularly engaging in physical abuse.

97.    In addition, "CANY monitors observed a pervasive culture of fear and retaliation at Marcy. On the second day of CANY's visit, several incarcerated individuals confided in CANY monitors that staff had walked through the housing units the night prior announcing threats of physical harm in retaliation for speaking with CANY."

98.    Notably, while incarcerated people at Marcy reported rampant physical staff abuse, especially in locations without cameras, "Executive team members reported [to CANY] that the RMHU [Residential Mental Health Unit] [was] the only housing unit at Marcy currently equipped with stationary cameras."

99.    CANY implored the NYSDOCCS Office of Special Investigations ("OSI") and Inspector General to "investigate the widespread claims of abuse at Marcy and make the findings and measures taken to address them reported to the public upon completion."

100.    On information and belief, Supervisory Defendants Martuscello and Medbury were each subjectively aware of the contents of the July 2023 CANY Report, including CANY's findings of rampant staff abuse at Marcy and CANY's recommendation that OSI and the New York Inspector General needed to investigate and take steps to address the problem. On information and belief, neither Supervisory Defendant took any steps to implement CANY's recommendation or meaningfully address the problems of staff violence at Marcy.

101.   Following Robert's death, CANY Executive Director Jennifer Scaife issued a statement that the video of his fatal attack would allow the public to "witness the brutality that [CANY] has documented . . . at Marcy as recently as two years ago."[4]

102.   Ms. Scaife pointed out that CANY had previously "called upon DOCCS' Office of Special Investigations and the New York State Inspector General to investigate the serious and pervasive allegations at Marcy Correctional Facility."

103.   Ms. Scaife also indicated that CANY notifies NYSDOCCS and other state agencies several times per week about allegations of abuse, maltreatment, neglect, or violations carried out by staff in New York's prisons.

104.   Several days later, following release of the video showing how Robert was killed, CANY issued another statement that the "footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, *but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility* and other prisons in the state." (emphasis added).[5]

105.   The experience of **Williams Alvarez** strongly corroborates CANY's findings about Marcy.

106.   In September 2020, Defendants Trombly, Farina, and three other Marcy officers brutally attacked Alvarez. The attack began with an officer pepper spraying Alvarez without

---

[4] *Correctional Association of New York (CANY) Statement on the Death of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 23, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy.

[5] *Correctional Association of New York (CANY) Statement on the Release of Video Depicting the Killing of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 27, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy-zax6a.

provocation while Alvarez was cleaning floors in a shower area. The officer ordered Alvarez to a vestibule away from other incarcerated individuals, where he stood with his hands against a wall while Defendants Trombly, Farina, and two additional officers beat him. The officers slammed his head against the wall multiples times, handcuffed him, and then kicked him multiple times in the head and body as he fell to the ground. During the attack, Alvarez heard officers laughing and no one intervened to help him. The beating caused fractures to Alvarez's face so severe that they required surgical repair and left him with a permanent facial deformity. His attackers also shattered his ankle bone, which likewise required surgery.

107.    After beating Alvarez, one of the officers created false disciplinary charges against him to cover up their actions. As a result of the false reports, Alvarez was sent to Marcy's Special Housing Unit (*i.e.* solitary confinement), discharged from an early release program that Alvarez was about to complete, and transferred to a maximum-security facility.

108.    In 2022, Alvarez filed a lawsuit in federal court, describing his attack as explained above. Defendants Trombly and Farina were named as defendants in Alvarez's suit.[6]

109.    At his deposition, Alvarez testified, under oath, that corrections officers at Marcy have a designated "beat-up squad" of officers who "go around and do . . . the assaults and rough handling the people [incarcerated at Marcy]." Alvarez identified Defendant Trombly as the "sergeant in charge of the beat-up squad."[7]

110.    The experience of ***Adam Bauer*** also strongly corroborates CANY's findings about Marcy.

---

[6] Amended Complaint, *Alvarez v. Bause et al.*, No. 22-CV-0186, (N.D.N.Y Mar. 29, 2022), Dkt. No. 12.

[7] Deposition of William Alvarez at 25, 34, *Alvarez v. Bause et al.*, No. 22-CV-0186 (N.D.N.Y Sept. 25, 2024), ECF No. 49-2.

111.    In February 2020, Defendant Anzalone and several other officers brutally attacked Bauer in a bathroom at Marcy. During the attack, an officer punched Bauer in the head, threw him to the ground, and kicked him in the side. Defendant Anzalone and two sergeants entered the bathroom and either joined in kicking Bauer or witnessed and did not stop the attack. At one point, one of the sergeants smashed a clipboard over Bauer's head, leaving a deep laceration. Bauer's attackers then brought him to the Marcy Infirmary where Defendant Anzalone kicked Bauer's feet while he was forced to lie face down on the floor and took the photo of Bauer's injuries, depicted in Figure 15 below.



*Figure 15*

112.    To cover up their brutal assault, the Marcy officers concocted a series of lies about how Bauer sustained his injuries. The lies they told various medical personnel included that Bauer's injuries were self-inflicted, that the injuries were inflicted by another incarcerated person, and that the injuries "occurred by a seatbelt."

113.    To further try and cover up their misconduct, the officers fabricated disciplinary charges against Bauer, threatened him not to disclose the assault to anyone, and then placed him in solitary confinement.

114.    In 2022, Bauer filed a lawsuit in federal court detailing the above facts of his assault and the subsequent cover up.[8]

115.    The extensive contact New York civil rights attorney *Amy Jane Agnew* has had with incarcerated individuals and staff at Marcy since 2019 further corroborates the CANY Report.

116.    Agnew represents dozens of individuals at Marcy in connection with class action litigation against NYSDOCCS. Agnew's clients have consistently reported experiencing retaliation and violence when they attempt to assert their legal rights. Marcy staff have also retaliated against Agnew personally for helping her clients expose misconduct at the facility. Marcy staff has left threatening notes on her car, eavesdropped on her attorney-client communications, denied her access to her clients, and concocted false and defamatory reports to justify their actions. Marcy staff made it so difficult for Agnew to represent her clients that in 2024 she personally filed a lawsuit against Marcy officials, asking the Court to enjoin their misconduct.[9]

**Systemic Problem of NYSDOCCS Staff Abuse Permeates Prisons Across the State**

117.    The documented pattern of brutal staff violence against individuals incarcerated at Marcy is representative of a much broader pattern that has long plagued prisons across the state because NYSDOCCS leaders, including but not limited to Supervisory Defendants Medbury and Martuscello, have continuously turned a blind eye to the epidemic of violence, rather than taking any meaningful action to correct it.

---

[8] *Bauer v. Iodice et. al*, No. 22-CV-1007 (N.D.N.Y. Sept. 23, 2022), Dkt. No. 1.

[9] *Agnew v. D'Amore et. al*, No. 6:23-CV-1610 (N.D.N.Y Feb. 7, 2024), Dkt. No. 12.

118.    In 2015-2016, The Marshall Project and The New York Times conducted an exhaustive investigation into the problem of excessive force and cover ups in NYSDOCCS prisons (the "MP/NYT Investigation"), concluding that "a culture of brutality has been allowed to thrive in the prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other way."

119.    Beginning with a front-page story on February 28, 2015, the findings of the *MP/NYT Investigation* were published in a series of New York Times articles, which examined brutality by NYSDOCCS officers at prisons across the state and how they are rarely held accountable. Horrific experiences of incarcerated individuals that were highlighted in the series are summarized below:

(a)    As the result of a near-fatal beating by officers at Attica Correctional Facility ("Attica"), **George Williams** sustained a broken shoulder, several cracked ribs, and two broken legs. He also had a severe fracture of the orbit surrounding his left eye, a large amount of blood lodged in his left maxillary sinus, and multiple cuts and bruises. After nearly killing Williams, the officers engaged in an elaborate cover up, falsifying official reports and destroying evidence. Williams' case was the impetus for the MP/NYT investigation because it offered "a vivid lesson in the intractable culture of prison brutality."[10]

(b)    After a 2015 escape at Clinton Correctional Facility ("Clinton"), officers subjected *dozens of people* to days of unjustified violence in "what seemed like a campaign of retribution . . . . In letters reviewed by the Times, as well as prison interviews, [incarcerated people] described a shockingly similar catalog of abuses, including being beaten while handcuffed, choked and slammed against cell bars and walls." One notoriously violent officer at Clinton, known as "Captain America," would tie plastic bags around incarcerated people's necks and tighten them until the incarcerated people passed out.[11]

(c)    **Samuel Harrell and other people** incarcerated at Fishkill Correctional Facility

---

[10] Tom Robbins, *A Brutal Beating Wakes Attica's Ghosts*, NEW YORK TIMES (Feb. 28, 2015), https://www.nytimes.com/2015/03/01/nyregion/attica-prison-infamous-for-bloodshed-faces-a-reckoning-as-guards-go-on-trial.html.

[11] Michael Schwirtz and Michael Winerip, *After 2 Killers Fled, Prisoners Say, Beatings Were Next*, NEW YORK TIMES (Aug. 11, 2015), https://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html.

("Fishkill") were subjected to an organized "Beat Up Squad," which consisted of a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people and thereafter engaging in elaborate cover ups of their misconduct (similar to the Beat Up Squad that William Alvarez testified in 2023 had beat him and others at Marcy). The Beat Up Squad unjustifiably attacked and brutally killed Harrell in a prison building that was long "singled out as a violent place," including by CANY, which had previously specifically briefed the NYSDOCCS Commissioner on the unjustified abuse that routinely took place there.[12] In December 2020, various Fishkill staff settled state and federal court claims against them for an undisclosed amount for Harrell's brutal assault and death. *See Harrell v. New York State Dep't of Corr. and Cmty. Supervision*, No. 15-cv-7065 (S.D.N.Y. Dec. 7, 2020), Dkt. Nos. 214, 238.

(d)    **Ramon Fabian** was brutally assaulted by an officer at Ulster Correctional Facility as part of a troubling pattern of brutality, that, according to CANY, NYSDOCCS "has often ignored."[13]

(e)    **Leonard Strickland** was pushed down a flight of stairs and viciously beaten, nearly to death, by a group of officers at Clinton, fitting yet again into "a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department that rarely holds anyone accountable."[14] NYSDOCCS' then-Commissioner Anthony Annucci declined to be interviewed about Strickland's attack and the lack of accountability associated with it.

120.    In addition to detailing incidences of NYSDOCCS staff brutalizing incarcerated individuals, the MP/NYT Investigation examined the significant liability the State had faced, requiring hundreds of payouts to incarcerated victims of unconstitutional excessive force. The investigation found that between 2010 and 2015, the State paid out at least $8.8 million in settlements or jury awards in cases where officers were accused of prisoner abuse or excessive

---

[12] Michael Schwirtz and Michael Winerip, *Prison Guard 'Beatup Squad' is Blamed in New York Inmate's Death*, NEW YORK TIMES (Aug. 18, 2015), https://www.nytimes.com/2015/08/19/nyregion/fishkill-prison-inmate-died-after-fight-with-officers-records-show.html.

[13] Tom Robbins, *Guarding the Prison Guards: New York State's Troubled Disciplinary System*, NEW YORK TIMES (Sept. 27, 2015), https://www.nytimes.com/2015/09/28/nyregion/guarding-the-prison-guards-new-york-states-troubled-disciplinary-system.html.

[14] Michael Winerip and Michael Schwirtz, *An Inmate Dies, and No One Is Punished*, NEW YORK TIMES (Dec. 13, 2015), https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html.

force. The MP/NYT Investigation also noted that "[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly."[15]

121.    As with the accounts of brutalization reported in the MP/NYT Investigation, the highly publicized attack on **Kevin Moore** at Downstate Correctional Facility in 2013 demonstrates that NYSDOCCS has been on notice of systemic staff brutality for more than a decade. Officers beat Moore in an unprovoked attack so severe that his ribs and facial bones were broken and one of his dreadlocks was ripped out of his head. One officer kept Moore's dreadlock as a "trophy."

122.    On September 21, 2016, then-United States Attorney Preet Bharara announced federal charges against five of the officers involved in the attack on Moore, including separate charges related to the use of excessive force and filing of false reports. At the announcement, Bharara stated:

> Today's charges allege a brutal beating and a brazen cover-up by five state correction officers that left Kevin Moore, a 54-year-old inmate, with life-threatening injuries and in the hospital for 17 days. [Incarcerated people] may be walled off from the public, but they are not walled off from the Constitution. And when correction officers viciously beat an inmate in their charge, then collude among themselves to cover it up—as alleged here—they trample on the Constitution and the very laws they have sworn to uphold.[16]

---

[15] Tom Robbins, *New York State Prisons Take Steps to Track Complaints About Guards*, NEW YORK TIMES (Dec. 20, 2015), https://www.nytimes.com/2015/12/21/nyregion/new-york-state-prisons-take-steps-to-track-complaints-about-guards.html.

[16] Press Release, *Five Correction Officers Charged With Federal Crimes In Beating Of Inmate At Downstate Correctional Facility And Cover-Up*, U.S. DEP'T OF JUSTICE (Sept. 21, 2016), https://www.justice.gov/usao-sdny/pr/five-correction-officers-charged-federal-crimes-beating-inmate-downstate-correctional.

123.    As Bharara succinctly put it in a statement still devastatingly applicable today: "*Excessive use of force in prisons . . . has reached crisis proportions in New York State*."[17]

124.    Each of the five officers involved in Moore's beating was convicted on all charges. Two were convicted following a jury trial and received 100- and 87-months of incarceration, respectively, and their convictions and sentences were affirmed by the Second Circuit. *See United States v. Scott*, 979 F.3d 986, 988 (2d Cir. 2020). The other three officers pled guilty, with one receiving 40 months of incarceration and the others receiving sentences of time served.

125.    More *recent jury verdicts, settlements, criminal pleas, and judicial findings* lay bare that NYSDOCCS has allowed a culture of staff brutalization to persist and flourish even after the Moore case, even after the many accounts widely publicized in the MP/NYT Investigation, and even after countless more heinous acts came to light from earlier findings of liability. The following summaries of cases resolved since 2020 demonstrate that officers and other staff continue to routinely engage in extreme violence in New York prisons, operating with impunity because NYSDOCCS has allowed them to believe it will be tolerated. The cases summarized are merely exemplary; on information and belief they reflect just a small fraction of the many other instances of excessive staff force in NYSDOCCS' facilities:

(a)    In December 2024, New York Court of Claims Judge Anthony Brindisi ruled in favor of *28 people incarcerated at Marcy's sister facility, Mid-State Correctional Facility* ("Mid-State"),[18] holding that 30 officers acted in concert to commit assault and battery on them during a 2016 raid. *Aliaga v. State of New York*, 84 Misc. 3d 1246(A) (N.Y. Ct. Cl. Dec. 2, 2024). Judge Brindisi determined that the officers had subjected the men to, among other things, being kicked in the mouth "like a football punt," being used by an officer "like a trampoline," having genitalia harmfully touched by officers, and even being sodomized by officers inserting objects into their anus or rectum, while officers asked "how does it feel

---

[17] Tom Robbins, *'I Was Terrified': Inmates Say They Paid a Brutal Price for a Guard's Injury*, NEW YORK TIMES (Nov. 15, 2016), https://www.nytimes.com/2016/11/15/nyregion/new-york-prison-inmates-guards-beatings.html.

[18] Mid-State is directly across the street from Marcy, and on information and belief, the two facilities often share staff.

to be helpless." Judge Brindisi found it evident "from the testimony of both claimants and officers that supervisors, including the Superintendent and senior staff, were present at various points during the raid, observing the damage to the dorm and appearing pleased with the result." Judge Brindisi ultimately characterized the raid and atrocious physical abuse inflicted by the officers as a "modern-day 'salting the earth.'"

(b)     In October 2024, officers Rohail Khan and Michael Williams pled guilty to deprivation of rights under color of law in violation of 18 U.S.C. § 242 for the brutal beating of ***James Barton*** at Mid-State. *See United States v. Khan*, No. 5:24-CR-391 (N.D.N.Y. Oct. 29, 2024), Dkt. No. 4; *United States v. Williams*, No. 5:24-cr-00323 (N.D.N.Y. Oct. 23, 2024), Dkt. No. 5. Khan and Williams assaulted Barton in a brutal attack they called the "George Floyd challenge." Khan and Williams, along with several other officers spent more than ten minutes punching Barton in his head, face, eyes, chest, back, stomach, legals, buttocks, and groin until he fell to the floor. The officers then proceeded to kick and stomp Barton, put him in a chokehold, and punch him further. The officers' plea agreement acknowledged the truth of these and many of the facts Barton alleged in a subsequent civil lawsuit. *See Barton v. Khan et al.*, 24-cv-01433 (N.D.N.Y. Nov. 25, 2024), Dkt. No. 1.

(c)     In November 2023, a federal jury awarded the family of ***Terry Cooper*** $9.25 million in connection with his fatal beating by Clinton officers who beat Cooper so severely it caused a fatal asthma attack, deprived him of his asthma pump, then covered up the attack and denied the use of force. *See Cooper v. Clancy, Case* No. 9:19-cv-00362 (N.D.N.Y. Nov. 23, 2023), Dkt. Nos. 52, 226.

(d)     In 2021 and 2022, NYSDOCCS settled three separate federal lawsuits on behalf of at least 20 officers who worked at Green Haven Correctional Facility ("Green Haven"). One suit involved the brutal assault of ***Carlos Garcia*** by six officers who put him into a chokehold until he lost consciousness then slammed his head against a wall while he was handcuffed. The second suit involved three separate assaults on ***Benjamin Stephens*** by nine officers whose abuses included smashing his head so hard he had seizure and choking him. The third suit was brought by ***Nakia Rose*** against five officers who, among other things, at a sergeant's direction, cuffed him, brought him to the floor, kicked and punched him and twisted his ankles. *See Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y Feb. 7, 2022), Dkt No. 101; *Stephens v. Venetozzi*, No. 13-cv-5779 (S.D.N.Y. Feb. 7, 2022), Dkt. No. 381; *Rose v. Garritt*, No. 16-cv-3624 (S.D.N.Y. July 30, 2021), Dkt. No. 128.

(e)     In July 2022, officer Aaron Finn pled guilty to violating 18 U.S.C. § 242 in connection with the brutal beating of ***Melvin Virgil*** at Green Haven. *United States v. Finn*, No. 7:21-cr-00650-NSR (S.D.N.Y Oct. 26, 2022), Dkt. No. 28. As alleged in Virgil's subsequent civil case and acknowledged in large part in Finn's plea, Finn handcuffed Virgil and repeatedly smashed his head into a wall and steel bars as other officers silently watched. Multiple officers fabricated reports of misconduct against Virgil. Finn's attack only was uncovered because BWCs had captured it. *See Virgil v. Finn*, No. 22-cv-3169 (S.D.N.Y. Mar. 24, 2023), Dkt. No. 74.

(f)     In April 2021, three Fishkill officers were found liable by a jury for using

excessive force against **Nicholas Magalios** in the amount of $1 million. *Magalios v. Peralta*, No. 19-cv-6188 (S.D.N.Y. June 1, 2021), Dkt. No. 44. One officer held down Magalios and other officers brutally kicked and punched him while others looked on and did nothing. Magalios suffered significant bruising, marks, abrasions, lacerations and aggravation of a pre- existing shoulder injury, which required surgery. Judge Seibel remarked that the "Defendants' conduct was reprehensible, violent, deceitful, and malicious."

(g)    In May 2020, Sullivan Correctional Facility ("Sullivan") officers whose excessive force killed **Karl Taylor** settled claims against them for $5 million. *See Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (S.D.N.Y. May 5, 2020), Dkt. No. 429. One officer struck Taylor in the back of his head several times with his fists and a number of other officers beat him on his way to the infirmary (where he was later pronounced dead), leaving an extensive pool of blood that took 1.5 hours to clean up.

(h)    In February 2020, a U.S. district court jury awarded **Jerome Anderson** $650,000 after finding a sergeant and three officers at Green Haven liable for excessive force. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Feb. 24, 2020), Dkt. No. 133. The officers coordinated an attack on Anderson by taking him to an area lacking surveillance where they punched, stomped, and kicked him for several minutes. *See id.*, Dkt. No. 161.

(i)    In February 2020, Sullivan officers settled claims against them for $500,000 concerning an allegedly grievous and sustained assault on **Anthony Medina**, a visually impaired incarcerated person. *See Medina v. Buther*, No. 15-cv-1955 (S.D.N.Y. Feb. 3, 2020), Dkt. No. 505; *Medina v. Barrett*, No. 14-cv-6377 (W.D.N.Y.), Dkt, No, 180. Officers allegedly took turns punching Medina while he was handcuffed, broke his fingers, chipped his tooth, strangled him with the cord of a device he used to help him read, and sexually assaulted him. *See Medina v. Butler*, Dkt. No. 447.

126.    Unsurprisingly, many of the cases summarized above involved egregious cover ups by NYSDOCCS officers, reflecting the existence of a much larger systemic problem and an organizational culture that condones lies. For example:

(a)    Following Kevin Moore's "brutal gang-style assault," the officers involved conspired to "engage[] in an elaborate cover-up of the crime they had committed." Their cover-up included manufacturing fake injuries to make it appear that Moore had been the aggressor and creating false records, including false use of force reports, that memorialized the fabricated conspiratorial story the officers had made up. Five of the officers involved either were convicted by a jury of, or pled guilty to, among other things, violations of 18 U.S.C. § 1519, which criminalizes the falsification of records.

(b)    Evidence in the Nicholas Magalios case showed that the officers involved "created false reports and gave false testimony that categorically denied using any force against Plaintiff and contended that Plaintiff fabricated the story entirely." According to

Judge Seibel, the jury "necessarily found that Defendants lied repeatedly through those reports and that testimony, demonstrating the malicious and deceitful nature of their conduct." In affirming an award of punitive damages, Judge Seibel specifically noted that "similar acts often go undetected in correctional facilities." Judge Seibel also explained that "'[r]eprehensible' may not be a strong enough word to describe Defendants' conduct here. They have disgraced themselves and their office, and such conduct seems to be all too acceptable among certain employees of New York's prison system."

(c)     In the case of Anthony Medina, a sergeant prevented medical staff from properly evaluating Medina after the attack, and prohibited Medina from discussing the assault with medical personnel. The officers falsely told medical staff that Medina had attempted suicide and that they had intervened. *See Medina v. Buther*, No. 15-cv-1955 (S.D.N.Y. Aug. 21, 2019), Dkt. No. 447.

(d)     The judge in the Jerome Anderson case noted evidence that each of the officers involved concocted a fabricated story to cover up their assault of Anderson. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Oct. 20, 2020), Dkt. No. 161.

(e)     In the case of Samuel Harrell, when officers and medical personnel could not resuscitate Harrell after the beating and finally called an ambulance, they fabricated that he had overdosed and the NYSCOBA spokesperson falsely informed media he had overdosed, all while Harrell's autopsy determined there were no illegal drugs in his system and his cause of death was a homicide caused by physical altercation with correction officers. Officers further falsely that claimed Harrell had falsely assaulted them. *See Harrell v. New York State Department of Corrections and Community Supervision*, No. 15-cv-7065 (S.D.N.Y. Aug. 14, 2019), Dkt. No. 214.

127.     Other recent examples of NYSDOCCS covering up their unlawful assaults of incarcerated people include those documented in *Keyes v. Annucci*, No. 18-cv-0372 (N.D.N.Y. Sept. 6, 2022), Dkt. No. 128 (officers settled claims against them alleging that they filed false misbehavior reports to retaliate against several incarcerated people that had reported officers' excessive use of force); *Patterson v. Patterson*, No. 16-cv-00844 (W.D.N.Y. Jan. 29, 2020), Dkt. Nos. 29, 66 (several officers settled claims that they deliberately falsified an incarcerated person misbehavior report as part of a conspiracy to cover up their assault of incarcerated person John P. Patterson); and *Walker v. Williams*, No. 16-cv-645 (W.D.N.Y.), Dkt. No. 1, 69-78 (officers settled claims that they struck incarcerated person Jerard Walker many times with a baton on his ribs, back, and head, and then submitted false misbehavior reports to cover up their assault).

128.    On information and belief, as with the summaries of excessive force summarized herein, the above summaries of officers' lying to cover up their assaults on incarcerated people reflect just a small number of the many other instances of this conduct systematically occurring throughout NYSDOCCS.

129.    Indeed, in 2023, the New York Times published the results of another investigation focused on analysis of 5,600 NYSDOCCS disciplinary records dating back to 2010 ("MP/NYT Disciplinary Record Investigation").[19]

130.    The 2023 **MP/NYT Disciplinary Record Investigation** found that staff cover ups of excessive force incidents were "commonplace" across NYSDOCCS.[20]

131.    As reported in the New York Times, "[t]he records illustrate how cover ups make it difficult to hold officers accountable using excessive force. They also reveal a typical playbook: Guards often work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims and have them sent to solitary."

132.    Defendant Martuscello was interviewed in connection with the 2023 MP/NYT Disciplinary Record Investigation and he told reporters that he was not surprised that false reports often accompany instances of excessive force. "There has to be some manipulation of facts," Martuscello said.

133.    The 2023 MP/NYT Disciplinary Record Investigation highlighted the case of **Chad Stanbro**, who was paralyzed in 2018 after a guard knelt on his neck while he received

---

[19] Alysia Santo, Joseph Neff, and Tom Meagher, *Guards Brutally Beat Prisoners and Lied About it. They Weren't Fired*, NEW YORK TIMES (May 25, 2023), https://www.nytimes.com/2023/05/19/nyregion/ny-prison-guards-brutality-fired.html.

[20] Joseph Neff, Alysia Santo, and Tom Meagher, *How a 'Blue Wall' Inside N.Y. State Prisons Protects Abusive Guards*, NEW YORK TIMES (May 22, 2023), https://www.nytimes.com/2023/05/22/nyregion/ny-state-prison-guards-abuse.html.

offsite dental treatment. At some point during the procedure, Mr. Stanbro lost consciousness and when he awoke one officer was kneeling on his neck while the other two held him down on the ground. In the aftermath of the incident, all three guards wrote false reports about how Mr. Stanbro sustained his injuries. Among the many lies they told was that Mr. Stanbro assaulted them, for which the newly paralyzed Mr. Stanbro had to spend 40 days in solitary confinement. Mr. Stanbro later sued the officers, and a federal jury awarded him over $1.6 million in damages against the officers. *See Stanbro v. Palou*, No. 7:20-cv-01591-KMK (S.D.N.Y. Feb. 21, 2023), Dkt. No. 238.

134.    The 2023 MP/NYT Disciplinary Record Investigation also highlighted the case of **Roy Harriger**, who was beaten in the back of his head with a nightstick by an unidentified guard at Attica.  The assault occurred sometime after a guard picked him up at a sergeant's office on his cell block and before he arrived unconscious at the infirmary. To cover up the beating, Attica guards concocted a story about Mr. Harriger falling in the shower. Ruling in Mr. Harriger's favor in his subsequently filed lawsuit, New York Court of Claims Judge Minarik said she was "appalled." She also ruled that Attica staff's story that Mr. Harriger had fallen in the shower was a "fabrication," and she awarded him $2 million. *See Harriger v. State of New York*, Claim No. 126681 (Nov. 18, 2018 and Nov. 24, 2020).

135.    The extensive and thoroughly documented history of NYSDOCCS staff brutally attacking—and in the worst cases like this one, killing—incarcerated people, then conspiring to cover up their crimes and elude accountability, can leave no doubt that Supervisory Defendants Medbury and Martuscello knew that the system they oversaw was dangerously broken. They knew that people like Robert faced a serious risk of harm by officers who felt free to act with impunity,

but they took no meaningful steps to abate the risk of harm. The result was fatal for Robert, whose group of killers never even flinched as they beat him to death.

### Count 1 – 42 U.S.C. § 1983 – Excessive Force
### (Against All On-Scene Defendants)

136.    All Paragraphs of this Complaint are incorporated by reference in this Count.

137.    As described more fully above, the On-Scene Defendants violated Robert's Eighth Amendment right to be free from excessive force. Information known to date demonstrates that the excessive force included, at minimum, the On-Scene Defendants: (i) punching, hitting, kicking or otherwise striking various parts of Robert's body, including his face, stomach, side and groin area; (2) using their body to impose excessive pressure on various parts of Robert's body, including his shoulders, knees, and chest; (3) choking Robert with their hands or arms around his neck and lifting him by the neck; and (4) putting an object into Robert's mouth, impeding his ability to breathe.

138.    As described more fully above, the degree of force used by the On-Scene Defendants was objectively unreasonable because Robert posed no security risk and their attack on him served no legitimate penological or government interest and was apparently intended to injure Robert.

139.    All On-Scene Defendants were subjectively aware that Robert's constitutional rights were being violated during the fatal beating because they observed and heard Robert's assault as it was occurring in and around their presence.

140.    All On-Scene Defendants had a legal duty to intervene to prevent or halt their fellow On-Scene Defendants' use of excessive force against Robert.

141.    In the manner described more fully above, the On-Scene Defendants acted willfully, wantonly, recklessly, maliciously, and with depraved and deliberate indifference to Robert's life.

142.    In brutally assaulting and failing to intervene to protect Robert, the On-Scene Defendants inflicted a cruel and unusual punishment and used unlawfully excessive force against Robert in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

143.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

144.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

**Count 2 – 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need**
**(Against All On-Scene Defendants)**

145.    All Paragraphs of this Complaint are incorporated by reference in this Count.

146.    As described more fully above, each On-Scene Defendant violated Robert's Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate indifference to Robert's obviously dire medical condition and serious need for medical treatment.

147.    As described more fully above, all On-Scene Defendants observed and knew that Robert suffered significant injuries throughout his assault, and it was obvious to each of them that Robert required medical attention.

148.    All On-Scene Defendants were subjectively aware that failing to provide Robert with immediate medical care put him at risk of suffering serious bodily harm or death.

149.    All On-Scene Defendants had a legal duty to act to ensure that Robert received medical treatment for his serious medical condition.

150.    Nevertheless, the On-Scene Defendants consciously disregarded that risk by failing to take steps to provide Robert with medical treatment or by actively interfering with the provision of medical treatment by others. The On-Scene Defendants took no steps to mitigate the risk that Robert would suffer serious bodily harm or death.

151.    The On-Scene Defendants' deliberate indifference to Robert's obvious need for medical treatment inflicted a cruel and unusual punishment against Robert in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

152.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

153.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

### Count 3 – 42 U.S.C. § 1983 – Failure to Protect
### (Against Supervisory Defendants Medbury and Martuscello)

154.    All Paragraphs of this Complaint are incorporated by reference in this Count.

155.    As described more fully above, Supervisory Defendants Medbury and Martuscello and other as yet identified supervisory individuals violated Robert's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from a substantial risk of serious harm.

156.    As described more fully above, Supervisory Defendants Medbury and Martuscello knew that NYSDOCCS' culture of brutalization and cover ups posed a substantial risk of serious harm to incarcerated individuals like Robert. On information and belief, they possessed this

knowledge not only from their own experience in NYSDOCCS, but also through independent reports, investigative reporting, jury verdicts, and criminal prosecutions concerning NYSDOCCS correctional staff, including those at Marcy, as described above.

157.    On information and belief, Supervisory Defendants Medbury and Martuscello acted with deliberate indifference to this risk of harm by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Robert.

158.    Supervisory Defendants Medbury and Martuscello were personally responsible for ensuring the safety of incarcerated individuals under their care and custody, including Robert. They had the power and responsibility to implement and enforce policies and practices to protect incarcerated people at Marcy from the use of excessive force by staff.

159.    As a direct and proximate cause of the deliberate indifference described in this Count, the On-Scene Defendants were emboldened to brutalize Robert, confident in the belief that their misconduct would never be subject to any meaningful scrutiny. When the On-Scene Defendants attacked and killed Robert, they reasonably believed that they could brutalize incarcerated individuals like Robert with impunity (so long as their actions were not captured on video), trusting that any evidence of their wrongdoing would be covered up by fellow officers.

160.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

161.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

## Count 4 – State Law Battery
### (Against Defendants Farina, Kessler, Kingsley, Galliher, Anzalone, Walrath and other as yet determined On-Scene Defendants)

162.    All Paragraphs of this Complaint are incorporated by reference in this Count.

163.    As described more fully above, Defendants Farina, Kessler, Kingsley, Galliher, Anzalone, Walrath and others as yet determined On-Scene Defendants, intentionally touched Robert without his consent and caused an offensive bodily contact when they used excessive force on him.

164.    As described more fully above, the misconduct described in this Count was objectively unreasonable and unnecessary under the circumstances.

165.    As described more fully above, the misconduct described in this Count was undertaken to harm Robert and offends a reasonable sense of personal dignity and is otherwise wrongful.

166.    As described more fully above, as a direct result of the misconduct described in this Count, Robert suffered physical injury and severe conscious pain and suffering and died.

### Count 5 – State Law
### Negligence, Gross Negligence, and Wrongful Death

167.    All Paragraphs of this Complaint are incorporated by reference in this Count.

168.    Defendants owed Robert a duty of reasonable care when Defendants took custody of Robert and transported him from Mohawk Correctional Facility to Marcy Correctional Facility and further owed him a duty of reasonable care to provide prompt medical assistance when he was fatally injured by the actions of Defendants as detailed above.

169.    Defendants breached such duty of reasonable care to Robert and acted with gross negligence and reckless indifference to his safety and his life by failing to cease their physical assault, failing to intervene, and failing to provide immediate medical assistance and being otherwise indifferent to his suffering and safety.

170.    The On-Scene Defendants who participated in the assault and battery of Robert were negligent, grossly negligent, and reckless in continuing their physical abuse to the point of causing his death.

171.    The On-Scene Defendants who did not directly participate in the beating breached the duty of care they owed to Robert by standing by and observing their colleagues' cruel abuse and use of deadly force against Robert and failing to intervene to protect Robert and save his life, both before lethal force was applied and after the beatings ended.

172.    The acts and omissions of the On-Scene Defendants were all committed within the scope of their employment and duties as NYSDOCCS employees and agents.

173.    As a direct and proximate result of Defendants' negligence, gross negligence, and reckless indifference, Robert suffered severe physical and emotional pain and suffering and was caused to die.

**Damages**

174.    Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr., is entitled to an award of compensatory damages for Robert's severe physical and emotional conscious pain and suffering prior to death.

175.    Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr.'s distributees, is entitled to an award of compensatory damages for causing Robert's wrongful death, including the pecuniary value of their loss of support, nurturing, and guidance incurred from the death of their father.

176.    Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr. and its distributees, is entitled to an award against all Defendants

of loss-of-life or hedonic damages for the death of Robert caused by the deprivation of his civil rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

177.    Based upon the facts and legal claims set forth above, and specifically the intentional, reckless, and grossly negligent conduct of the individual Defendants, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr. and its distributees, is entitled to an award of punitive damages against Defendants.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

Dated: January 15, 2025

Respectfully Submitted,

By: /s/ Stephen G. Schwarz
Stephen G. Schwarz
Lesley E. Niebel
FARACI LANGE, LLP
1822 South Winton Road, Suite 1
Rochester, New York 14618
Tel: 585.325.5150
Fax: 585.325.3285
sschwarz@faraci.com
lniebel@faraci.com

Elizabeth Mazur
Matthew J. Piers (*admission pending*)
Caryn C. Lederer
Kate Schwartz
HUGHES SOCOL PIERS RESNICK & DYM, Ltd.
70 W. Madison Street Suite 4000
Chicago, Illinois 60602
Tel: 312.580.0100

Fax: 312.580.1994
emazur@hsplegal.com
mpiers@hsplegal.com
clederer@hsplegal.com
kschwartz@hsplegal.com

*Attorneys for Plaintiff*