**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――――

CRESSIDA A. DIXON, Monroe County Public
Administrator, in her capacity as Administrator of the
ESTATE OF ROBERT L. BROOKS SR.,

              Plaintiff,

         v.

ANTHONY FARINA, MATTHEW GALLIHER,
NICHOLAS ANZALONE, DAVID KINGSLEY,
NICHOLAS KIEFFER, ROBERT KESSLER,
MICHAEL FISHER, CHRISTOPHER WALRATH,
MICHAEL ALONG, SHEA SCHOFF, DAVID
WALTERS, MICHAEL MASHAW,
GLENN TROMBLEY, KYLE DASHNAW,
ABEDIN MEHMEDOVIC, DANIELLE MEDBURY,
DANIEL MARTUSCELLO III, and other as yet
identified individuals.

              Defendants.

―――――――――――――――――――――――――――――

**No. 9:25-cv-0068-AMN-ML**

**FIRST AMENDED**
**COMPLAINT**

**(JURY TRIAL DEMANDED)**

      Plaintiff CRESSIDA A. DIXON, Monroe County Public Administrator, in her capacity as

Administrator of the ESTATE OF ROBERT L. BROOKS SR., by her undersigned counsel,

complains against Defendants ANTHONY FARINA, MATTHEW GALLIHER, NICHOLAS

ANZALONE, DAVID KINGSLEY, NICHOLAS KIEFFER, ROBERT KESSLER, MICHAEL

FISHER, CHRISTOPHER WALRATH, MICHAEL ALONG, SHEA SCHOFF, DAVID

WALTERS, MICHAEL MASHAW, GLENN TROMBLEY, KYLE DASHNAW, ABEDIN

MEHMEDOVIC, DANIELLE MEDBURY, DANIEL MARTUSCELLO III, and other as yet

identified individuals as follows:

## INTRODUCTION

1.      This is a case about the deadly use of force by New York State Department of Corrections and Community Supervision ("NYSDOCCS") staff on Robert L. Brooks Sr. ("Robert"). On December 9, 2024, prison staff at Marcy Correctional Facility ("Marcy") repeatedly punched, kicked, and otherwise physically attacked Robert while he was at all times handcuffed, restrained, and completely defenseless. Robert's fatal beating by the people charged with protecting him—a prolonged beating so severe and grotesque that it shocks the conscience—occurred because of the ongoing tolerance of staff violence against people incarcerated at Marcy and other prisons throughout the NYSDOCCS system. Robert's attackers systematically and casually beat him to death. Other Defendants assisted in the fatal beating by further restraining Robert when he was already handcuffed and then also later shackled. Still other Defendants simply stood by and observed the fatal beating as if it were a normal and common occurrence at Marcy. On information and belief—it was exactly that.

2.      Robert had done nothing to justify the use of any force against him, much less deadly force.

3.      Robert's killers were unaware that some of their own body-worn cameras ("BWC"s) passively recorded much of the attack on video. As Marcy staff brutalized Robert, they believed that their actions would never see the light of day.

4.      None of the Defendants reported the attack. Instead, after killing Robert, they concocted lies to attempt to cover up their actions and then went about their daily business as usual.

5.      The video footage showing Robert's fatal assault reveals a chilling scene. It depicts several large white law enforcement officers torturing a bloodied Black man who is restrained, helpless, and struggling to maintain consciousness. The perpetrators' brutality goes on and on and on over the course of roughly ten minutes. It continues past several initial rounds of beatings. It

continues beyond one officer hammering Robert repeatedly with the heel of a shoe and another officer lifting Robert by the neck using a chokehold. The brutality continues even beyond Robert losing the ability to sit upright and well after Robert falls into a state of semiconsciousness.

6.      Almost as disturbing as the video's depiction of violence perpetrated on Robert by at least six Defendants is the demeanor of at least nine other Defendants who all stood by watching Robert's killing. Rather than making any effort to end the inhumane brutality, every staff member who was present casually observed Robert's prolonged attack as if it were a routine activity. All remained calm and utterly unfazed by what was happening. Some appear bored. Others appear amused, visibly smiling or laughing at what seems to have been a spectator sport to them. The brutal attack on Robert was very obviously business-as-usual for all involved.

7.      The video is frightening and very difficult to watch, but it reflects the dark and dangerous reality that individuals incarcerated at Marcy face severe staff violence on a regular basis. It reveals precisely what Marcy staff do to those incarcerated in the prison when they believe no one is watching. It evidences the rampant abuses that New York prisoners as well as the Correctional Association of New York ("CANY")[1] have reported and warned about for years. As CANY recognized, "Mr. Brooks's death cast a harsh light on the grim realities of life within our state prisons, realities that have been documented by [CANY] for decades." For far too long, CANY's warnings that the lives of people in NYSDOCCS are profoundly at risk and those individuals' pleas for help and protection have been met with profound silence.

---

[1] CANY is the State of New York's legal designee for providing independent oversight and monitoring of New York's prisons.

8.    After viewing the video of Robert's killing, state leaders and prison officials decried the officers' actions and publicly acknowledged the existence of systemic problems in New York's prisons.

9.    Governor Kathy Hochul, after viewing the video, stated that she was "outraged and horrified" by what she saw. She described Roberts's killing as "senseless" and acknowledged that "Mr. Brooks and his family did not deserve this . . . . The system failed Mr. Brooks[.]"

10.    NYSDOCCS Commissioner Daniel Martuscello III also issued a public statement that watching the video of Robert's fatal beating made him feel "deeply repulsed and nauseated." In the same statement, Martuscello acknowledged that there was "no excuse" for the officers' actions, and he recognized the need for "institutional change" to prevent future similar occurrences.

11.    The overdue need for institutional change has been known to NYSDOCCS leaders, including Defendant Martuscello, for far too long. In the wake of Robert's killing, CANY issued a telling reminder that it had been sounding alarms for years about the culture of violence at Marcy and the risk to Robert Brooks and others there: "The body-worn camera footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility and other prisons in the state."

12.    There can be no doubt that responsibility for Robert's killing extends beyond the Marcy staff present at the scene of his fatal beating. Robert's killers did not act in a vacuum. Their actions were the entirely foreseeable result of NYSDOCCS leaders knowingly maintaining an utterly broken system that condones, tolerates, or turns a blind eye to violence on incarcerated people, as those leaders have done for decades.

13.     Robert's beating and death occurred precisely because of that broken system, which is undergirded by a sustained acceptance of brutal staff violence from the highest level of NYSDOCCS. It has caused Defendants and others who work at Marcy and other New York prisons to systemically engage in violence, including the violence that killed Robert.

14.     With this lawsuit, Robert's Estate, on behalf of his children, seeks to hold accountable every individual responsible for his killing.

## JURISDICTION AND VENUE

15.     This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Robert Brooks' civil rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution.

16.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## PARTIES

18.     Cressida A. Dixon is the Monroe County Public Administrator and the duly appointed Administrator of the Estate of Robert L. Brooks Sr. At all times relevant to this Complaint, Robert L. Brooks Sr. was a resident of Rochester, New York and was in the care and custody of NYSDOCCS.

19.     Defendants Anthony Farina, Matthew Galliher, Nicholas Anzalone, David Kingsley, Nicholas Keiffer, Robert Kessler, Michael Fisher, Christopher Wallrath, Michael Along, Shea Schoff, David Walters, Michael Mashaw, Glenn Trombley, and Kyle Dashnaw (collectively, together with Defendant Mehmedovic, the "On-Scene Defendants") are current or former employees of the State of New York who worked at Marcy, all of whom were present on-scene while Robert's fatal beating occurred. Some of the On-Scene Defendants directly participated in

carrying out Robert's fatal beating. Others stood by and did nothing to stop it. Two of the On-Scene Defendants held supervisory positions within NYSDOCCS.

20.     Defendant Abedin Mehmedovic was employed by an as-yet unknown private staffing agency to work at Marcy. Along with the other On-Scene Defendants, Mehmedovic was present on-scene while Robert's fatal beating occurred.

21.     At all times relevant to this Complaint, Defendant Danielle Medbury was the Acting Superintendent of the Marcy Correctional Facility. In this role, Defendant Medbury set policies, customs, and practices for Marcy; assumed responsibility for overseeing all aspects of day-to-day life at Marcy; and was responsible for ensuring the safety of people incarcerated at Marcy.

22.     At all times relevant to this Complaint, Defendant Daniel Martuscello III was Commissioner of NYSDOCCS. In this role, Defendant Martuscello set policies, customs, and practices for NYSDOCCS and was responsible for ensuring the safety of individuals in NYSDOCCS custody. Defendant Martuscello had expansive personal knowledge of issues affecting NYSDOCCS. Prior to becoming Commissioner, Martuscello had nearly three decades of experience working with NYSDOCCS in various capacities. For six years prior to becoming Commissioner, Martuscello served as second-in-command and principal advisor to Commissioner Anthony Annucci in the role of Executive Deputy Commissioner, where he coordinated the activities of and provided general direction to the NYSDOCCS Executive Team, with an emphasis on labor relations. Prior to that, from 2012 to 2017, Martuscello served as the Deputy Commissioner for Administrative Services, in which role he was responsible for addressing problems in the NYSDOCCS staff disciplinary system. In each of these roles, Defendant Martuscello had authority over the NYSDOCCS systems in place for investigating allegations of

correctional officer abuse and kept himself informed about significant staff misconduct allegations, lawsuits, investigations, and news coverage about staff abuse within NYSDOCCS.

23.     At all times relevant to this Complaint, every Defendant named in the Complaint was acting within the scope of his or her employment and under color of law.

## FACTS

24.     On the evening of December 9, 2024, NYSDOCCS staff transported Robert from Mohawk Correctional Facility ("Mohawk") in Rome, New York, to Marcy in Utica, New York, approximately seventeen miles away.

25.     Shortly after Robert arrived at Marcy, Defendants Anzalone, Kieffer, and Walrath assaulted Robert on two occasions: first inside an arsenal building and second just outside of the Marcy infirmary building. On information and belief, neither of these beatings was captured by video.

26.     Publicly available video shows Robert was on the ground outside of the Marcy infirmary building with his hands handcuffed behind his back, while surrounded by Defendants Kieffer, Mashaw, Kessler and Kinglsey.

27.     After Defendants Trombly and Farina approached the group, two of the Defendants lifted Robert off the ground and began moving him toward the Marcy Infirmary Building with his arms extended above his head and his upper torso parallel to the ground (*see* Figure 1 below). The other four Defendants in the group followed.



*Figure 1*

28.     Approximately one minute later, at 9:22 p.m., Robert entered the Infirmary Building carried by three Defendants. Defendants Kessler and Anzalone each held Robert by his arms and Defendant Kingsley held Robert by both of his feet, carrying him in a contorted face-down position (*see* Figure 2 below).



*Figure 2*

29.    The Defendants proceeded to carry Robert into the open door of a medical examination room, in and around which other On-Scene Defendants were already gathered.

30.    On information and belief, the On-Scene Defendants knew that there were no surveillance cameras in Marcy's medical examination rooms and they deliberately took Robert to that location so there would be no recordings of what they intended to do to him.

31.    Inside the room, with the door left open, Defendants placed Robert on an examination table face down on his stomach. One Defendant used his knee and hands to forcibly restrain Robert's legs, while at least one other Defendant used his arms to forcibly restrain Robert's upper body (*see* Figure 3 below).



*Figure 3*

32.     Thereafter, over the course of approximately ten minutes, numerous On-Scene Defendants continued to viciously batter Robert in myriad ways without any provocation whatsoever on Robert's part. Robert's hands remained restrained behind his back the entire time, leaving him no means to defend himself against Defendants' attacks or soften their blows.

33.     The continued assault on Robert included, but was not limited to, the actions described in the following paragraphs, that were all recorded on video.

34.     Defendant Anzalone repeatedly punched Robert while Robert was on his back on the examination table, leaving his face visibly bloodied and swollen when Defendants then raised his upper torso (*see* Figure 4 below).



*Figure 4*

35.    Defendant Farina forcibly tried to shove a white cloth into Robert's mouth while Defendant Kinglsey kept both of his hands grasped around Robert's neck, impairing Robert's ability to breathe (*see* Figure 5 below).



*Figure 5*

11

36.     When Robert struggled to move his head for breath, Defendant Anzalone grabbed the front of Robert's shirt and Defendant Kingsley pulled back on Robert's neck as Defendant Farina rapidly punched Robert in the face and neck or shoulder area, with hard closed-fist blows, at least six times.

37.     After Defendant Farina's initial punches to Robert's face made Robert fall back onto the examination table, Defendant Anzalone punched Robert in the groin or leg area at least twice as Defendant Farina simultaneously continued to punch Robert's face or shoulder area.

38.     Seconds later, Defendant Kinglsey lifted Robert's upper torso back up off the table with one hand behind Robert's head, and another hand around Robert's neck, so that Robert was again in a sitting position on the edge of the table (*see* Figure 6 below).



*Figure 6*

39.    Defendant Kingsley then proceeded to position both of his hands around Robert's neck and lift Robert's buttocks up off the table two consecutive times by pulling up on Robert's neck (*see* Figure 7 below).



*Figure 7*

40.    Defendant Kingsley next repositioned himself by placing his right arm further around Robert's neck, in a chokehold, and once again forcefully raised Robert up off the examination table by his neck (*see* Figures 8 and 9 below).

41.    At the same time, Defendant Farina threw away the white cloth that he previously tried to shove into Robert's mouth, removed one of his gloves, and examined the hand he had just used to repeatedly strike Robert (*see* Figure 8 below). Defendant Farina then opened and closed his fingers and shook out his hand in an apparent effort to relieve the self-inflicted pain caused by his repeated blows to Robert's face and head.



*Figure 8*



*Figure 9*

42.    Defendant Kingsley then forcefully shoved Robert back down to a seated position on the examination table.

43.    Defendant Anzalone next proceeded to repeatedly beat Robert in the stomach with the back of one of Robert's shoes.

44.    Next, Defendant Anzalone and Defendant Kingsley pushed Robert's head and shoulders back down onto the examination table once again.

45.    Defendant Anzalone, Defendant Kingsley, and Defendant Galliher then restrained Robert's upper torso, while Defendant Farina kicked his foot into Robert's groin (*see* Figure 10 below).



*Figure 10*

46.    Defendant Farina shifted his weight to push his foot deeper into Robert's groin or lower stomach area for approximately 8 seconds while the three other Defendants surrounding Robert continued to restrain Robert's upper body.

47.    Defendant Walrath then joined the assault on Robert's groin area by holding at least one of Robert's legs to prevent him from closing them to protect himself.

48.    Thereafter, Defendant Anzalone proceeded to punch Robert in the stomach.

49.    Defendants Walrath and Farina then forcibly restrained Robert's legs and feet with their hands as Robert lay on his back on the examination table, while at the same time other Defendants, including Defendants Kingsley and Anzalone, applied pressure to Robert's upper body area for an extended period, further restricting his ability to breathe.

50.    When Robert's body began writhing, Defendant Farina punched Robert three times in the area between Robert's buttocks and upper thighs.

51.    While Defendant Farina was delivering those punches to Robert's right side, Defendant Walrath delivered multiple punches to Robert's left side (*see* Figure 11 below).



*Figure 11*

52.    While Robert remained on his back on the examination table, with his lower ribcage area visibly extended, Defendant Anzalone struck Robert's stomach twice with his hands, provoking no visible response from Robert.

53.    After being prompted by another Defendant, Defendant Anzalone then gave Robert a sternum rub.[2] Robert's stomach rose up, demonstrating that he was still responsive to pain.

54.    Defendants, including Defendant Galliher, then placed Robert's ankles in leg cuff restraints (also known as "leg irons") while Robert remained on his back on the examination table with his hands restrained behind him.

55.    For an extended time thereafter, Defendant Kingsley kept one of his hands on Robert's neck and his other hand on Robert's left arm, while Defendant Anzalone used one of his hands to restrain Robert's right shoulder. During this period, Robert's body writhed again with his ribcage visibly extended (*see* Figure 12 below), and Defendant Anzalone intermittently used his free hand to poke the side of Brooks' stomach and strike the side of Brooks' ribcage.



*Figure 12*

---

[2] A sternum rub is a technique typically used to assess whether an unconscious person is alive by applying a painful stimulus to the middle of the person's chest to test the person's responsiveness.

56.     Defendant Anzalone then shifted his weight to push his other hand down harder on Robert's right shoulder.

57.     Next, Defendants Kinglsey and Anzalone forcefully yanked Robert upright into a sitting position at the edge of the examination table by pulling up on his shoulders while Defendant Anzalone simultaneously dug his fist into Robert's lower stomach area.

58.     Defendant Kingsley and Defendant Anzalone held Robert by the back of his neck to allow Defendant Anzalone to deliver a hard, closed-fist punch to Robert's stomach (*see* Figure 13 below).



*Figure 13*

59.     Defendant Anzalone stopped supporting the right side of Robert's body as he stepped away to retrieve rubber gloves, leaving Robert to struggle to hold himself fully upright (*see* Figure 14 below).



*Figure 14*

60.     Defendant Anzalone approached Robert once again and grabbed the front of the neck hole of Robert's shirt with his now-gloved hand.

61.     Defendants Anzalone and Kingsley then forcefully yanked Robert into a standing position, lifted Robert's feet and body up off the ground by Robert's arms and shirt, shoved Robert into a closed window shade in the corner of the medical examination room, and pushed their knees into the back of his legs.

62.     Robert remained in the corner for an extended period, during which time Defendants Kinglsey, Kessler, and Anzalone continued to push Robert into the wall, apparently committing other abuses that are not visible on camera.

63.     Robert was eventually pushed down onto his knees, remaining in that position until Defendant Anzalone wrapped both of his arms around Robert's torso and violently jolted Robert's entire body up off the ground.

64.     Thereafter, Defendants moved Robert back to the examination table, where two Defendants removed Robert's pants as Defendant Anzalone gave Robert another sternum rub, which this time provoked no apparent response.

65.     By approximately 9:32 p.m., Robert lay motionless and apparently unresponsive, with his pants removed and his socks hanging halfway off his feet, and Defendants finally ended their beating.

66.     Robert was eventually transported to Wynn Hospital in Utica, New York, where he was pronounced dead in the early hours of December 10, 2024.

67.     Defendants' brutal assault, described above, was the sole cause of Robert's death.

### On-Scene Defendants Responsible for Robert's Fatal Beating

68.     After Governor Hochul directed Defendant Martuscello to begin the termination process for state employees involved in Robert's killing, NYSDOCCS announced that Defendants Galliher, Anzalone, Kingsley, Keiffer, Kessler, Fisher, Wallrath, Along, Schoff, Walters, Farina, Mashaw, Trombley, and Dashnaw had all been suspended without pay or resigned.

69.     Those fourteen Defendants and Defendant Mehmedovic (a contractor), who together comprise the On-Scene Defendants in this case, all either actively participated in Robert's fatal beating, or stood by and watched it, or both.

70.     All On-Scene Defendants knew that Robert was being grievously harmed and was in obvious need of medical attention but took no action to stop the assault or help Robert.

71.     The On-Scene Defendants who were not actively beating Robert at any given time casually entered and exited the room where Robert's assault was underway, posted up in the open doorway of the room, or milled about in the hallway immediately outside the room, while nonchalantly watching Robert's beating, hearing Robert's abuse, and engaging in conversation with one another.

72.     In the video footage of Robert's fatal beating, the On-Scene Defendants at times appeared to be smiling or laughing and at other times appeared to be bored. Notably, none of the On-Scene Defendants in the footage appeared to be at all concerned at any time about what was being done to Robert or about the fact that Robert was plainly deteriorating to a state of unconsciousness.

73.     Despite seeing, hearing, and otherwise knowing that Robert was being beaten to death, all the On-Scene Defendants failed to intervene to stop Robert's assault at any time, despite having ample opportunity to do so.

74.     All the On-Scene Defendants were likewise deliberately indifferent to Robert's obvious need for critical medical care that could have saved his life.

75.     In the aftermath of Robert's fatal beating, Defendants Anzalone, Kieffer, and other as yet unknown On-Scene Defendants participated in an elaborate cover up to evade accountability for their actions.

76.     Among other things, the On-Scene Defendants concocted a false narrative about their interactions with Robert, repeated the false narrative in official reports, lied to ambulance and hospital staff about Robert's injuries, and allowed physical crime scene evidence to be destroyed.

**Defendants Martuscello, Medbury, and Other As Yet Known
Supervisory Defendants Responsible for Robert's Fatal Beating**

77.     The indisputable fact that over a dozen people casually carried out or watched Robert's fatal beating without even bothering to shut the door of the room where he was being killed reflects that institutional tolerance of staff brutality against incarcerated people permeates Marcy, and, on information and belief, other institutions in the NYSDOCCS system.

78.     As Governor Hochul acknowledged, the State's prison system failed Robert. She ordered Defendant Medbury to be removed from her position as Marcy's top leader soon after Robert's fatal attack.

79.     As Defendant Martuscello admitted, institutional change is required to prevent similar acts from happening in New York's prisons.

80.     As CANY reminded the public in the wake of Robert's killing: "The body-worn camera footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility and other prisons in the state."

81.     The responsibility for Robert's killing extends beyond the Marcy staff present at the scene of his fatal beating. Robert's killers did not act in a vacuum. Their actions were the entirely foreseeable result of maintaining an utterly broken system that tolerates staff violence against incarcerated people, as NYSDOCCS leadership has done for decades.

82.     Defendants Martuscello and Medbury (the "Supervisory Defendants") are personally involved in and liable for Robert's death because they were each aware of and deliberately indifferent to the substantial risk of serious harm to incarcerated individuals like Robert.

83.     On information and belief, a well-settled and widespread de facto policy has long existed across NYSDOCCS, including in the period leading up to Robert's killing, of failing to hold correctional officers accountable for abusive misconduct toward incarcerated individuals. Part and parcel of this de facto policy is maintaining a strict code of silence, pursuant to which NYSDOCCS correctional officers uniformly look the other way or assist in covering up abuse of incarcerated individuals.

84.     Under this de facto policy, correctional officers are permitted to maintain order and control over incarcerated individuals by any means necessary, meting out violence at will, so long as their misconduct can be plausibly covered up. As a result of this de facto policy, correctional officers can freely assault incarcerated individuals, safe in the knowledge that their actions will never be subject to any meaningful scrutiny.

85.     This de facto policy benefits NYSDOCCS because it helps maintain the appearance of order in its facilities, albeit at the expense of incarcerated individuals, whose accounts of abuse are disregarded.

86.     It is only in the most exceptional cases, where (as here) incontrovertible evidence of clear abuse comes to light, that meaningful action is taken to hold officers accountable.

87.     The de facto policy described above posed a substantial risk of harm to incarcerated individuals like Robert and was a moving force behind Robert's killing.

88.     At the time of Robert's killing, this de facto policy was so well-settled and widespread that the On-Scene Defendants were emboldened, and indeed encouraged, to brutalize Robert with impunity. The On-Scene Defendants were confident in the knowledge that their misconduct would be easily concealed and would not be subject to any meaningful examination or investigation.

89.     On information and belief, the Supervisory Defendants were personally aware of this de facto policy. As discussed in further detail below, it has been thoroughly documented, publicized, and confirmed by, among others, independent research organizations, federal and state prosecutors, criminal and civil juries, the news media, internal complaints by incarcerated people at Marcy, and a multitude of civil rights lawsuits.

90.     On information and belief, the Supervisory Defendants were also personally aware that this de facto policy posed a substantial risk of serious harm to incarcerated individuals like Robert.

91.     At the time of Robert's killing, the Supervisory Defendants were each personally responsible for ensuring the safety of individuals in NYSDOCCS custody and at Marcy. They each had the authority and responsibility to set policy, make rules, communicate expectations, and control the correctional officers who worked under their command.

92.     Despite their knowledge and authority, neither of the Supervisory Defendants took any meaningful action to abate the risk of harm that this de facto policy posed to incarcerated individuals like Robert.

93.     As a direct and proximate result of the Supervisory Defendants' deliberate indifference to this de facto policy, On-Scene Defendants brutalized and killed Robert.

**Illustrations of the De Facto Policy At Marcy Correctional Facility**

94.     Well before Robert was beaten to death, the Supervisory Defendants knew that people incarcerated at Marcy faced a substantial risk of serious harm at the hands of correctional officers.

95.     In October 2022, CANY conducted an in-depth two-day monitoring visit at Marcy ("Monitoring Visit"). During the Monitoring Visit, CANY interviewed over 100 incarcerated

people, met with executive staff, medical staff, and union representatives, and visually inspected the facility.

96.    Following the Monitoring Visit, on October 21, 2022, CANY Executive Director Jennifer Scaife sent an email directly to Defendant Martuscello, outlining "key areas of concern" at Marcy that would be further detailed in a report ("Marcy Visit Email").

97.    The key areas of concern in Scaife's Marcy Visit Email included "numerous allegations from incarcerated people of physical abuse by staff," and "multiple individuals who expressed fear of retaliation for speaking with CANY representatives," including reports that individuals were "warned by security staff not to speak with us."

98.    Martuscello read and forwarded the Marcy Visit Email, which soon made its way to Defendant Medbury as well.

99.    At the time Martuscello and Medbury received the October 21, 2022 Marcy Visit Email, they both held positions in NYSDOCCS where they were expected to read the email, know its contents, and take appropriate steps in response to protect the safety of incarcerated individuals at Marcy.

100.    In July 2023, CANY published a comprehensive "Post-Visit Briefing and Recommendations" report about its Marcy Monitoring Visit ("CANY Report").[3]

101.    As reflected in the **CANY Report**, incarcerated individuals at Marcy reported "rampant abuse by staff, including physical assaults" and "a significant number of instances of racialized abuse." CANY found a "higher instance of staff abuse" at Marcy compared to other NYSDOCCS facilities.

---

[3] *Post-Visit Briefing & Recommendations No.22-10: Monitoring Visit to Marcy Correctional Facility - October 11-12, 2022*, CANY, https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-10-marcy (last visited Jan. 10, 2025).

102.    Specifically, the CANY Report indicates that a shocking 80 percent of respondents at Marcy reported having seen or been personally subjected to verbal, physical, or sexual abuse by staff, and 70 percent reported racial discrimination or bias.

103.    The CANY Report further documents that people "in general population units detailed experiencing or witnessing a range of abusive behaviors by staff, such as *physical assaults in locations where cameras are absent* including between the gates, in vans, and in showers. They also described staff engaging in verbal harassment and using pepper spray." (emphasis added).

104.    The CANY Report quotes one incarcerated person as saying, "Physical abuse is rampant; the CO told me when I got here this is a 'hands-on facility,' we're going to put hands on you if we don't like what you're doing."

105.    The CANY Report quotes another incarcerated person as saying, "Vibes in this jail with staff are off - they brag and intimidate us about the number of people they've beat or sprayed."

106.    The CANY Report reflects that Marcy's Incarcerated Liaison Committee reported a pattern of staff regularly engaging in physical abuse.

107.    In addition, "CANY monitors observed a pervasive culture of fear and retaliation at Marcy. On the second day of CANY's visit, several incarcerated individuals confided in CANY monitors that staff had walked through the housing units the night prior announcing threats of physical harm in retaliation for speaking with CANY."

108.    Notably, while incarcerated people at Marcy reported rampant physical staff abuse, especially in locations without cameras, "Executive team members reported [to CANY] that the RMHU [Residential Mental Health Unit] [was] the only housing unit at Marcy currently equipped with stationary cameras."

109.     CANY implored the NYSDOCCS Office of Special Investigations ("OSI") and Inspector General to "investigate the widespread claims of abuse at Marcy and make the findings and measures taken to address them reported to the public upon completion."

110.     On information and belief, Supervisory Defendants Martuscello and Medbury were each subjectively aware of the contents of the July 2023 CANY Report, including CANY's findings of rampant staff abuse at Marcy and CANY's recommendation that OSI and the New York Inspector General needed to investigate and take steps to address the problem. On information and belief, neither Supervisory Defendant ever took any steps to implement CANY's recommendation or meaningfully address, much less abate, the problem of rampant staff violence at Marcy.

111.     Following Robert's death, CANY Executive Director Jennifer Scaife issued a statement that the video of his fatal attack would allow the public to "witness the brutality that [CANY] has documented . . . at Marcy as recently as two years ago."[4]

112.     Ms. Scaife pointed out that CANY had previously "called upon DOCCS' Office of Special Investigations and the New York State Inspector General to investigate the serious and pervasive allegations at Marcy Correctional Facility."

113.     Ms. Scaife also indicated that CANY notifies NYSDOCCS and other state agencies several times per week about allegations of abuse, maltreatment, neglect, or violations carried out by staff in New York's prisons.

---

[4] *Correctional Association of New York (CANY) Statement on the Death of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 23, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy.

114.    Several days later, following release of the video showing how Robert was killed, CANY issued another statement that the "footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, *but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility* and other prisons in the state." (emphasis added).[5]

115.    The experience of **Juan Rivas** strongly corroborates the 2022 CANY Report.

116.    In September and October 2024, Mr. Rivas was violently assaulted by Marcy correctional officers. Three officers who were involved in Robert's killing – Defendants Kessler, Farina, and Anzalone – participated in the final assault of Mr. Rivas, which left him grievously injured.

117.    While in a blind spot with no fixed cameras, Defendant Kessler choked Mr. Rivas with his hands and repeatedly struck Mr. Rivas in the torso with his knee while Defendant Farina used a rope to choke Mr. Rivas, leaving ligature marks on his neck.[6]

118.    Mr. Rivas's injuries from this attack were so severe that he spent nearly two weeks in the hospital following the beating. His ribs were broken so badly that his lung was punctured, requiring extensive surgery that necessitated freezing Rivas's nerves due to the severity of his pain.

119.    On October 21, 2024, Rivas's attorney sent a letter by Fed Ex overnight delivery directly to Defendant Martuscello and the Marcy Superintendent, detailing the harrowing violence Rivas experienced at Marcy.

---

[5] *Correctional Association of New York (CANY) Statement on the Release of Video Depicting the Killing of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 27, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy-zax6a.

[6] *Rivas v. Kessler et al.*, No. 9:25-cv-253 (N.D.N.Y. Mar. 31, 2025), Dkt. No. 5 (First Amended Complaint).

120.    On information and belief, between the date of the Rivas Letter and Robert's deadly assault, the Supervisory Defendants took no meaningful action to prevent Robert and other individuals at Marcy from being similarly subjected to unlawful physical assaults and violent acts of retaliation by Defendants Kessler, Farina, Anzalone or any other Marcy correctional officers.

121.    The experience of **Williams Alvarez** also strongly corroborates CANY's findings about Marcy.

122.    In September 2020, Defendants Trombly, Farina, and three other Marcy officers brutally attacked Alvarez.

123.    The attack began with an officer pepper spraying Alvarez without provocation while Alvarez was cleaning floors in a shower area.

124.    The officer ordered Alvarez to a vestibule away from other incarcerated individuals, where he stood with his hands against a wall while Defendants Trombly, Farina, and two additional officers beat him.

125.    The officers slammed his head against the wall multiples times, handcuffed him, and then kicked him multiple times in the head and body as he fell to the ground.

126.    During the attack, Alvarez heard officers laughing and no one intervened to help him.

127.    The beating caused fractures to Alvarez's face so severe that they required surgical repair and left him with a permanent facial deformity. His attackers also shattered his ankle bone, which likewise required surgery.

128.    After beating Alvarez, one of the officers created false disciplinary charges against him to cover up their actions. As a result of the false reports, Alvarez was sent to Marcy's Special

Housing Unit (*i.e.* solitary confinement), discharged from an early release program that Alvarez was about to complete, and transferred to a maximum-security facility.

129.    In 2022, Alvarez filed a lawsuit in federal court, describing his attack as explained above. Defendants Trombly and Farina were named as defendants in Alvarez's suit.[7]

130.    At his deposition, Alvarez testified, under oath, that corrections officers at Marcy have a designated "beat-up squad" of officers who "go around and do . . . the assaults and rough handling the people [incarcerated at Marcy]." Alvarez identified Defendant Trombly as the "sergeant in charge of the beat-up squad."[8]

131.    The experience of ***Adam Bauer*** also strongly corroborates CANY's findings about Marcy.

132.    In February 2020, Defendant Anzalone and several other officers brutally attacked Bauer in a bathroom at Marcy.

133.    During the attack, an officer punched Bauer in the head, threw him to the ground, and kicked him in the side.

134.    Defendant Anzalone and two sergeants entered the bathroom and either joined in kicking Bauer or witnessed and did not stop the attack.

135.    At one point, one of the sergeants smashed a clipboard over Bauer's head, leaving a deep laceration. Bauer's attackers then brought him to the Marcy Infirmary where Defendant Anzalone kicked Bauer's feet while he was forced to lie face down on the floor and took the photo of Bauer's injuries, depicted in Figure 15 below.

---

[7] Amended Complaint, *Alvarez v. Bause et al.*, No. 22-CV-0186, (N.D.N.Y Mar. 29, 2022), Dkt. No. 12.

[8] Deposition of William Alvarez at 25, 34, *Alvarez v. Bause et al.*, No. 22-CV-0186 (N.D.N.Y Sept. 25, 2024), Dkt. No. 49-2.



*Figure 15*

136. To cover up their brutal assault, the Marcy officers concocted a series of lies about how Bauer sustained his injuries. The lies they told various medical personnel included that Bauer's injuries were self-inflicted, that the injuries were inflicted by another incarcerated person, and that the injuries "occurred by a seatbelt."

137. To further try and cover up their misconduct, the officers fabricated disciplinary charges against Bauer, threatened him not to disclose the assault to anyone, and then placed him in solitary confinement.

138. In 2022, Bauer filed a lawsuit in federal court detailing the above facts of his assault and the subsequent cover up.[9]

139. The extensive contact New York civil rights attorney **Amy Jane Agnew** has had with incarcerated individuals and staff at Marcy since 2019 further corroborates the CANY Report.

---

[9] *Bauer v. Iodice et. al*, No. 22-CV-1007 (N.D.N.Y. Sept. 23, 2022), Dkt. No. 1.

140.    Agnew represents dozens of individuals at Marcy in connection with class action litigation against NYSDOCCS. Agnew's clients have consistently reported experiencing retaliation and violence when they attempt to assert their legal rights. Marcy staff have also retaliated against Agnew personally for helping her clients expose misconduct at the facility. Marcy staff has left threatening notes on her car, eavesdropped on her attorney-client communications, denied her access to her clients, and concocted false and defamatory reports to justify their actions. Marcy staff made it so difficult for Agnew to represent her clients that in 2024 she personally filed a lawsuit against Marcy officials, asking the Court to enjoin their misconduct.[10]

### Evidence of the De Facto Policy Across NYSDOCCS Facilities

141.    The documented pattern of brutal staff violence against individuals incarcerated at Marcy is representative of how this de facto policy expresses itself in correctional facilities across the state because NYSDOCCS leaders, including but not limited to Supervisory Defendants Medbury and Martuscello, turned a blind eye to the epidemic of violence, rather than taking any meaningful action to correct it.

142.    The Marshall Project and The New York Times highlighted some of the many cases of excessive force and cover ups in NYSDOCCS prisons as part of an exhaustive investigation in 2015-2016 (the "2015-2016 MP/NYT Investigation"), which concluded that "a culture of brutality has been allowed to thrive in the prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other way."

143.    Beginning with a front-page story on February 28, 2015, the findings of the *2015-2016 MP/NYT Investigation* were published in a series of *New York Times* articles, which

---

[10] *Agnew v. D'Amore et. al*, No. 6:23-CV-1610 (N.D.N.Y Feb. 7, 2024), Dkt. No. 12.

examined brutality by NYSDOCCS officers at prisons across the state and how they are rarely held accountable. Horrific experiences of incarcerated individuals that were highlighted in the series are summarized below:

(a)    As the result of a near-fatal beating by officers at Attica Correctional Facility ("Attica"), *George Williams* sustained a broken shoulder, several cracked ribs, and two broken legs. He also had a severe fracture of the orbit surrounding his left eye, a large amount of blood lodged in his left maxillary sinus, and multiple cuts and bruises. After nearly killing Williams, the officers engaged in an elaborate cover up, falsifying official reports and destroying evidence. Williams' case was the impetus for the MP/NYT investigation because it offered "a vivid lesson in the intractable culture of prison brutality."[11]

(b)    After a 2015 escape at Clinton Correctional Facility ("Clinton"), officers subjected *dozens of people* to days of unjustified violence in "what seemed like a campaign of retribution . . . . In letters reviewed by the Times, as well as prison interviews, [incarcerated people] described a shockingly similar catalog of abuses, including being beaten while handcuffed, choked and slammed against cell bars and walls." One notoriously violent officer at Clinton, known as "Captain America," would tie plastic bags around incarcerated people's necks and tighten them until the incarcerated people passed out.[12]

(c)    *Samuel Harrell and other people* incarcerated at Fishkill Correctional Facility ("Fishkill") were subjected to an organized "Beat Up Squad," which consisted of a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people and thereafter engaging in elaborate cover ups of their misconduct (similar to the Beat Up Squad that William Alvarez testified in 2023 had beat him and others at Marcy). The Beat Up Squad unjustifiably attacked and brutally killed Harrell in a prison building that was long "singled out as a violent place," including by CANY, which had previously specifically briefed the NYSDOCCS Commissioner on the unjustified abuse that routinely took place there.[13] In December 2020, various Fishkill staff settled state and federal court

---

[11] Tom Robbins, *A Brutal Beating Wakes Attica's Ghosts*, NEW YORK TIMES (Feb. 28, 2015), https://www.nytimes.com/2015/03/01/nyregion/attica-prison-infamous-for-bloodshed-faces-a-reckoning-as-guards-go-on-trial.html.

[12] Michael Schwirtz and Michael Winerip, *After 2 Killers Fled, Prisoners Say, Beatings Were Next*, NEW YORK TIMES (Aug. 11, 2015), https://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html.

[13] Michael Schwirtz and Michael Winerip, *Prison Guard 'Beatup Squad' is Blamed in New York Inmate's Death*, NEW YORK TIMES (Aug. 18, 2015), https://www.nytimes.com/2015/08/19/nyregion/fishkill-prison-inmate-died-after-fight-with-officers-records-show.html.

claims against them for an undisclosed amount for Harrell's brutal assault and death. *See Harrell v. New York State Dep't of Corr. and Cmty. Supervision*, No. 15-cv-7065 (S.D.N.Y. Dec. 7, 2020), Dkt. Nos. 214, 238.

    (d)    ***Ramon Fabian*** was brutally assaulted by an officer at Ulster Correctional Facility as part of a troubling pattern of brutality, that, according to CANY, NYSDOCCS "has often ignored."[14]

    (e)    ***Leonard Strickland*** was pushed down a flight of stairs and viciously beaten, nearly to death, by a group of officers at Clinton, fitting yet again into "a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department that rarely holds anyone accountable."[15] NYSDOCCS' then-Commissioner Anthony Annucci declined to be interviewed about Strickland's attack and the lack of accountability associated with it.

144.    In addition to detailing incidences of NYSDOCCS staff brutalizing incarcerated individuals, the 2015-2016 MP/NYT Investigation examined the significant liability the State had faced, requiring hundreds of payouts to incarcerated victims of unconstitutional excessive force. The investigation found that between 2010 and 2015, the State paid out at least $8.8 million in settlements or jury awards in cases where officers were accused of prisoner abuse or excessive force. The MP/NYT Investigation also noted that "[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly."[16]

145.    Defendant Martuscello was interviewed in connection with the 2015-2016 MP/NYT Investigation. Although Martuscello was not yet Commissioner at the time,

---

[14] Tom Robbins, *Guarding the Prison Guards: New York State's Troubled Disciplinary System*, NEW YORK TIMES (Sept. 27, 2015), https://www.nytimes.com/2015/09/28/nyregion/guarding-the-prison-guards-new-york-states-troubled-disciplinary-system.html.

[15] Michael Winerip and Michael Schwirtz, *An Inmate Dies, and No One Is Punished*, NEW YORK TIMES (Dec. 13, 2015), https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html.

[16] Tom Robbins, *New York State Prisons Take Steps to Track Complaints About Guards*, NEW YORK TIMES (Dec. 20, 2015), https://www.nytimes.com/2015/12/21/nyregion/new-york-state-prisons-take-steps-to-track-complaints-about-guards.html.

NYSDOCCS put Defendant Martuscello forward for the 2015-2015 MP/NYT Investigation because he was the NYSDOCCS Executive Team member most knowledgeable about the agency's history of failing to hold abusive officers accountable. In connection with the interview, Martuscello posed for photos with a *New York Times* photographer and told reporters that he was "ready to take the battle to the prison guards' union."

146.    As with the accounts of brutalization reported in the 2015-2016 MP/NYT Investigation, the highly publicized attack on ***Kevin Moore*** at Downstate Correctional Facility in 2013 demonstrates that NYSDOCCS has been on notice of systemic staff brutality for more than a decade. Officers beat Moore in an unprovoked attack so severe that his ribs and facial bones were broken and one of his dreadlocks was ripped out of his head. One officer kept Moore's dreadlock as a "trophy."

147.    On September 21, 2016, then-United States Attorney Preet Bharara announced federal charges against five of the officers involved in the attack on Moore, including separate charges related to the use of excessive force and filing of false reports. At the announcement, Bharara stated:

> Today's charges allege a brutal beating and a brazen cover-up by five state correction officers that left Kevin Moore, a 54-year-old inmate, with life-threatening injuries and in the hospital for 17 days. [Incarcerated people] may be walled off from the public, but they are not walled off from the Constitution. And when correction officers viciously beat an inmate in their charge, then collude among themselves to cover it up—as alleged here—they trample on the Constitution and the very laws they have sworn to uphold.[17]

---

[17] Press Release, *Five Correction Officers Charged With Federal Crimes In Beating Of Inmate At Downstate Correctional Facility And Cover-Up*, U.S. DEP'T OF JUSTICE (Sept. 21, 2016), https://www.justice.gov/usao-sdny/pr/five-correction-officers-charged-federal-crimes-beating-inmate-downstate-correctional.

148.    As Bharara succinctly put it in a statement still devastatingly applicable today: "*Excessive use of force in prisons . . . has reached crisis proportions in New York State*."[18]

149.    Each of the five officers involved in Moore's beating was convicted on all charges. Two were convicted following a jury trial and received 100- and 87-months of incarceration, respectively, and their convictions and sentences were affirmed by the Second Circuit. *See United States v. Scott*, 979 F.3d 986, 988 (2d Cir. 2020). The other three officers pled guilty, with one receiving 40 months of incarceration and the others receiving sentences of time served.

150.    More *recent jury verdicts, settlements, criminal pleas, and judicial findings* lay bare that NYSDOCCS has allowed a culture of staff brutalization to persist and flourish even after the Moore case, even after the many accounts widely publicized in the MP/NYT Investigation, and even after countless more heinous acts came to light from earlier findings of liability.

151.    The following summaries of cases resolved since 2020 demonstrate that officers and other staff continue to routinely engage in extreme violence in New York prisons, operating with impunity because NYSDOCCS has allowed them to believe it will be tolerated. The cases summarized are merely exemplary; on information and belief they reflect just a small fraction of the many other instances of excessive staff force in NYSDOCCS' facilities:

(a)    In December 2024, New York Court of Claims Judge Anthony Brindisi ruled in favor of *28 people incarcerated at Marcy's sister facility, Mid-State Correctional Facility* ("Mid-State"),[19] holding that 30 officers acted in concert to commit assault and battery on the men during a 2016 raid. *Aliaga v. State of New York*, 84 Misc. 3d 1246(A) (N.Y. Ct. Cl. Dec. 2, 2024). Judge Brindisi determined that the officers had subjected the men to, among other things, being kicked in the mouth "like a football punt," being used by an officer "like a trampoline," having genitalia harmfully touched by officers, and even being sodomized by officers inserting objects into their anus or rectum, while officers asked "how does it feel

---

[18] Tom Robbins, *'I Was Terrified': Inmates Say They Paid a Brutal Price for a Guard's Injury*, NEW YORK TIMES (Nov. 15, 2016), https://www.nytimes.com/2016/11/15/nyregion/new-york-prison-inmates-guards-beatings.html.

[19] Mid-State is directly across the street from Marcy, and on information and belief, the two facilities often share staff.

to be helpless." Judge Brindisi found it evident "from the testimony of both claimants and officers that supervisors, including the Superintendent and senior staff, were present at various points during the raid, observing the damage to the dorm and appearing pleased with the result." Judge Brindisi ultimately characterized the raid and atrocious physical abuse inflicted by the officers as a "modern-day 'salting the earth.'"

(b)     In October 2024, officers Rohail Khan and Michael Williams pled guilty to deprivation of rights under color of law in violation of 18 U.S.C. § 242 for the brutal beating of ***James Barton*** at Mid-State. *See United States v. Khan*, No. 5:24-CR-391 (N.D.N.Y. Oct. 29, 2024), Dkt. No. 4; *United States v. Williams*, No. 5:24-cr-00323 (N.D.N.Y. Oct. 23, 2024), Dkt. No. 5. Khan and Williams assaulted Barton in a brutal attack they called the "George Floyd challenge." Khan and Williams, along with several other officers spent more than ten minutes punching Barton in his head, face, eyes, chest, back, stomach, legals, buttocks, and groin until he fell to the floor. The officers then proceeded to kick and stomp Barton, put him in a chokehold, and punch him further. The officers' plea agreement acknowledged the truth of these and many of the facts Barton alleged in a subsequent civil lawsuit. *See Barton v. Khan et al.*, 24-cv-01433 (N.D.N.Y. Nov. 25, 2024), Dkt. No. 1.

(c)     In November 2023, a federal jury awarded the family of ***Terry Cooper*** $9.25 million in connection with his fatal beating by Clinton officers who beat Cooper so severely it caused a fatal asthma attack, deprived him of his asthma pump, then covered up the attack and denied the use of force. *See Cooper v. Clancy, Case* No. 9:19-cv-00362 (N.D.N.Y. Nov. 23, 2023), Dkt. Nos. 52, 226.

(d)     In 2021 and 2022, NYSDOCCS settled three separate federal lawsuits on behalf of at least 20 officers who worked at Green Haven Correctional Facility ("Green Haven"). One suit involved the brutal assault of ***Carlos Garcia*** by six officers who put him into a chokehold until he lost consciousness then slammed his head against a wall while he was handcuffed. The second suit involved three separate assaults on ***Benjamin Stephens*** by nine officers whose abuses included smashing his head so hard he had seizure and choking him. The third suit was brought by ***Nakia Rose*** against five officers who, among other things, at a sergeant's direction, cuffed him, brought him to the floor, kicked and punched him and twisted his ankles. *See Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y Feb. 7, 2022), Dkt No. 101; *Stephens v. Venetozzi*, No. 13-cv-5779 (S.D.N.Y. Feb. 7, 2022), Dkt. No. 381; *Rose v. Garritt*, No. 16-cv-3624 (S.D.N.Y. July 30, 2021), Dkt. No. 128.

(e)     In July 2022, officer Aaron Finn pled guilty to violating 18 U.S.C. § 242 in connection with the brutal beating of ***Melvin Virgil*** at Green Haven. *United States v. Finn*, No. 7:21-cr-00650-NSR (S.D.N.Y Oct. 26, 2022), Dkt. No. 28. As alleged in Virgil's subsequent civil case and acknowledged in large part in Finn's plea, Finn handcuffed Virgil and repeatedly smashed his head into a wall and steel bars as other officers silently watched. Multiple officers fabricated reports of misconduct against Virgil. Finn's attack only was uncovered because BWCs had captured it. *See Virgil v. Finn*, No. 22-cv-3169 (S.D.N.Y. Mar. 24, 2023), Dkt. No. 74.

(f)     In April 2021, three Fishkill officers were found liable by a jury for using

excessive force against **Nicholas Magalios** in the amount of $1 million. *Magalios v. Peralta*, No. 19-cv-6188 (S.D.N.Y. June 1, 2021), Dkt. No. 44. One officer held down Magalios and other officers brutally kicked and punched him while others looked on and did nothing. Magalios suffered significant bruising, marks, abrasions, lacerations and aggravation of a pre- existing shoulder injury, which required surgery. Judge Seibel remarked that the "Defendants' conduct was reprehensible, violent, deceitful, and malicious."

(g)    In May 2020, Sullivan Correctional Facility ("Sullivan") officers whose excessive force killed **Karl Taylor** settled claims against them for $5 million. *See Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (S.D.N.Y. May 5, 2020), Dkt. No. 429. One officer struck Taylor in the back of his head several times with his fists and a number of other officers beat him on his way to the infirmary (where he was later pronounced dead), leaving an extensive pool of blood that took 1.5 hours to clean up.

(h)    In February 2020, a U.S. district court jury awarded **Jerome Anderson** $650,000 after finding a sergeant and three officers at Green Haven liable for excessive force. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Feb. 24, 2020), Dkt. No. 133. The officers coordinated an attack on Anderson by taking him to an area lacking surveillance where they punched, stomped, and kicked him for several minutes. *See id.*, Dkt. No. 161.

(i)    In March 2025, for $1.2 million plus legal fees, Auburn Correctional Facility ("Auburn") officers settled claims that a Lieutenant waterboarded and violently assaulted **Matthew Raymond** while he was shackled and defenseless, inflicting permanent injuries to his genitals and bladder, while a Sergeant and other officers stood by and did nothing to stop the attack. *See Raymond v. Mitchell*, No. 18-cv-1467 (N.D.N.Y., Mar. 1, 2019), Dkt. Nos. 20, 201.

152.    On information and belief, since approximately 2017, Defendant Martuscello was made personally aware of significant legal cases like these, including settlements and jury verdicts involving allegations of excessive force by NYSDOCCS staff as well as criminal charges against correctional officer defendants involving excessive force and cover ups.

153.    Unsurprisingly, many of the cases summarized above involved egregious cover ups by NYSDOCCS officers, reflecting the existence of a widespread and well-settled code of silence among NYSCOSS staff. For example:

(a)    Following Kevin Moore's "brutal gang-style assault," the officers involved conspired to "engage[] in an elaborate cover-up of the crime they had committed." Their cover-up included manufacturing fake injuries to make it appear that Moore had been the aggressor and creating false records, including false use of force reports, that memorialized

the fabricated conspiratorial story the officers had made up. Five of the officers involved either were convicted by a jury of, or pled guilty to, among other things, violations of 18 U.S.C. § 1519, which criminalizes the falsification of records.

(b)     Evidence in the Nicholas Magalios case showed that the officers involved "created false reports and gave false testimony that categorically denied using any force against Plaintiff and contended that Plaintiff fabricated the story entirely." According to Judge Seibel, the jury "necessarily found that Defendants lied repeatedly through those reports and that testimony, demonstrating the malicious and deceitful nature of their conduct." In affirming an award of punitive damages, Judge Seibel specifically noted that "similar acts often go undetected in correctional facilities." Judge Seibel also explained that "'[r]eprehensible' may not be a strong enough word to describe Defendants' conduct here. They have disgraced themselves and their office, and such conduct seems to be all too acceptable among certain employees of New York's prison system."

(c)     The judge in the Jerome Anderson case noted evidence that each of the officers involved concocted a fabricated story to cover up their assault of Anderson. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Oct. 20, 2020), Dkt. No. 161.

(d)     In the case of Samuel Harrell, when officers and medical personnel could not resuscitate Harrell after the beating and finally called an ambulance, they fabricated that he had overdosed and the NYSCOBA spokesperson falsely informed media he had overdosed, all while Harrell's autopsy determined there were no illegal drugs in his system and his cause of death was a homicide caused by physical altercation with correction officers. Officers further falsely that claimed Harrell had falsely assaulted them. *See Harrell v. New York State Department of Corrections and Community Supervision*, No. 15-cv-7065 (S.D.N.Y. Aug. 14, 2019), Dkt. No. 214.

154.     Other recent examples of NYSDOCCS covering up their unlawful assaults of incarcerated people include those documented in *Keyes v. Annucci*, No. 18-cv-0372 (N.D.N.Y. Sept. 6, 2022), Dkt. No. 128 (officers settled claims against them alleging that they filed false misbehavior reports to retaliate against several incarcerated people that had reported officers' excessive use of force); *Patterson v. Patterson*, No. 16-cv-00844 (W.D.N.Y. Jan. 29, 2020), Dkt. Nos. 29, 66 (several officers settled claims that they deliberately falsified an incarcerated person misbehavior report as part of a conspiracy to cover up their assault of incarcerated person John P. Patterson); and *Walker v. Williams*, No. 16-cv-645 (W.D.N.Y), Dkt. No. 1, 69-78 (officers settled claims that they struck incarcerated person Jerard Walker many times with a baton on his

ribs, back, and head, and then submitted false misbehavior reports to cover up their assault).

155.    Most recently, officers at Mid-State went to great lengths to cover up their fatal attacks on Messiah Nantwi. In an all-too-familiar pattern, those involved in the murder either were not wearing their BWCs, turned off their BWCs, or turned their backs to prevent damning footage from being captured on their BWC during Nantwi's assaults. The next day, the perpetrators met to concoct and coordinate a false narrative, blaming Nantwi for his own killing and falsely claiming that Nantwi possessed a weapon that was in fact planted by a correctional officer.

156.    On information and belief, as with the summaries of excessive force described herein, the above illustrations are merely examples of how NYSDOCCS' widespread de facto code-of-silence policy plays out after officers engage in abusive conduct of incarcerated individuals.

157.    Indeed, in 2023, the New York Times published the results of another investigation focused on analysis of 5,600 NYSDOCCS disciplinary records dating back to 2010 ("MP/NYT Disciplinary Record Investigation").[20]

158.    The 2023 ***MP/NYT Disciplinary Record Investigation*** found that staff cover ups of excessive force incidents were "commonplace" across NYSDOCCS.[21]

159.    As reported in the New York Times, "[t]he records illustrate how cover ups make it difficult to hold officers accountable using excessive force. They also reveal a typical playbook:

---

[20] Alysia Santo, Joseph Neff, and Tom Meagher, *Guards Brutally Beat Prisoners and Lied About it. They Weren't Fired*, NEW YORK TIMES (May 25, 2023), https://www.nytimes.com/2023/05/19/nyregion/ny-prison-guards-brutality-fired.html.

[21] Joseph Neff, Alysia Santo, and Tom Meagher, *How a 'Blue Wall' Inside N.Y. State Prisons Protects Abusive Guards*, NEW YORK TIMES (May 22, 2023), https://www.nytimes.com/2023/05/22/nyregion/ny-state-prison-guards-abuse.html.

Guards often work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims and have them sent to solitary."

160.    Defendant Martuscello was interviewed in connection with the 2023 MP/NYT Disciplinary Record Investigation. He told reporters that he was not surprised that false reports often accompany instances of excessive force. "There has to be some manipulation of facts," Martuscello said.

161.    Yet, on information and belief, the Supervisory Defendants took no action to prevent correctional officers from continuing to operate the familiar playbook. Rather, under the Supervisory Defendants' leadership, on information and belief, neither Marcy nor NYSDOCCS more broadly, have routinely investigated whether officers' use of force reports are true or punished officers who submit reports that are false. Failing to do so has emboldened officers to continue covering up their unlawful conduct by lodging false reports against their victims.

162.    The 2023 MP/NYT Disciplinary Record Investigation highlighted the case of **Chad Stanbro**, who was paralyzed in 2018 after a guard knelt on his neck while he received offsite dental treatment. At some point during the procedure, Mr. Stanbro lost consciousness and when he awoke one officer was kneeling on his neck while the other two held him down on the ground. In the aftermath of the incident, all three guards wrote false reports about how Mr. Stanbro sustained his injuries. Among the many lies they told was that Mr. Stanbro assaulted them, for which the newly paralyzed Mr. Stanbro had to spend 40 days in solitary confinement. Mr. Stanbro later sued the officers, and a federal jury awarded him over $1.6 million in damages against the officers. *See Stanbro v. Palou*, No. 7:20-cv-01591-KMK (S.D.N.Y. Feb. 21, 2023), Dkt. No. 238.

163.    The 2023 MP/NYT Disciplinary Record Investigation also highlighted the case

of **Roy Harriger**, who was beaten in the back of his head with a nightstick by an unidentified guard at Attica. The assault occurred sometime after a guard picked him up at a sergeant's office on his cell block and before he arrived unconscious at the infirmary. To cover up the beating, Attica guards concocted a story about Mr. Harriger falling in the shower. Ruling in Mr. Harriger's favor in his subsequently filed lawsuit, New York Court of Claims Judge Minarik said she was "appalled." She also ruled that Attica staff's story that Mr. Harriger had fallen in the shower was a "fabrication," and she awarded him $2 million. *See Harriger v. State of New York*, Claim No. 126681 (Nov. 18, 2018 and Nov. 24, 2020).

164. On information and belief, Defendant Martuscello was familiar with all the news reports described in this Complaint, including the Marshall Project/New York Times Investigative reports discussed herein. As a member of the NYSDOCCS Executive Team, Defendant Martuscello was provided with (and would regularly read) news clips containing information about NYSDOCCS, that would contain articles like the ones described in this Compliant.

165. In the period leading up to Robert's killing, prisoners' advocacy organizations also made Defendant Martuscello aware of risks NYSDOCCS's de fact policy posed to incarcerated individuals like Robert.

166. On August 27, 2024, prisoners' rights advocates met with Defendant Martuscello and warned that correctional officers throughout NYSDOCCS were regularly beating incarcerated people without consequence (the "August Meeting").

167. Many advocates at the August Meeting were formerly incarcerated individuals with firsthand lived experience in NYSDOCCS and others worked closely with incarcerated individuals.

168.    The advocates told Defendant Martuscello about the prevalence of "beat up squads" and implored Martuscello to stop the systemic abuse by, among other things, closing the most problematic facilities. They included Marcy in the group of facilities that should be closed due to rampant staff violence.

169.    According to a participant at the August Meeting, Martuscello dismissed the advocates' warnings, stating that there were too many cameras inside correctional facilities for staff abuse to occur.

170.    Meanwhile, for approximately two years leading up to the August Meeting, Defendant Martuscello had quarterly conference calls with non-profit organizations whose representatives, likewise, repeatedly and consistently raised alarms about assaults by correctional officers. Each time, Martuscello acknowledged the concern and then quickly deflected by moving on to a new topic without any meaningful response. On one such conference call, an advocate warned Martuscello that the epidemic of staff violence was a "ticking time-bomb."

171.    Defendant Martuscello's personal knowledge of physical abuse by NYSDOCCS correctional officers dates back even further.

172.    By virtue of the leadership roles that Martuscello has held in NYSDOCCS since 2012, he has been personally informed, briefed on, and updated about significant use of force incidents throughout NYSDOCCS.

173.    On information and belief, during the period 2012 to 2023, Defendant Martuscello was responsible for reviewing OSI investigations and deciding whether to issue Notices of Discipline for correctional staff who engaged in physical abuse of incarcerated individuals.

174.    On information and belief, during that period, and continuing through the present, Martuscello has also been personally informed about significant OSI investigations involving staff

abuse and lawsuits involving abuse by correctional officers (including the lawsuits mentioned in this Complaint).

175.     As described above, NYSDOCCS maintains a widespread and well-settled de facto policy of failing to hold correctional officers accountable for even the worst misconduct.

176.     As part of this de facto policy, correctional officers maintain a strict and widely accepted code of silence, under which officers who become aware of abuse by officers look the other way and actively facilitate cover ups. These de facto policies are persistent, widespread, and well-known across NYSDOCCS.

177.     This de facto policy encourages correctional officers across the system – even those who do not personally participate in brutality – to believe they are above the law because they know the chances are exceedingly slim that they will ever be held to account for even the most egregious misconduct.

178.     NYSDOCCS correctional officers know it is only in truly exceptional circumstances (for example, when officers accidentally record themselves committing murder) that NYSDOCCS leaders take meaningful action to hold abusive staff accountable.

### Events Following Robert's Killing Further
### Demonstrate the De Facto Policies In This Complaint

179.     If the officers who killed Robert had not accidentally recorded themselves, nothing would have come of Robert's death. No one in NYSDOCCS would have questioned the officers' lies about how Robert died, and everyone in NYSDOCCS would have gone about their business as usual.

180.     Because the officers accidentally recorded themselves killing Robert, video evidence emerged that stoked public outrage.

181.    By mid-February 2025, several officers who participated in Robert's killing and the subsequent cover-up of it were charged criminally. Legislators and advocacy groups mobilized over NYSDOCCS's apparent failure to control its officers, creating momentum for new laws that would threaten the de facto policy described in this Complaint.

182.    Unsurprisingly, correctional officers across NYSDOCCCS responded to these events with even more lawlessness.

183.    Over a three-week period starting in mid-February 2025, more than *ten thousand* (10,000) NYSDOCCS correctional officers abandoned their posts and engaged in a coordinated, illegal work stoppage that upended the entire state's prison system.

184.    The work stoppage clearly violated state law as well as the officers' own collective bargaining agreement.

185.    In addition to being illegal, work stoppages by correctional officers pose a clear threat to the safety of others.

186.    By abandoning their posts, correctional officers who participated in the work stoppage exposed incarcerated individuals and remaining staff behind prison walls to extreme hardship and danger.

187.    Each of the more than 10,000 correctional officers who participated in the work stoppage knew that their actions were illegal and dangerous to others, but they did it anyway because they were emboldened by the de facto policy discussed in this Complaint.

188.    Consistent with the de facto policy described in this complaint, the correctional officers knew it was exceedingly unlikely that NYSDOCCS would ever hold them accountable for their actions.

189.    Several days into the correctional officers' illegal work stoppage, a New York supreme court judge ordered the correctional officers to stop their illegal activities, but more than 10,000 NYSDOCCS correctional officers openly flouted the court order.

190.    The NYSDOCCS correctional officers were comfortable violating state law, flouting the court's order, and exposing others to danger because NYSDOCCS had a long-standing de facto policy of allowing officers to act with impunity.

191.    If NYSDOCCS had an actual policy of holding correctional officers accountable for dangerous misconduct, then 10,000 of its correctional officers would not have felt emboldened to abandon their posts, violate state law, violate a court order, and expose others to grave danger.

192.    At least 9 incarcerated individuals died during the correctional officers' three-week illegal work stoppage, including two men at Auburn Correctional Facility who did not receive needed medical treatment in time and one man at Sing Sing Correctional Facility who died by suicide when no one intervened.

193.    One of the people who died was a man named Messiah Nantwi, an incarcerated individual at Mid-State.

194.    Like Robert, Mr. Nantwi was brutally beaten and murdered by correctional officers.

195.    Like the officers who killed Robert, the officers who killed Mr. Nantwi engaged in a protracted attack, continuing their violence against him when it was clear that Mr. Nantwi was in dire physical distress and needed medical intervention.

196.    Like the officers who killed Robert, the officers who killed Mr. Nantwi continued their fatal beating in a prison infirmary.

197. Like the officers who killed Robert, the officers who killed Mr. Nantwi engaged in an elaborate plan to cover up their actions, concocting a scheme to write false reports and plant a weapon on Mr. Nantwi to make their actions appear justified.

198. Like the officers who killed Robert, the officers who killed Mr. Nantwi were encouraged and assisted by on-scene supervisory staff, in both their violent acts and their subsequent coverups.

199. Like the officers who killed Robert, the officers who killed Mr. Nantwi were emboldened to act in such a violent and lawless manner because they knew about the de facto policies described in this compliant. These officers were comfortable brutalizing Mr. Nantwi and then lying about it because they knew it was exceedingly unlikely that their fellow officers would expose their misconduct or take steps to hold them accountable.

200. If NYSDOCCS had an actual policy of holding correctional officers accountable for engaging in dangerous misconduct, then the officers who killed Mr. Nantwi would not have felt emboldened to engage in such violent, deceptive, and illegal conduct, particularly not in the aftermath of Robert's widely publicized killing.

**Count 1 – 42 U.S.C. § 1983 – Excessive Force**
**(Against All On-Scene Defendants)**

201. All Paragraphs of this Complaint are incorporated by reference in this Count.

202. As described more fully above, the On-Scene Defendants violated Robert's Eighth Amendment right to be free from excessive force. Information known to date demonstrates that the excessive force included, at minimum, the On-Scene Defendants: (i) punching, hitting, kicking or otherwise striking various parts of Robert's body, including his face, stomach, side and groin area; (2) using their body to impose excessive pressure on various parts of Robert's body, including his shoulders, knees, and chest; (3) choking Robert with their hands or arms around his neck and

lifting him by the neck; and (4) putting an object into Robert's mouth, impeding his ability to breathe.

203.    As described more fully above, the degree of force used by the On-Scene Defendants was objectively unreasonable because Robert posed no security risk and their attack on him served no legitimate penological or government interest and was apparently intended to injure Robert.

204.    All On-Scene Defendants were subjectively aware that Robert's constitutional rights were being violated during the fatal beating because they observed and heard Robert's assault as it was occurring in and around their presence.

205.    All On-Scene Defendants had a legal duty to intervene to prevent or halt their fellow On-Scene Defendants' use of excessive force against Robert.

206.    In the manner described more fully above, the On-Scene Defendants acted willfully, wantonly, recklessly, maliciously, and with depraved and deliberate indifference to Robert's life.

207.    In brutally assaulting and failing to intervene to protect Robert, the On-Scene Defendants inflicted a cruel and unusual punishment and used unlawfully excessive force against Robert in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

208.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

209.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

48

## Count 2 – 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need
### (Against All On-Scene Defendants)

210.    All Paragraphs of this Complaint are incorporated by reference in this Count.

211.    As described more fully above, each On-Scene Defendant violated Robert's Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate indifference to Robert's obviously dire medical condition and serious need for medical treatment.

212.    As described more fully above, all On-Scene Defendants observed and knew that Robert suffered significant injuries throughout his assault, and it was obvious to each of them that Robert required medical attention.

213.    All On-Scene Defendants were subjectively aware that failing to provide Robert with immediate medical care put him at risk of suffering serious bodily harm or death.

214.    All On-Scene Defendants had a legal duty to act to ensure that Robert received medical treatment for his serious medical condition.

215.    Nevertheless, the On-Scene Defendants consciously disregarded that risk by failing to take steps to provide Robert with medical treatment or by actively interfering with the provision of medical treatment by others. The On-Scene Defendants took no steps to mitigate the risk that Robert would suffer serious bodily harm or death.

216.    The On-Scene Defendants' deliberate indifference to Robert's obvious need for medical treatment inflicted a cruel and unusual punishment against Robert in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

217.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

218.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

### Count 3 – 42 U.S.C. § 1983 – Failure to Protect
### (Against Supervisory Defendants Medbury and Martuscello)

219.    All Paragraphs of this Complaint are incorporated by reference in this Count.

220.    As described more fully above, Supervisory Defendants Medbury and Martuscello and other as yet identified supervisory individuals violated Robert's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from a substantial risk of serious harm.

221.    As described more fully above, Supervisory Defendants Medbury and Martuscello knew that NYSDOCCS' culture of brutalization and cover ups posed a substantial risk of serious harm to incarcerated individuals like Robert. On information and belief, they possessed this knowledge not only from their own experience in NYSDOCCS, but also through independent reports, investigative reporting, jury verdicts, and criminal prosecutions concerning NYSDOCCS correctional staff, including those at Marcy, as described above.

222.    On information and belief, Supervisory Defendants Medbury and Martuscello acted with deliberate indifference to this risk of harm by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Robert.

223.    Supervisory Defendants Medbury and Martuscello were personally responsible for ensuring the safety of incarcerated individuals under their care and custody, including Robert. They had the power and responsibility to implement and enforce policies and practices to protect incarcerated people at Marcy from the use of excessive force by staff.

224.    The Supervisory Defendants were personally involved in the attack of Robert because as a direct and proximate cause of the deliberate indifference described in this Count, the

On-Scene Defendants were emboldened to brutalize Robert, confident in the belief that their misconduct would never be subject to any meaningful scrutiny. When the On-Scene Defendants attacked and killed Robert, they reasonably believed that they could brutalize incarcerated individuals like Robert with impunity (so long as their actions were not captured on video), trusting that any evidence of their wrongdoing would be covered up by fellow officers.

225.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

226.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

### Count 4 – State Law
### Negligence, Gross Negligence, and Wrongful Death
### (Against Defendant Mehmedovic)

227.    All Paragraphs of this Complaint are incorporated by reference in this Count.

228.    Defendant Mehmedovic owed Robert a duty of reasonable care to provide prompt medical assistance when he was fatally injured by the actions of Defendants as detailed above.

229.    Defendant Mehmedovic breached such duty of reasonable care to Robert and acted with gross negligence and reckless indifference to his safety and his life by failing to intervene, and failing to provide immediate medical assistance and being otherwise indifferent to his suffering and safety.

230.    As a direct and proximate result of Defendant Mehmedovics' negligence, gross negligence, and reckless indifference, Robert suffered severe physical and emotional pain and suffering and was caused to die.

**Damages**

231.     Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr., is entitled to an award of compensatory damages for Robert's severe physical and emotional pain and suffering.

232.     Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr.'s distributees, is entitled to an award of compensatory damages for causing Robert's wrongful death, including the pecuniary value of their loss of support, nurturing, and guidance incurred from the death of their father.

233.     Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr. and its distributees, is entitled to an award against all Defendants of loss-of-life or hedonic damages for the death of Robert caused by the deprivation of his civil rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

234.     Based upon the facts and legal claims set forth above, and specifically the intentional, reckless, and grossly negligent conduct of the individual Defendants, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr. and its distributees, is entitled to an award of punitive damages against Defendants.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

## Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

Respectfully Submitted,

By: /s/ Elizabeth Mazur

Elizabeth Mazur
Kate Schwartz
HUGHES SOCOL PIERS RESNICK & DYM, Ltd.
70 W. Madison Street Suite 4000
Chicago, Illinois 60602
Tel: 312.580.0100
Fax: 312.580.1994
emazur@hsplegal.com
kschwartz@hsplegal.com

Stephen G. Schwarz
Lesley E. Niebel
FARACI LANGE, LLP
1822 South Winton Road, Suite 1
Rochester, New York 14618
Tel: 585.325.5150
Fax: 585.325.3285
sschwarz@faraci.com
lniebel@faraci.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

     I hereby certify that on May 19, 2025, I electronically filed Plaintiff's First Amended Complaint with the Clerk of the court using the CM/ECF system, thereby serving a copy of the same on counsel listed below

Kimberly Zimmer
120 East Washington Street, Suite 815
Syracuse, New York 13202
Bar Roll No.: 505346
Tel: 315-422-9909
Fax: 315-422-9911
kmz@kimzimmerlaw.com
*Attorney for Shea Schoff*

William A. Scott
Assistant Attorney General
Attorney General of the State of New York
The Capitol
Albany, New York 12224
Bar Roll No.: 512434
Tel: 518-776-2255
William.Scott@ag.ny.gov
*Attorney for Daniel Martuscello III*

Thomas J. Murphy, Esq.
1800 AXA Tower 1
100 Madison St.
Syracuse, NY 13202
Bar Roll No.: 102248
Tel: 315-565-4572
Tjmurphy@hancocklaw.com
*Attorney for Defendant Danielle Medbury*

James L. Riotto II 4876488
30 W. Broad Street Suite 100
Rochester, NY 14614
Tel: 585-546-4001
Fax: 585-219-6242
Jriotto@riottolaw.com
*Attorney for Anthony Farina*

Brady J. O'Malley
231 Walton St
Syracuse, NY 13202
Bar Roll No.: 517407
Tel: 315-551-7438
brady@naveteam.com
*Attorney for Kyle Dashnaw*

Michael D. Assaf
Assaf & Siegal PLLC, 16 Corporate Woods
Blvd., Albany, NY 12211
Bar Roll No.: 505592
Tel: 518-431-1000
Fax: 518-465-7200
massaf@assafandsiegal.com
*Attorney for Robert Kessler*

Andrew F. Pisanelli, Esq.
Milber Makris Plousadis & Seiden, LLP
100 Manhattanville Road, Suite 4E20
Purchase, New York 10577
Bar Roll No.: 706313
Tel: 914-231-8025
apisanelli@milbermakris.com
*Attorneys for Defendant Abedin Mehmedovic*

Andrew R. Safranko 510803
Nicholas J. Evanovich III 520762
Lily G. Killar 705214
LaMarche Safranko Law PLLC
987 New Loudon Road
Cohoes, NY 12047
Tel: 518-982-0770
Fax: 518-982-0773
ASafranko@LSLawNY.com
NEvanovich@LSLawNY.com
LKillar@LSLawNY.com
*Attorneys for Nicholas Anzalone*

Alexandra N. von Stackelberg
Capezza Hill, LLP
30 South Pearl Street, P-110
Albany, New York 12207
Bar Roll No. 705595
Tel: 518-478-6065
allee@capezzahill.com
*Attorney for Michael Mashaw*

      I further hereby certify that on May 19, 2025 I caused a copy of Plaintiff's First Amended Complaint be served on the individuals listed below by U.S. mail:

Michael Fisher
124 South Crescent Dr.
Rome, NY 13440

      I further certify that per Local Rule 15.1(c), I will arrange for Plaintiff's First Amended Complaint to be served pursuant to Federal Rule of Civil Procedure Rule 4 on the individuals listed below who have not yet appeared in this matter:

Nicholas Kieffer

David Kingsley

Christopher Walrath

David Walters

Glenn Trombley

Dated: May 19, 2025

By: /s/ Elizabeth Mazur
*Counsel for Plaintiff*