**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CRESSIDA A. DIXON, Monroe County Public
Administrator, in her capacity as Administrator of
the ESTATE OF ROBERT L. BROOKS SR.,

                    Plaintiff,                9:25-cv-00068 (AMN/ML)

     v.

ANTHONY FARINA *et al.*,

                    Defendants.

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **HUGHES SOCOL PIERS**<br>**RESNICK DYM, LTD.**<br>70 West Madison Street – Suite 4000<br>Chicago, Illinois 60602<br>*Attorneys for Plaintiff* | **CARYN CECELIA LEDERER, ESQ.**<br>**ELIZABETH N. MAZUR, ESQ.**<br>**KATE E. SCHWARTZ, ESQ.**<br>**MATTHEW J. PIERS, ESQ.** |
| **FARACI LANGE, LLP**<br>1882 South Winton Road – Suite 1<br>Rochester, New York 14618<br>*Attorneys for Plaintiff* | **LESLEY E. NIEBEL, ESQ.**<br>**STEPHEN G. SCHWARZ, ESQ.** |
| **THE LAW OFFICE OF JAMES L. RIOTTO**<br>30 West Broad Street – Suite 306<br>Rochester, New York 14614<br>*Attorneys for Defendant, Cross Defendant,*<br>*and Cross Claimant Anthony Farina* | **JAMES L. RIOTTO, ESQ.** |
| **LUIBRAND LAW FIRM, PLLC**<br>950 New Loudon Road – Suite 270<br>Latham, New York 12110<br>*Attorneys for Defendant, Cross Defendant,*<br>*and Cross Claimant Matthew Galliher* | **KEVIN A. LUIBRAND, ESQ.**<br>**ELIZABETH M. HARMON, ESQ.** |
| **LAMARCHE SAFRANKO LAW PLLC**<br>987 New Loudon Road<br>Cohoes, New York 12047 | **ANDREW R. SAFRANKO, ESQ.**<br>**NICHOLAS J. EVANOVICH, III**<br>**LILY G. KILLAR, ESQ.** |

*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Nicholas Anzalone*

**DAVID KINGSLEY**
26 North Main Street
Adams, New York 13605
*Defendant and Cross Defendant pro se*

**LAW OFFICE OF DAVID A.**          **DAVID A. LONGERETTA, ESQ.**
**LONGERETTA, PLLC**
298 Genesee Street
Utica, New York 13502
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Nicholas Kieffer*

**ASSAF, SIEGAL LAW FIRM**          **MICHAEL D. ASSAF, ESQ.**
16 Corporate Woods Boulevard
Albany, New York 12211
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Robert Kessler*

**MICHAEL FISHER**
124 South Crescent Drive
Rome, New York 13440
*Defendant and Cross Defendant pro se*

**CHRISTOPHER WALRATH**
117 Dockey Road
Little Falls, New York 13365
*Defendant and Cross Defendant pro se*

**SUGARMAN LAW FIRM LLP**          **STEPHEN A. DAVOLI, ESQ.**
211 West Jefferson Street
Syracuse, New York 13202
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Michael Along*

**ZIMMER LAW OFFICE PLLC**          **KIMBERLY M. ZIMMER, ESQ.**
The University Building
120 East Washington Street – Suite 815
Syracuse, New York 13202
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Shea Schoff*

**PAUL TUCK ATTORNEY AT LAW PLLC**          **PAUL J. TUCK, ESQ.**
P.O. Box 44

Manlius, New York 13104
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant David Walters*

**CAPEZZA HILL LLP**                              **THOMAS A. CAPPEZZA, ESQ.**
30 South Pearl Street – Suite P-110              **BENJAMIN W. HILL, ESQ.**
Albany, New York 12207                           **ALEXANDRA VON STACKELBERG,**
*Attorneys for Defendant, Cross Defendant,*      **ESQ.**
*and Cross Claimant Michael Mashaw*

**NAVE LAW FIRM**                                **BRADY J. O'MALLEY, ESQ.**
231 Walton Street
Syracuse, New York 13202
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Kyle Dashnaw*

**MILBER MAKRIS PLOUSADIS**
**& SEIDEN, LLP**                                **ANDREW F. PISANELLI, ESQ.**
100 Manhattanville Road – Suite 4e20
Purchase, New York 10577
P.O. Box 44
Manlius, New York 13104
*Attorneys for Defendant, Cross Defendant,*
*and Cross Claimant Abedin Mehmedovic*

**HANCOCK ESTABROOK, LLP**                       **THOMAS J. MURPHY, ESQ.**
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202
*Attorneys for Defendant and Cross Defendant*
*Danielle Medbury*

**HON. LETITIA JAMES**                           **WILLIAM A. SCOTT, ESQ.**
New York State Attorney General                  **CHI-HSIN E. ENGELHART, ESQ.**
The Capitol
Albany, New York 12224
*Attorneys for Defendant and Cross Defendant*
*Daniel Martuscello, III*

**NO APPEARANCES:**

**GLENN TROMBLEY**
*Defendant and Cross Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On January 15, 2025, Robert L. Brooks, Jr., as administrator of the estate of Robert L. Brooks, Sr., commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), against numerous defendants (collectively, "Defendants"), asserting claims as a result of his father's death while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1. On May 19, 2025, the administrator of the estate of Robert L. Brooks, Sr. ("Plaintiff") filed an amended complaint. Dkt. No. 146 ("Amended Complaint").

Presently before the Court are Plaintiff's motion for leave to file a second amended complaint, Dkt. No. 428 ("Second Amended Complaint"); several motions to dismiss, *see, e.g.,* Dkt. No. 219, 295, 309, 351, 416; and related ancillary motions, Dkt. Nos. 360-363, 365, 426. *See also* Dkt. Nos. 333, 342, 357, 364, 366, 379, 380, 442. The Court addresses each below.

## II.    BACKGROUND

Unless otherwise noted, the following facts are drawn from the proposed Second Amended Complaint, its attachments, or materials it incorporates by reference, and are assumed to be true for purposes of ruling on the Motion, *see Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (*per curiam*), or are otherwise matters of public record, *see Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020). *See also infra* Section IV.A.

### A.  The Parties

Cressida A. Dixon is the former Monroe County public administrator and Brian Laudadio is the current Monroe County public administrator, as well as the duly appointed administrator of

the Estate of Robert L. Brooks, Sr.  Dkt. No. 428-3 at ¶ 22; Dkt. No. 428-1 at ¶ 3.

At all relevant times, Robert L. Brooks, Sr. ("Mr. Brooks"), was in the care and custody of DOCCS, first at Mohawk Correctional Facility ("Mohawk") and then at Marcy Correctional Facility ("Marcy").  Dkt. No. 428-3 at ¶¶ 2, 22, 29.  Plaintiff alleges that while incarcerated, Mr. Brooks earned his GED, worked several jobs, maintained close relationships with family members, deepened his religious faith, and consistently avoided trouble.  *Id.* at ¶ 69.  The only disciplinary ticket Mr. Brooks received was for a single instance of failing to appear for a job assignment.  *Id.*

DOCCS employed as correction officers Defendants Michael Along, Nicholas Anzalone, John Bankert, Bobbi Bedient, Steven Caufield, Kyle Dashnaw, Anthony Farina, Michael Fisher, Matthew Galliher, Robert Kessler, Nicholas Kieffer, David Kingsley, Michael Mashaw, Jared Popiel, Shea Schoff, Travis Tabor, Glenn Trombley, Christopher Walrath, and David Walters, and a staffing agency employed Abedin Mehmedovic as a nurse at Marcy (collectively, the "On-Scene Defendants").  *Id.* at ¶¶ 23-24.  Defendant Bedient was a lieutenant who served as Marcy's acting watch commander, and Defendants Mashaw and Trombley were sergeants.  *Id.* at ¶ 23.  DOCCS also employed Defendant Sherri Abreu as a correction officer.  *Id.*

Defendant Danielle Medbury served as the acting superintendent at Marcy, after serving as the first deputy superintendent of the facility.  *Id.* at ¶ 25.  Defendant Michael D'Amore served as the DOCCS deputy commissioner for correctional facilities, after previously serving as the superintendent and first deputy superintendent at Marcy.  *Id.* at ¶ 26.  Defendant Daniel Martuscello III (collectively with Defendants Medbury and D'Amore, the "Supervisory Defendants") served as the DOCCS commissioner, after holding numerous other leadership roles

during his nearly three decades at the agency.  *Id.* at ¶ 27.

**B.  Plaintiff's Factual Allegations**

Plaintiff's allegations are serious and extensive.  At this stage, the Court details them only as necessary to resolve the pending motions.

**1.  Alleged Events at Mohawk on December 7-9, 2024**

On December 7, 2024, Mr. Brooks was sleeping in a dormitory at Mohawk when another incarcerated individual struck him in the face with a padlock.  *Id.* at ¶¶ 29-30.  Mr. Brooks reported headaches and nausea, and was eventually transported to a hospital.  *Id.* at ¶ 32.  He continued to experience these and other symptoms, including vomiting, at the hospital.  *Id.* at ¶ 33.  X-rays of Mr. Brooks' forearm, wrist, and chest, as well as CT scans of his spine, head, and jaw, all showed no abnormalities.  *Id.*

When Mr. Brooks returned to Mohawk, he was transferred to a new dormitory, overseen by Defendant Abreu.  *Id.* at ¶¶ 34-35.  Mr. Brooks purportedly had visible injuries to his face, and appeared tired and weak.  *Id.* at ¶ 36.  On December 8, as Defendant Abreu made her rounds through the dormitory, she noticed vomit on the floor of Mr. Brooks' sleeping area.  *Id.* at ¶ 37.  Defendant Abreu instructed Mr. Brooks to clean up the vomit.  *Id.*  Mr. Brooks was too weak to get up.  *Id.* at ¶ 38.  He allegedly told Defendant Abreu that he would clean up the vomit, but that he was too ill at that moment to do so immediately.  *Id.*  A short time later, Defendant Abreu and Mr. Brooks had another similar exchange.  *Id.* at ¶ 39.

Plaintiff alleges that Defendant Abreu wanted the vomit cleaned up before a sergeant made his own rounds through the dormitory.  *Id.* at ¶ 43.  As a result, Defendant Abreu allegedly summoned an incarcerated individual affiliated with the Bloods (nicknamed "Swift") and communicated with Swift regarding Mr. Brooks' failure to follow her orders.  *Id.* at ¶ 40.

According to Plaintiff, Swift was physically imposing and controlled other incarcerated individuals in the dormitory through force. *Id.* at ¶ 41. Because Swift helped correction officers maintain order in the dorm, the officers treated him well in return. *Id.* Plaintiff alleges that, after speaking with Defendant Abreu, Swift and two affiliates approach Mr. Brooks, said words to the effect of "[d]idn't she tell you clean the shit up?" and proceeded to physically beat Mr. Brooks. *Id.* at ¶ 44. Mr. Brooks then cleaned up his vomit. *Id.* at ¶ 45.

Mr. Brooks continued vomiting throughout the evening of December 8. *Id.* at ¶ 47. He purportedly did not sleep at all that night. *Id.* at ¶ 48. Instead, he stayed awake to avoid being assaulted a third time. *Id.*

On the morning of December 9, Swift discovered that Mr. Brooks had vomited again and had not cleaned it up. *Id.* at ¶ 49. Swift spoke with Defendant Abreu, who then left the dormitory. *Id.* at ¶ 50. Swift and his affiliates then approached Mr. Brooks and said words to the effect of "[d]idn't I tell you don't throw up again? Didn't Miss A tell you don't throw up again?" *Id.* at ¶ 51. The group proceeded to punch Mr. Brooks and hit him with a sock containing padlocks. *Id.* Mr. Brooks cried out and crawled toward the dormitory exit for help from correction officers. *Id.*

Mr. Brooks eventually encountered Defendant Abreu and told her that he had been assaulted. *Id.* at ¶ 52. Defendant Abreu summoned a non-party sergeant, who removed Mr. Brooks from her dormitory. *Id.* at ¶ 53. This sergeant brought Mr. Brooks to Mohawk's medical unit for evaluation. *Id.* at ¶ 54. Medical staff purportedly observed a laceration and swelling on Mr. Brooks' face. *Id.* Because Mr. Brooks was making strange statements about having plans to fly to Puerto Rico that day, the sergeant also arranged for mental health staff to see him. *Id.*

Following that meeting, the sergeant determined that Mr. Brooks would continue to be assaulted if he remained at Mohawk. *Id.* at ¶ 56. The sergeant then allegedly arranged a so-called

involuntary protective custody ("IPC") transfer for Mr. Brooks, through which Mr. Brooks would be transferred out of Mohawk and to a different facility. *Id.*

Defendant Caufield was assigned to watch Mr. Brooks while Mr. Brooks waited several hours to be transferred out of Mohawk. *Id.* at ¶ 57. During this time, Defendant Caufield purportedly learned that Mr. Brooks had twice been assaulted at Mohawk and purportedly observed Mr. Brooks' facial injuries, as well as Mr. Brooks talking to himself and to an imaginary person named "Ray-Ray." *Id.* at ¶ 58.

Defendant Caulfield and a non-party correction officer were subsequently assigned the task of transporting Mr. Brooks from Mohawk to Marcy. *Id.* at ¶ 59. They shackled Mr. Brooks' hands and feet and transported him to Marcy in a van. *Id.* at ¶ 60.

### 2. Alleged Events at Marcy on December 9, 2024

Mr. Brooks arrived at Marcy around 9:07 p.m. and departed around 9:50 p.m. on December 9, when he was taken, by ambulance, to Wynn Hospital and subsequently pronounced dead. *Id.* at ¶¶ 63, 238.

During the approximately forty-five minutes that Mr. Brooks spent at Marcy, Plaintiff alleges that Mr. Brooks was beaten and choked to death, including while he was shackled, in a series of sustained and unprovoked attacks that the twenty On-Scene Defendants committed and/or failed to stop or mitigate. *See, e.g., id.* at ¶¶ 2-8, 95-219, 387-90. According to Plaintiff, much of the alleged violence occurred, intentionally, in areas of Marcy without stationary cameras. *Id.* at ¶¶ 115, 170, 214.

Broadly, during these forty-five minutes, Plaintiff alleges that Mr. Brooks was moved from the transport van into the administration building, then to a breezeway, then to an outdoor walkway, and then into an examination room in the infirmary. *Id.* at ¶¶ 82, 93, 95, 133-34, 167.

### i. Alleged Events in the Administration Building and Breezeway

Prior to Mr. Brooks entering the administration building, Defendant Caufield went in first and spoke with Defendant Popiel at the front desk. *Id.* at ¶ 71. Defendant Caufield told Defendant Popiel that the transport had been delayed and that Mr. Brooks was "being an asshole" and "might be a real shithead." *Id.* at ¶¶ 72-73.

Defendant Popiel then summoned Defendants Anzalone, Kessler, and Kieffer to process Mr. Brooks into Marcy. *Id.* at ¶¶ 74-75, 79. When these three Defendants arrived at the administration building, Defendants Caufield and Popiel informed them that Mr. Books had been assaulted multiple times at Mohawk, that he was coming to Marcy as an IPC transfer, and that he was being difficult. *Id.* at ¶ 81.

Defendants Caufield, Anzalone, Kessler, and Kiefer then went out to the transport van and escorted Mr. Brooks into the administration building. *Id.* at ¶¶ 82, 83, 93. Soon after Mr. Brooks arrived, Defendants Kieffer and Popiel purportedly broadcast radio transmissions to the effect of "wait till you get a look at this guy" and "you aren't going to like this one." *Id.* at ¶ 92.

As Defendants Caufield, Anzalone, Kessler, and Kiefer walked Mr. Brooks through the administration building to the breezeway, they walked past Defendants Bankert, Lieutenant Bedient (Marcy's acting watch commander), Popiel, and Tabor. *Id.* at ¶¶ 94-95. Plaintiff alleges that all eight of these Defendants observed Mr. Brooks' visible facial injuries. *Id.* at ¶¶ 82-83, 94.

As Defendants Caufield, Anzalone, Kessler, and Kiefer moved from the administration building into the breezeway with Mr. Brooks, Defendant Walrath arrived. *Id.* at ¶ 96. Plaintiff alleges that Defendant Walrath joined because he expected Mr. Brooks to be assigned to the dormitory Defendant Walrath often worked and Defendant Walrath had heard about Mr. Brooks being difficult. *Id.* at ¶ 97.

Defendant Caufield proceeded to remove Mr. Brooks' shackles. *Id.* at ¶ 98. Defendant Kessler then directed Mr. Brooks to stand up and put his hands in his pockets. *Id.* at ¶ 99. When Mr. Brooks put his hands only partly in his pockets, Defendant Walrath rammed him into the breezeway wall and placed him in a chokehold. *Id.* at ¶¶ 100, 102, 117. Defendants Anzalone, Kessler, and Kiefer proceeded to strike Mr. Brooks multiple times. *Id.* at ¶ 103. Plaintiff alleges that despite the use of force, none of these Defendants activated their body-worn cameras ("BWCs") as required by formal DOCCS policy. *Id.* at ¶ 114. Plaintiff alleges that the actual DOCCS policy was that correction officers "could do whatever they wanted when it came to BWC usage." *Id.*

Plaintiff alleges that the violence in the breezeway lasted sixty to ninety seconds and severely injured Mr. Brooks. *Id.* at ¶¶ 119, 121. Mr. Brooks' alleged injuries left numerous bloodstains in the breezeway, including a pool of blood on the floor that was twelve to eighteen inches in diameter. *Id.* at ¶ 121. Plaintiff alleges that Defendants Bankert, Lieutenant Bedient, Caufield, Farina, Sergeant Mashaw, Popiel, Tabor, and Sergeant Trombley each witnessed at least some violence in the breezeway. *Id.* at ¶¶ 116, 150-52. With respect to Marcy's acting watch commander, Defendant Lieutenant Bedient, Plaintiff alleges that she casually called out during the breezeway violence words to the effect of "[d]on't kill him, boys[.]" *Id.* at ¶ 123. Plaintiff further alleges that no Defendant intervened to stop the violence in the breezeway. *Id.* at ¶ 132. At the conclusion of the violence, Defendant Kieffer instructed Defendant Caufield "you didn't see anything" or words to that effect. *Id.* at ¶ 120.

As Defendant Caufield walked back through the administration building to the transport van, he purportedly remarked "you Marcy guys don't fuck around," to which Defendant Tabor allegedly responded, "you're right." *Id.* at ¶¶ 141-42.

### ii. Alleged Events on the Walkway

Meanwhile, Defendants Anzalone, Kessler, and Kieffer escorted Mr. Brooks from the breezeway onto the walkway. *Id.* at ¶¶ 133-34. Because Mr. Brooks was not moving as quickly as they desired on the walkway, these Defendants allegedly forced him to the ground, pepper sprayed him, got on top of him, handcuffed his hands behind his back, and then pulled Mr. Brooks to his feet. *Id.* at ¶¶ 135-36. Following the use of pepper spray, Defendant Kieffer broadcast a "red dot" request on his radio. *Id.* at ¶ 138. Plaintiff alleges that such a request relates to the use of force against an incarcerated individual and indicates a correction officer has an urgent need for assistance from fellow officers. *Id.* at ¶¶ 139-40.

Plaintiff alleges that Defendants Farina, Galliher, Kingsley, Sergeant Mashaw, and Sergeant Trombley heard the radio transmission and quickly responded to the walkway.[1] *Id.* at ¶¶ 154, 158, 160. Plaintiff alleges that each of these five Defendants knew that Defendants Anzalone, Kessler, and Kiefer had previously used force against Mr. Brooks. *See, e.g., id.* at ¶ 161.

This group of eight Defendants then proceeded along the walkway with Mr. Brooks handcuffed. *Id.* at ¶ 163. Plaintiff alleges that multiple of these Defendants continued to use excessive force against Mr. Brooks as they walked through the walkway towards the infirmary. *Id.* at ¶¶ 164-65. For example, Defendant Kessler allegedly punched Mr. Brooks in the ribs, while Defendant Kingsley pulled Mr. Brooks' feet out from under him. *Id.* at ¶ 166. Defendants Anzalone and Kessler then held Mr. Brooks' arms up and behind his back, while Defendant Kingsley held Mr. Brooks' feet. *Id.* at ¶ 167. These Defendants then proceeded to carry Mr. Brooks through the walkway in this hogtied position. *Id.*

---

[1] Plaintiff also alleges that Defendants Bankert, Lieutenant Bedient, Caufield, Popiel, and Tabor each heard this radio transmission, but still did nothing to protect Mr. Brooks. *Id.* at ¶¶ 143-44.

### iii. Alleged Events in the Infirmary

Plaintiff includes a purported photograph of Mr. Brooks being carried facedown in this hogtied position into an examination room in the infirmary building. *Id.*

Defendants Along, Dashnaw, Galliher, Mehmedovic, and Walters were waiting in the infirmary building. *Id.* at ¶ 169. At least three of them were purportedly aware that Mr. Brooks was "coming in hot," a phrase which Plaintiff alleges meant that correction officers had used force against Mr. Brooks because he was causing problems for them. *Id.* at ¶ 173. According to Plaintiff, these five Defendants, among others, also knew that the examination rooms had no stationary cameras and that Defendants Anzalone, Farina, and Kessler had reputations for using excessive force. *Id.* at ¶¶ 170-71; *see also id.* at ¶¶ 161, 214.

After Mr. Brooks was carried into the examination room, Plaintiff alleges that numerous Defendants subjected Mr. Brooks to a brutal and protracted beating between approximately 9:22 p.m. and 9:32 p.m. *See, e.g., id.* at ¶¶ 181-210. Plaintiff alleges that the BWCs worn by Defendants Along, Fisher, Galliher, and Sergeant Trombley passively recorded some of this violence. *Id.* at ¶ 182. According to Plaintiff, this BWC footage shows that:

> "[Defendants]' brutality goes on and on, even beyond [Mr. Brooks] losing the ability to sit upright . . . . Almost as disturbing as the video's depiction of violence perpetrated on [Mr. Brooks] is the demeanor of . . . other Marcy staff who watched or otherwise knew about brutal assaults on [Mr. Brooks] and did nothing. Rather than expressing shock or concern about [Mr. Brooks'] safety, these individuals calmly went about their duties as Marcy correctional officers.

*Id.* at ¶¶ 7-8.

Plaintiff alleges that fourteen Defendants—Along, Anzalone, Dashnaw, Farina, Fisher, Kessler, Kieffer, Kingsley, Sergeant Mashaw, Mehmedovic, Schoff, Sergeant Trombley, Walrath, and Walters—were present in the infirmary, and that each participated in the violence therein, or at least witnessed some of it. *Id.* at ¶ 211. According to Plaintiff, none of these Defendants sought

to intervene or protect Mr. Brooks. *Id.* at ¶¶ 212-13, 218-19. Plaintiff alleges that Mr. Brooks eventually lost conscious and went limp as a result of the violence. *Id.* at ¶ 200.

Approximately ten minutes after the violence ended, two non-party lieutenants entered the examination room and ordered everyone to activate their BWCs. *Id.* at ¶¶ 236-37. Only at that time did resuscitative efforts begin. *Id.* Around 9:50 p.m., an ambulance arrived and took Mr. Brooks to Wynn Hospital. *Id.* at ¶ 238. According to Plaintiff, the Onondaga County Medical Examiner subsequently determined that Mr. Brooks died because of asphyxia due to compression to his neck and multiple blunt force injuries, and deemed his manner of death a homicide. *Id.* at ¶ 239.

### iv. Alleged Events after the Infirmary

Soon after the ambulance left Marcy with Mr. Brooks, Plaintiff alleges that one of the non-party lieutenants began coordinating the documentation of the use of force against Mr. Brooks. *Id.* at ¶ 240. According to Plaintiff, this lieutenant summoned to his office only Defendants Anzalone, Kessler, and Kieffer. *Id.* at ¶ 242. These three Defendants were purportedly selected because one or more of them had used pepper spray on the walkway. *See, e.g., id.* at ¶¶ 133-37. In Plaintiff's telling, the lieutenant decided to document only this portion of events because (i) it was witnessed by the fewest number of correction officers; (ii) included the most easily justifiable use of force (pepper spray); and (iii) required documentation, because DOCCS monitored pepper spray quantities. *Id.* at ¶ 246.

During this meeting, Defendant Kessler allegedly began telling the lieutenant about the earlier violence in the breezeway. *Id.* at ¶ 244. The lieutenant purportedly told Defendant Kessler to stop talking. *Id.* According to Plaintiff, the lieutenant went on to pose various rhetorical questions to Defendants Anzalone, Kessler, and Kieffer, such as "[w]hat, you killed another one?"

and "[y]ou guys had to dump the smallest convict in the history of man? You couldn't have found a bigger guy?" *Id.* at ¶ 247. The lieutenant supposedly instructed these three Defendants to work with Defendant Sergeant Trombley to prepare use of force reports that addressed only the use of force on the walkway. *Id.* at ¶ 249. Later than evening, this lieutenant allegedly also told Defendants Anzalone, Kessler, Kieffer, and Sergeant Trombley to "get their stories straight." *Id.*

Plaintiff claims that these four Defendants subsequently worked to fabricate a report justifying the use of pepper spray on the walkway, and that Defendant Sergeant Trombley also prepared a false disciplinary charge against Mr. Brooks to support this fictious narrative. *See, e.g., id.* at ¶¶ 250-52.

### 3. DOCCS' Alleged Policy

Plaintiff states that Mr. Brooks' death was the result of "a well-settled and widespread de facto policy has long existed across []DOCCS . . . of failing to hold correctional officers accountable for using excessive force against incarcerated individuals." *Id.* at ¶ 265. Plaintiff alleges that this policy (the "Policy") benefits DOCCS "because it helps maintain the appearance of order in [DOCCS] facilities[.]" *Id.* at ¶ 267.

Plaintiff alleges that as a result of the Policy, "correctional officers can freely assault incarcerated individuals, safe in the knowledge that their actions will never be subject to any meaningful scrutiny." *Id.* at ¶ 266. In Plaintiff's telling, the Policy "posed a substantial risk of harm to incarcerated individuals like [Mr. Brooks] and was a moving force behind [Mr. Brooks'] killing." *Id.* at ¶ 269. According to Plaintiff:

> [The P]olicy was so well-settled and widespread that the officers who beat [Mr. Brooks] and those who looked on while it occurred were emboldened, and indeed encouraged, to brutalize [Mr. Brooks] or allow [him] to be brutalized with impunity. These officers were confident in the knowledge that their misconduct would be easily concealed and would not be subject to any meaningful examination or investigation.

> Indeed, two Sergeants watched their subordinates use deadly force against [Mr. Brooks] in the [examination] room, a Lieutenant immediately set a coverup into motion afterward, and none of the . . . individuals who witnessed uses of force against Robert in the breezeway and [examination] room made any report of what occurred. These things do not happen by accident—they are the result of [the P]olicy that flourished and became engrained in Marcy culture in the years leading up to December 9, 2024, under the leadership of the Supervisory Defendants.

*Id.* at ¶¶ 270-71.

### 4. Alleged Evidence of the Policy

Separate from the death of Mr. Brooks, Plaintiff alleges numerous instances in which the Policy permitted correction officers to perpetuate violence against incarcerated individuals without accountability. The Court details three of these instances before summarizing Plaintiff's additional allegations related to the Policy.

At Marcy in October 2024, multiple correction officers (including Defendants Anzalone, Farina, and Kessler) allegedly choked and assaulted another incarcerated man, also in an area of the facility without stationary cameras. *Id.* at ¶¶ 299-300. According to Plaintiff, the violence broke the man's ribs, punctured his lung, and caused ligature marks on his neck, injuries which necessitated a nearly two-week hospital stay. *Id.* at ¶¶ 300-01. Plaintiff alleges that the incarcerated man's attorney communicated with Defendant Martuscello in October 2024 about the incident, *id.* at ¶ 302, but that Defendant Martuscello took no meaningful action to prevent Defendants Anzalone, Farina, and Kessler, or any other Marcy correction officer, from subjecting other incarcerated individuals to similar violence, *id.* at ¶ 303. This incarcerated man subsequently filed a federal civil rights lawsuit in connection with the alleged violence. *Id.* at ¶ 300 n.6; *see also Rivas v. Kessler et al.*, Case No. 25-cv-00253 (N.D.N.Y. filed Feb. 26, 2025).

At Marcy in September 2020, multiple correction officers (including Defendants Farina and Sergeant Trombly) allegedly assaulted another incarcerated man in a shower area. Dkt. No.

428-3 at ¶¶ 305-08.  Correction officers were purportedly laughing during the assault and, although this man was also handcuffed, no correction officer attempted to intervene.  *Id.* at ¶¶ 308-09. According to Plaintiff, the violence shattered the man's ankle bone and permanently deformed his face, injuries which required surgeries.  *Id.* at ¶ 310.  Plaintiff alleges that false disciplinary charges were filed against this man in order to cover up the assault.  *Id.* at ¶ 311.  This man subsequently filed a federal civil rights lawsuit in connection with the alleged violence.  *Id.* at ¶ 312 & n.7; *see also Alvarez v. Bause et al.*, Case No. 22-cv-00186 (N.D.N.Y. filed Feb. 28, 2022).  During his October 2023 deposition, this man testified that Defendant Sergeant Trombley is the "sergeant in charge of the beat-up squad" of correction officers who supposedly assault incarcerated individuals at Marcy.  Dkt. No. 428-3 at ¶ 313 & n.8 (quoting *Alvarez*, Dkt. No. 49-2 at 25, 34).

At Marcy in February 2020, multiple correction officers (including Defendant Anzalone and two sergeants) allegedly assaulted a third incarcerated man in a bathroom, leaving him with serious injuries to his face and head.  *Id.* at ¶¶ 314-18.  These officers purportedly sought to cover-up the violence in several ways, including by filing fabricated disciplinary charges against the man. *Id.* at ¶¶ 319-20.  This man subsequently filed a federal civil rights lawsuit in connection with the alleged violence, *id.* at ¶ 321 & n.9; *see also Bauer v. Iodice et al.*, Case No. 22-cv-01007 (N.D.N.Y. filed Sept. 23, 2022).

Plaintiff also sets forth three additional categories of allegations related to the Policy.

First, Plaintiff details claims made by a civil rights attorney whose clients at Marcy "have consistently reported experiencing retaliation and violence when they attempt to assert their legal rights" and who herself filed a federal civil rights lawsuit against Marcy officials because "Marcy staff made it so difficult for [her] to represent her clients[.]"  Dkt. No. 428-3 at ¶¶ 322-23 & n.10; *see also Agnew v. D'Amore et al.*, Case No. 23-cv-01610 (N.D.N.Y. filed Dec. 20, 2023).

Second, Plaintiff relies on a series of jury verdicts, settlements, criminal prosecutions, and judicial findings since 2020 to detail more than a dozen specific instances of correction officers using violence and/or covering up such conduct. *See, e.g.,* Dkt. No. 428-3 at ¶¶ 333-39. Plaintiff asserts that payouts in these matters exceeded $17 million. *Id.* at ¶ 334.

Third, Plaintiff cites three publicly reported investigations of New York State prisons. The first, conducted at Marcy in October 2022 by the Correctional Association of New York ("CANY"), resulted in a July 2023 report. *See generally id.* at ¶¶ 278-97. Among the alleged findings from this investigation were that incarcerated individuals at Marcy reported a "higher instance of staff abuse" compared to other DOCCS facilities, *id.* at ¶ 284, as well as "rampant physical staff abuse, especially in locations without cameras," *id.* at ¶ 291. CANY personnel also purportedly "observed a pervasive culture of fear and retaliation at Marcy[,]" observations that were apparently confirmed by incarcerated individuals confiding that Marcy "staff had walked through the housing units the night prior announcing threats of physical harm in retaliation for speaking with CANY." *Id.* at ¶ 290. According to Plaintiff, "CANY implored the []DOCCS Office of Special Investigations ('OSI') and Inspector General to 'investigate the widespread claims of abuse at Marcy[,']" *id.* at ¶ 292, but the Supervisory Defendants did nothing to "meaningfully address, much less abate, the problem of rampant staff violence at Marcy[,]" *id.* at ¶ 293.

The second and third investigations were conducted and then reported by the Marshall Project and the New York Times in 2015, 2016, and 2023. *See generally id.* at ¶¶ 325-28, 340-46. Among the purported conclusions from these investigations were that "a culture of brutality has been allowed to thrive in [DOCCS] prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other

way[,]" *id.* at ¶ 325; that New York State had faced significantly liability as a result, "requiring hundreds of payouts to incarcerated victims of unconstitutional excessive force," totaling at least $8.8 million in settlements or jury awards between 2010 and 2015, *id.* at ¶ 327; and that among more than 200 cases, "the names of some officers and prisons crop up repeatedly[,]" *id.* (citation omitted).  These investigations also purportedly examined more than 5,000 DOCCS disciplinary records and found that "staff cover ups of excessive force incidents were 'commonplace'" across DOCCS, *id.* at ¶¶ 340-41, and that the disciplinary "records illustrate how cover ups make it difficult to hold officers accountable for using excessive force" and "also reveal a typical playbook: Guards often work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims[,]" *id.* at ¶ 342.

### 5.  Defendant Martuscello's Alleged Involvement

Plaintiff alleges that Defendant Martuscello was personally aware of the Policy, as well as the substantial risk of serious harm that the Policy created for incarcerated individuals like Mr. Brooks.[2]  *Id.* at ¶¶ 272-73.

Plaintiff alleges that from 2012 to 2017, Defendant Martuscello served as the DOCCS Deputy Commissioner for Administrative Services, a role in which "he was responsible for addressing problems in the []DOCCS staff disciplinary system[;]" that from approximately 2017 to 2023, Defendant Martuscello served as the DOCCS Executive Deputy Commissioner, the "second-in-command and principal advisor" to the commissioner, a role in which "he coordinated the activities of and provided general direction to the []DOCCS Executive Team, with an emphasis

---

[2] Plaintiff makes related allegations against the other two Supervisory Defendants, who each held leadership roles at Marcy.  *See, e.g., id.* at ¶¶ 25-26, 272-73.  Because Defendants D'Amore and Medford have not moved to dismiss, however, the Court does not detail Plaintiff's allegations against them.

on labor relations[;]" and that, since he became commissioner, Defendant Martuscello "sets policies, customs, and practices for []DOCCS and was responsible for ensuring the safety of individuals in []DOCCS custody." *Id.* at ¶ 27. Plaintiff alleges that in each of these roles, Defendant Martuscello had authority over the []DOCCS systems in place for investigating allegations of correctional officer abuse and kept himself informed about significant staff misconduct allegations, lawsuits, investigations, and news coverage about staff abuse within []DOCCS." *Id.*

More specifically, Plaintiff claims that "during the period 2012 to 2023, Defendant Martuscello was responsible for reviewing OSI investigations and deciding whether to issue Notices of Discipline for correctional staff who engaged in physical abuse of incarcerated individuals[,]" *id.* at ¶ 356; and that Defendant Martuscello "has also been personally informed about significant OSI investigations involving staff abuse and lawsuits involving abuse by correctional officers (including the lawsuits mentioned in this Complaint)[,]" *id.* at ¶ 357. Plaintiff further alleges that, since approximately 2017, Defendant Martuscello has been "made personally aware of significant legal cases like these, including settlements and jury verdicts involving allegations of excessive force by []DOCCS staff as well as criminal charges against correctional officer defendants involving excessive force and cover ups[,]" *id.* at ¶ 335; and that Defendant Martuscello is also "familiar with all the news reports described in this Complaint," *id.* at ¶ 347.

For example, Plaintiff alleges that Defendant Martuscello was interviewed in connection with the first investigation by the Marshall Project and New York Times. *Id.* at ¶ 328. Plaintiff claims that, while Defendant Martuscello was not the commissioner at that time, DOCCS nonetheless put him forward "because he was the []DOCCS Executive Team member most knowledgeable about the agency's history of failing to hold abusive officers accountable." *Id.*

Defendant Martuscello allegedly posed for photographs and told reporters that he was "ready to take the battle to the prison guards' union." *Id.*

Plaintiff alleges that Defendant Martuscello was interviewed again in connection with the second investigation by the Marshall Project and New York Times. *Id.* at ¶ 343. Defendant Martuscello allegedly "told reporters that he was not surprised that false reports often accompany instances of excessive force" and that "[t]here has to be some manipulation of facts[.]" *Id.*

With respect to the CANY investigation, Plaintiff alleges that Defendant Martuscello read and forwarded an email from CANY regarding the "key areas of concern" identified during the October 2022 investigation at Marcy, and that he was also aware of the contents of the resulting July 2023 report. *Id.* at ¶¶ 280-81, 293.

Plaintiff alleges that, for approximately two years prior to Mr. Brooks' death, Defendant Martuscello had quarterly conference calls with advocates for incarcerated individuals. *Id.* at ¶¶ 348, 353. During these conversations, Plaintiff alleges that advocates repeatedly and consistently raised alarms about assaults by correction officers, once even characterizing the issue as a "ticking time-bomb." *Id.* at ¶ 353. According to Plaintiff, "[e]ach time, [Defendant] Martuscello acknowledged the concern and then quickly deflected by moving on to a new topic without any meaningful response." *Id.* Plaintiff further alleges that Defendant Martuscello met with advocates for incarcerated individuals on August 27, 2024. *Id.* at ¶ 349. Formerly incarcerated individuals were purportedly among the advocates at this meeting. *Id.* at ¶ 350. Advocates allegedly raised with Defendant Martuscello "the prevalence of 'beat up squads[,]'" "implored" him "to stop the systemic abuse by, among other things, closing the most problematic facilities[,]" and "included Marcy in the group of facilities that should be closed due to rampant staff violence." *Id.* at ¶ 351. Defendant Martuscello supposedly dismissed these concerns as well,

"stating that there were too many cameras inside correctional facilities for staff abuse to occur." *Id.* at ¶ 352.

### 6. Alleged Events Following Mr. Brooks' Death

Plaintiff alleges that, because various Defendants accidentally recorded some of the violence against Mr. Brooks on their BWCs, video evidence emerged and sparked public outcry.[3] *Id.* at ¶ 363. Defendant Martuscello purportedly issued a public statement that watching the video made him feel "deeply repulsed and nauseated." *Id.* at ¶ 12. Defendant Martuscello allegedly acknowledged that there was "no excuse" for the correction officers' actions and recognized the need for "institutional change" to prevent any similar future occurrences. *Id.*

State authorities subsequently brought criminal charges against eleven On-Scene Defendants. *Id.* at ¶ 364; *see also* Dkt. No. 401. According to the parties, Defendants Anzalone, Farina, Sergeant Mashaw, Walrath, and Walters pled guilty to manslaughter; Defendant Fisher pled guilty to reckless endangerment; and Defendants Kessler and Sergeant Trombley have agreed to plead guilty to gang assault. *See, e.g.,* Dkt. No. 454 at 2.[4] A jury found Defendant Kingsley guilty of murder and acquitted Defendants Galliher and Kieffer of the criminal charges brought against them. *Id.*

Plaintiff alleges that the public outcry and criminal prosecution created political pressure to reform DOCCS, which resulted in a multiweek strike by more than 10,000 correction officers, beginning in February 2025. Dkt. No. 428-3 at ¶¶ 364-71. More than 10,000 of these officers allegedly flouted a court order directing that this purportedly illegal work stoppage cease. *Id.* at

---

[3] Plaintiff alleges that this video emerged because New York State officials were required to publicly release it a few weeks after Mr. Brooks' death. *Id.* at ¶ 9.

[4] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

¶ 372.  Plaintiff alleges that correction officers took these actions because of the Policy, which they supposedly knew would permit them to act with impunity but was under threat.  *Id.* at ¶¶ 364, 373.  According to Plaintiff, if "[]DOCCS had an actual policy of holding correctional officers accountable for dangerous misconduct, then 10,000 of its correctional officers would not have felt emboldened to abandon their posts, violate state law, violate a court order, and expose others to grave danger."  *Id.* at ¶ 374.

Plaintiff alleges that at least nine incarcerated individuals died during this strike.  *Id.* at ¶ 375.  According to Plaintiff, correction officers also beat one of these men to death in a prison infirmary[5] and sought to cover up the circumstances of his death.  *Id.* at ¶¶ 376-83.

### C.    Plaintiff's Legal Claims

Based on these factual allegations, Plaintiff asserts three types of claims in the Second Amended Complaint: under Section 1983 (i) that twenty-one Defendants violated Mr. Brooks' Eighth Amendment rights in numerous different ways, *id.* at ¶¶ 384-93; (ii) that the three Supervisory Defendants violated Mr. Brooks' Eighth Amendment rights by failing to protect him from a substantial risk of serious harm, *id.* at ¶¶ 394-401; and, under New York State law (iii) negligence, gross negligence, and wrongful death against Defendant Mehmedovic, *id.* at ¶¶ 402-05.

## III.    STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of a party's claim for relief.  *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007).  In

---

[5] Plaintiff alleges that this occurred in the facility directly across the street from Marcy and that the two facilities often share staff.  *Id.* at ¶ 334(a) n.19.  This man's estate has also filed a federal civil rights lawsuit in connection with his death.  *See Damas v. Bartlett et al.*, Case No. 25-cv-00775 (N.D.N.Y. filed June 17, 2025).

considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This presumption, however, does not extend to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (quotation omitted). Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *id.* at 570.

## IV.    DISCUSSION

Plaintiff has moved for leave to file the Second Amended Complaint. Dkt. No. 428. Defendants Martuscello and Kingsley have moved to dismiss Plaintiff's claims against them. Dkt. Nos. 219, 309. Defendant Martuscello has also moved to dismiss the crossclaims against him by Defendants Along, Anzalone, Dashnaw, Farina, Galliher, Kessler, Kieffer, Sergeant Mashaw, Mehmedovic, Schoff, and Walters. Dkt. Nos. 295, 351, 416. The Court addresses each motion in

turn.

### A. Plaintiff's Motion to Amend

On December 18, 2025, Plaintiff moved for leave to file the Second Amended Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure. Dkt. No. 428. "A district court 'should freely give leave' to amend a complaint 'when justice so requires.'" *Baroni v. Port Auth. of N.Y. & N.J.*, 161 F.4th 48, 62 (2d Cir. 2025) (quoting Fed. R. Civ. P. 15(a)(2)). No Defendant has opposed Plaintiff's request. *See generally* Docket Sheet. Defendant Martuscello expressly "defers to the Court's discretion to grant or deny such a motion." Dkt. No. 442. Plaintiff also made her motion in compliance with the applicable deadline set forth by United States Magistrate Judge Miroslav Lovric, Dkt. No. 277 at ¶ 5, as well as the requirements of Local Rule 15.1(a). As such, Plaintiff's motion is granted.

### B. Defendant Martuscello's Motion to Dismiss Plaintiff's Claim

The Court proceeds to consider Defendant Martuscello's pending motion to dismiss Plaintiff's claim against him, Dkt. No. 219,[6] given the allegations in the Second Amended Complaint. *See, e.g., Pettaway v. Nat'l Recovery Sols.*, 955 F.3d 299, 303-04 (2d Cir. 2020) ("[We] hold that when a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint.").

Defendant Martuscello contends that Plaintiff's Eighth Amendment claim against him fails because Plaintiff has not sufficiently alleged that (i) the Policy existed;[7] (ii) Defendant Martuscello

---

[6] The unopposed related requests, by Defendant Martuscello for an extension of time, Dkt. No. 361, and by Plaintiff to file supplemental authority, Dkt. No. 363, are granted.

[7] While improperly raised only in Defendant Martuscello's reply brief, the Court nonetheless finds it useful to address this argument, as doing so clarifies the remaining legal issues. *But see, e.g., Adecco USA, Inc. v. Staffworks, Inc.*, No. 20-cv-744, 2022 WL 16571380, at *5 n.4 (N.D.N.Y.

was personally involved in any deprivation of Mr. Brooks' constitutional rights; and (iii) Defendant Martuscello was deliberately indifferent to a serious risk of harm to Mr. Brooks.  Dkt. No. 379 at 7-9; Dkt. No. 219-1 at 9.

Under Section 1983, "'[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' is 'liable to the party injured.'"  *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (alterations in original) (quoting 42 U.S.C. § 1983).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases).  The Second Circuit has also made clear that "there is no special rule for supervisory liability" under Section 1983.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 676).  "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary."  *Kravitz*, 87 F.4th at 129 (quoting *Tangreti*, 983 F.3d at 618).

"The Eighth Amendment prohibits the infliction of '[c]ruel and unusual punishments' on those convicted of crimes" and "requires prison officials to 'take reasonable measures to guarantee the safety of inmates.'"  *Morgan v. Dzurenda*, 956 F.3d 84, 88-89 (2d Cir. 2020) (alteration in

---

Nov. 1, 2022) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.") (collecting cases).

original) (first quoting *Gregg v. Georgia*, 428 U.S. 153, 178 (1976); and then quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "[T]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" *Tangreti*, 983 F.3d at 618-19 (quoting *Vega v. Simple*, 963 F.3d 259, 273 (2d Cir. 2020)). Deliberate indifference in this context "means the official must 'know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 619 (alterations in original) (quoting *Vega*, 963 F.3d at 273).

### 1. Conditions of Confinement

Defendant Martuscello contends that Plaintiff has not sufficiently alleged the existence of the Policy, but rather has merely alleged "a condition, not a policy." Dkt. No. 379 at 7.

Given the nature of Plaintiff's Eighth Amendment claim against Defendant Martuscello, the Court views this as a distinction without a difference.[8] Plaintiff largely styles her allegations as describing a de facto policy, and the Court has adopted that terminology for convenience. *But see id.* at ¶¶ 16, 214, 258, 271, 333, 396 (allegations instead describing a "culture"). Other plaintiffs and courts have used different labels to describe similar allegations. *See, e.g., Virgil v. Finn et al.*, Case No. 22-cv-03169 (S.D.N.Y. filed Apr. 18, 2022), Dkt. No. 111 at 21:2-11 ("The plaintiff's complaint here is extensive in its detail of DOCCS's harsh environment and history of brutal instances such as this one. . . . I will not take this time to summarize the many reports,

---

[8] Similarly unavailing is Defendant Martuscello's reliance on authority addressing *Monell* liability and municipal policy, given that neither are at issue in this case. *See* Dkt. No. 379 at 7-9 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

investigations, indictments, verdicts, and settlements that more than plausibly suggest a culture of brutality and cover-ups within DOCCS in general and at Green Haven except to say that the [second amended complaint] paints a sordid picture. Not only is it plausible that this culture exists but the SAC plausibly alleges that the supervisory defendants knew of the existence of this culture.") (denying motion to dismiss by, *inter alia*, prior DOCCS commissioner); *Stone #1 v. Annucci*, No. 20-cv-1326, 2021 WL 4463033, at *11 (S.D.N.Y. Sept. 28, 2021) ("[T]he Court finds that Plaintiffs have adequately described a series of policies, customs, or enforcement practices within Annucci and Effman's areas of responsibility that are linked to the [ ] abuse allegedly suffered by Plaintiffs.") (denying motion to dismiss by, *inter alia*, prior DOCCS commissioner).

Regardless of the terminology used, the underlying legal issue is whether Plaintiff has plausibly alleged the existence of a condition of confinement posing an objectively serious risk of serious harm. *See, e.g., Morgan*, 956 F.3d at 89 ("[A]n inmate seeking to establish an Eighth Amendment violation for failure to protect or deliberate indifference to safety must prove (1) 'that [the plaintiff] is incarcerated under conditions posing a substantial risk of serious harm,' and (2) . . ."); (second alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *Tangreti*, 983 F.3d at 618-19 ("[T]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) . . .") (quoting *Vega*, 963 F.3d at 273); *see also* Dkt. No. 428-3 at ¶¶ 391-401.

As to whether Plaintiff has plausibly alleged the existence of such a condition (e.g., the Policy), the Court concludes that she has. As detailed above, *see supra* Section II.B.2, Plaintiff alleges that twenty On-Scene Defendants beat Mr. Brooks to death, or permitted him to be beaten,

within approximately forty-five minutes of his arrival at Marcy, and did not report the violence that they inflicted and/or witnessed. Plaintiff alleges that numerous correction officers, including Marcy's acting watch commander and multiple other supervisors, were unfazed by these events and instead purportedly made casual statements like "[d]on't kill him boys"; "you Marcy guys don't fuck around"; "[w]hat you killed another one?"; and "[y]ou guys had to dump the smallest convict in the history of man? You couldn't have found a bigger guy?" *Id.*

As further detailed above, *see supra* Section II.B.3-4, Plaintiff alleges that this conduct was the result of DOCCS' de facto policy of failing to hold correction officers accountable for violence against incarcerated individuals. *See, e.g.,* Dkt. No. 428-3 at ¶¶ 265, 269. In Plaintiff's telling, Defendants were emboldened to act as they did, confident that their misconduct would be easily concealed and that they would never be held accountable, because that is what had been happening for years at Marcy and within DOCCS. *See, e.g., id.* at ¶¶ 270-71. Plaintiff details three specific instances at Marcy in the months and years before Mr. Brooks' death in which multiple On-Scene Defendants and correction officers allegedly assaulted other incarcerated individuals and grievously injured them. *Id.* at ¶¶ 298-321. Plaintiff also relies on a series of jury verdicts, settlements, criminal prosecutions, judicial findings, and publicly reported investigations over the last decade or so to detail dozens of alleged instances of violence and related misconduct by DOCCS correction officers, as well as tens of millions of dollars in payouts as a result. *Id.* at ¶¶ 333-47. The alleged findings from the most recent investigation included that incarcerated individuals at Marcy reported "rampant physical staff abuse, especially in locations without cameras," and a "higher instance of staff abuse" compared to other DOCCS prisons. *Id.* at ¶¶ 291, 284.

Plaintiff further alleges that On-Scene Defendants were only held accountable after New

York State officials were legally required to publicly release the BWC footage showing some of the violence against Mr. Brooks.  *Id.* at ¶ 9.  Soon after, Plaintiff alleges that more than 10,000 correction officers engaged in an unlawful strike because of Policy and the threat of additional accountability.  *Id.* at ¶¶ 364-74.

In sum, Plaintiff's allegations are sufficient to plausibly suggest the existence of a condition of confinement (the Policy) that created an objective risk of serious harm to Mr. Brooks.  *See, e.g., Tangreti*, 983 F.3d at 618-19; *Morgan*, 956 F.3d at 89.

## 2.  Personal Involvement

Defendant Martuscello also asserts that Plaintiff has not sufficiently alleged his personal involvement in any constitutional violation.

Defendant Martuscello first argues that Plaintiff has failed to allege that he was present for or directly involved in the beating of Mr. Brooks.  Dkt. No. 219-1 at 6, 9.  However, Plaintiff is asserting an Eighth Amendment failure to protect claim against Defendant Martuscello, not an excessive force claim.  *Compare* Dkt. No. 428-3 at ¶¶ 384-93, *with id.* at ¶¶ 394-401.  And an allegation that Defendant Martuscello was present for, or directly participated in, the alleged violence against Mr. Brooks is not a necessary element of Plaintiff's failure to protect claim.  *Vega*, 963 F.3d at 273; *Morgan*, 956 F.3d at 89.

Defendant Martuscello next argues that Plaintiff has failed to sufficiently allege his personal involvement with respect to the Policy.  Dkt. No. 219-1 at 6; Dkt. No. 379 at 9-11.  According to Defendant Martuscello, following *Tangreti*, Plaintiff must specifically plead that he created, adopted, or implemented the Policy.  Relying on substantial persuasive authority, Plaintiff responds that she has plausibly alleged Defendant Martuscello's personal involvement through his deliberate indifference to the continuation of the Policy.  Dkt. No. 342 at 13-16.

The Court agrees with Plaintiff.  Defendant Martuscello's arguments boil down to his assertion that there can be no Eighth Amendment claim against him unless Plaintiff alleges that he *created* an objectively dangerous condition.  Dkt. No. 379 at 6-7.  But a failure to protect claim under the Eighth Amendment requires that an official "know[] of and disregard[] an excessive risk to inmate health or safety;" *Tangreti*, 983 F.3d at 619 (alterations in original) (quoting *Vega*, 963 F.3d at 273), not necessarily that the official also create that risk.  And, as discussed below, Plaintiff plausibly alleges that Defendant Martuscello was aware of the risk created by the Policy, but disregarded that risk and permitted the Policy to continue.  *See infra* Section IV.B.3.

Defendant Martuscello supports his contrary position primarily with his own characterization of *Iqbal*.  Dkt. No. 379 at 5-7, 9-11.  But the Second Circuit has already explained the significance of *Iqbal* with respect to Eighth Amendment claims against supervisors.  *See, e.g.,* *Tangreti*, 983 F.3d at 618-19.  And Defendant Martuscello's interpretation of *Iqbal* adds nothing to the Second Circuit's guidance.  Moreover, the conclusory allegations at issue in *Iqbal* are readily distinguishable from the extensive allegations in this case.  *See, e.g., Iqbal*, 556 U.S. at 680-81.

Moreover, numerous district courts within the Second Circuit have determined that Eighth Amendment claims against supervisors who are responsible[9] for the continuation of allegedly unconstitutional policies remain possible following *Tangreti*.  *See, e.g., Pearson v. Annucci*, No. 20-cv-01175, 2023 WL 2537722, at *8 (N.D.N.Y. Mar. 16, 2023) ("[T]he Court will allow the Eighth Amendment claims to go forward against Annucci. . . . If Plaintiff can establish Annucci's *mens rea* of deliberate indifference to Plaintiff's long-term solitary confinement, then he might be

---

[9] Defendant Martuscello does not contest Plaintiff's allegations that he had policymaking authority at the time of Mr. Brooks' death.  *See, e.g.,* Dkt. No. 219-1 at 10; *see also Stone #1*, 2021 WL 4463033, at *11; *Myers ex rel. Est. of Myers v. Davenport*, No. 21-cv-0922, 2022 WL 3017367, at *5 (N.D.N.Y. July 29, 2022); *compare Braxton v. Bruen*, No. 21-2795, 2023 WL 7478331, at *2 (2d Cir. Nov. 13, 2023) (summary order).

able to establish Eighth Amendment claims against Annucci based on the theory that Annucci failed to discontinue an unconstitutional policy.") (collecting cases); *Jordan v. Dep't of Corr.*, No. 22-cv-701, 2023 WL 2503376, at *11 (D. Conn. Mar. 13, 2023) ("After *Tangreti*, courts have recognized that 'imposing liability for a defendant's role in creating or perpetuating an unconstitutional policy is not necessarily inconsistent with *Tangreti* (or, for that matter, *Iqbal*) so long as the defendant's actions—not those of [his/]her subordinates—afford a basis.'") (alteration in original) (citations omitted); *Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 416 (E.D.N.Y. 2023) ("Post-*Tangreti*, district courts in the Circuit have determined that personal involvement still may be established for a supervisory defendant if he or she 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.'") (collecting cases); *Brunache v. Annucci*, No. 22-cv-196, 2023 WL 146850, at *12 (W.D.N.Y. Jan. 9, 2023) ("While *Tangreti* overruled *Colon*'s five-factor test . . . it did not 'suggest' that a defendant who 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,' cannot be found liable under Section 1983.") (citations omitted); *Myers*, 2022 WL 3017367, at *5 ("[A]n official's conduct in making and executing policy, or failing to make or execute policy, may satisfy *Iqbal*'s requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind. . . . For an Eighth Amendment failure to protect claim, those elements are that the defendant was aware of a risk of substantial harm to the plaintiff and—through their own actions in making a policy or failing to enact a policy—exhibited deliberate indifference and disregard for that risk.") (citations omitted); *Meli v. City of Burlington, Vt.*, 585 F. Supp. 3d 615, 638 (D. Vt. 2022) ("[W]hile a supervisor cannot be found liable alone 'by reason of . . . [his] supervision of others who committed the

violation,' *Tangreti*, 983 F.3d at 619, it seemingly remains possible for a policy maker to be held liable for their creation or continuance of an unconstitutional policy or custom.") (second and third alterations in original) (citation omitted); *Stone #1*, 2021 WL 4463033, at *8 ("Although the Second Circuit generally rejected *Colon*, *Tangreti* does not suggest that *Colon*'s third factor— whereby a defendant can be said to be personally involved in a constitutional violation if he 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,' . . . could never form the basis of an official's liability.") (citation omitted).

This authority is persuasive, and further confirms that Plaintiff has adequately pled Defendant Martuscello's personal involvement.

### 3. Deliberate Indifference

Defendant Martuscello finally argues that Plaintiff has failed to sufficiently allege that he was aware of the existence of the Policy or the substantial risk of harm it created.[10] Dkt. No. 219-1 at 10-15; Dkt. No. 379 at 11-14. Plaintiff responds that her numerous factual allegations are sufficient to establish Defendant Martuscello's deliberate indifference at this stage. Dkt. No. 342 at 17-19.

The Court again agrees with Plaintiff. For one, Defendant Martuscello fails to meaningfully engage with Plaintiff's allegations concerning his publicly reported statements over

---

[10] Defendant Martuscello's conclusory assertion in his reply that Plaintiff has not adequately alleged that he disregarded any risk, Dkt. No. 379 at 11, is unpersuasive given Plaintiff's allegations. *See generally supra* Section II.B; *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) ("A complaint is allowed to contain general allegations as to a defendant's knowledge, *see* Fed. R. Civ. P. 9(b), because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'") (additional citations omitted); *Conn. Bar Ass'n v. U.S.*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.") (citation omitted).

nearly a decade. *See, e.g.*, Dkt. No. 428-3 at ¶¶ 327-28 ("In addition to detailing incidences of []DOCCS staff brutalizing incarcerated individuals, the 2015-2016 [ ] Investigation examined the significant liability the State had faced, requiring hundreds of payouts to incarcerated victims of unconstitutional excessive force.  The investigation found that between 2010 and 2015, the State paid out at least $8.8 million in settlements or jury awards in cases where officers were accused of prisoner abuse or excessive force.  The [ ] Investigation also noted that '[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly.' . . . Defendant Martuscello was interviewed in connection with the 2015-2016 [ ] Investigation. . . . []DOCCS put Defendant Martuscello forward for the 2015-201[6 ] Investigation because he was the []DOCCS Executive Team member most knowledgeable about the agency's history of failing to hold abusive officers accountable.  In connection with the interview, [Defendant] Martuscello posed for photos with a *New York Times* photographer and told reporters that he was 'ready to take the battle to the prison guards' union.'"); *id.* at ¶¶ 342-43 ("As reported in the New York Times, '[t]he records illustrate how cover ups make it difficult to hold officers accountable using excessive force.  They also reveal a typical playbook: Guards often work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims and have them sent to solitary.' [ ]  Defendant Martuscello was interviewed in connection with the 2023 [ ] Disciplinary Record Investigation.  He told reporters that he was not surprised that false reports often accompany instances of excessive force.  'There has to be some manipulation of facts,' [Defendant] Martuscello said."); *id.* at ¶ 12 (alleging that Defendant Martuscello "issued a public statement" after watching video of Mr. Brooks' death and "recognized the need for 'institutional change' to prevent future similar occurrences").  Plaintiff also alleges the existence of numerous private conversations and communications, including in August and October 2024, through which

Defendant Martuscello was informed of the risk of violence by correction officers—in DOCCS generally, at Marcy specifically, and with respect to numerous Defendants individually. *Id.* at ¶¶ 280-81, 293, 299-303, 348-53. Plaintiff further alleges that Defendant Martuscello expressly dismissed at least some of these concerns, "stating that there were too many cameras inside correctional facilities for staff abuse to occur." *Id.* at ¶ 352. In short, Plaintiff is correct that Defendant Martuscello effectively ignores these and other allegations. Dkt. No. 342 at 6 ("[Defendant] Martuscello impermissibly presents Plaintiff's factual allegations in the light most favorable to him and ignores many substantial factual allegations entirely."); *see also* Dkt. No. 219-1 at 10; Dkt. No. 379 at 10.

As for Defendant Martuscello's arguments, he first contends that Plaintiff has not alleged that he ever received any complaints from Mr. Brooks or on Mr. Brooks' behalf. Dkt. No. 219-1 at 9-10. The Court is not persuaded that it was the responsibility of Mr. Brooks to (i) foresee the risk that, within approximately forty-five minutes of his arrival at Marcy, twenty Defendants would violate his Eighth Amendment rights so severely that he would be transported to a hospital and pronounced dead; and (ii) address that risk with Defendant Martuscello. Of course, allegations that Mr. Brooks specifically complained about particular Defendants violating his Eighth Amendment rights at Marcy in December 2024 could be relevant to assessing Defendant Martuscello's purported knowledge. But the absence of such allegations hardly ends that inquiry. *Tangreti*, 983 F.3d at 616 ("[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it.") (citation omitted). Put differently, because the inquiry hinges on Defendant Martuscello's alleged knowledge, a specific complaint from Mr. Brooks is only one way to allege knowledge. Plaintiff

instead plausibly alleges numerous other ways in which Defendant Martuscello was aware of the substantial risk of serious harm posed by the Policy at Marcy. *See supra* Section II.B.3-5.

The decisions cited by Defendant Martuscello on this point appear entirely distinguishable. Dkt. No. 379 at 12-13. In contrast to the allegations at issue here, the district courts in these cases found that Eighth Amendment claims failed, for example, because prior complaints regarding the alleged risk "did not involve the named defendants, physical assault, or threats of physical violence[,]" *Coleman v. Racette*, No. 18-cv-0390, 2021 WL 4312392, at *7 (N.D.N.Y. May 27, 2021); because the defendant supervisor's knowledge was not plausibly alleged, *see, e.g., Cissé v. Annucci*, No. 22-cv-0156, 2022 WL 1183274, at *9 (N.D.N.Y. Apr. 21, 2022); and because of "the absence of allegations of actual physical injury" as a result of the alleged risk, *see, e.g., Livingston v. Hoffnagle*, No. 19-cv-0353, 2019 WL 7500501, at *7 (N.D.N.Y. Nov. 8, 2019). Defendant Martuscello has not persuasively identified any similarly pertinent deficiencies with Plaintiff's allegations that Mr. Brooks was beaten to death by correction officers.

Second, Defendant Martuscello argues that most of alleged evidence of the Policy arose prior to him becoming commissioner, and thus cannot be a basis for his knowledge. Dkt. No. 219-1 at 10-11. Given, *inter alia*, Defendant Martuscello's lengthy history at DOCCs and the alleged public statements he made on this issue over nearly a decade, this argument borders on frivolous. Plaintiff sets forth additional reasons why this position is unpersuasive. Dkt. No. 342 at 24-25.

Third, and as noted above, Defendant Martuscello seeks to re-plead and minimize various well-pled allegations regarding his knowledge. Dkt. No. 219-1 at 11-15. As Plaintiff correctly notes, that is improper at this stage. Dkt. No. 342 at 15.

Fourth, the pre-*Tangreti* authority on which Defendant Martuscello relies is also distinguishable, again given the breadth and specificity of Plaintiff's allegations here. Dkt. No.

219-1 at 12-14; *see generally supra* Section II.B.

Finally, Defendant Martuscello's contention that all of Plaintiff's prior alleged instances of violence by correction officers are "unrelated to Mr. Brooks" lacks merit. Dkt. No. 219-1 at 13. The Court is not convinced that the alleged instances of violence at facilities other than Marcy cannot serve as a basis for subjective knowledge given Defendant Martuscello's history of public statements on the issue. *See, e.g., Sanchez*, 662 F. Supp. 3d at 417 ("[T]here were at least 11 lawsuits filed against [defendant] in which pretrial detainees alleged that they were assaulted while in custody. . . . Further, the news articles submitted by Plaintiff . . . establish that [the defendant supervisor] was or should have been on notice of a significant number of complaints of assaults[.]") (citations omitted). Even if that is so, Plaintiff also alleges multiple prior instances of excessive force by numerous On-Scene Defendants, including two months before On-Scene Defendants allegedly beat Mr. Brooks to death. *See supra* Section II.B.4. Defendant Martuscello's related suggestion that the numerous cases cited by Plaintiff cannot establish knowledge and are "statistical[ly] insignifican[t,]" Dkt. No. 219-1 at 14 & n.7, is also unpersuasive. Some of the public reporting that Plaintiff alleges demonstrates Defendant Martuscello's knowledge, Dkt. No. 428-3 at ¶ 340 n.20, includes that Defendant Martuscello:

> said in an interview that the number of officers accused of abuse is a small subset of the department's 16,000 guards. 'Certainly on egregious cases, we want to go all the way to termination,' [Defendant] Martuscello said. He said that the overall firing rate was low in part because department officials have usually settled for less harsh punishments than they originally sought, just as prosecutors do.

Alysia Santo et al., *Guards Brutally Beat Prisoners and Lied About It. They Weren't Fired.*, N.Y. Times, May 19, 2023, https://www.nytimes.com/2023/05/19/nyregion/ny-prison-guards-brutality-fired.html (last visited Feb. 20, 2026). That Defendant Martuscello was involved in the discipline of correction officers accused of abuse, that such accusations are apparently quite rare, and that

such accusations were made against numerous On-Scene Defendants in the months and years before Mr. Brooks death further establishes that Plaintiff has plausibly alleged Defendant Martuscello's subjective knowledge.

In sum, the Court finds that Plaintiff has plausibly alleged Defendant Martuscello's deliberate indifference.  *See, e.g., Elting v. Lassiter*, No. 22-cv-8573, 2023 WL 8699454, at *5 (S.D.N.Y. Dec. 14, 2023) ("[C]ourts have concluded that notice of a substantial risk of harm is sufficient to plead a policymaker's *mens rea* of deliberate indifference.") (collecting cases); *see also supra* n.10.

For all of these reasons, Defendant Martuscello's Motion is denied.

### C.  Defendant Kingsley's Motion to Dismiss Plaintiff's Claim

As detailed above, Plaintiff alleges that Defendant Kingsley violated Mr. Brooks' Eighth Amendment rights by, *inter alia*, using excessive force against him on the walkway and in the examination room.  *See supra* Section II.B.2; *see also* Dkt. No. 428-3 at ¶¶ 387-90.  A jury subsequently convicted Defendant Kingsley of murder.  *See supra* Section II.B.6.

Defendant Kingsley, who is proceeding *pro se*, argues that dismissal is required because service of the Amended Complaint was purportedly improper.  Dkt. No. 309.  As Plaintiff notes, Defendant Kingsley does not challenge service of the Complaint, nor service of the Amended Complaint after he provided his current mailing address.  Dkt. No. 333 at 3-4; *see also* Dkt. Nos. 277, 286, 288, 328.  Defendant Kingsley also attended a court conference shortly after Plaintiff's purportedly defective service, Dkt. No. 277, and even requested and received an extension of time to respond to the Amended Complaint, Dkt. Nos. 311, 313.  Given this, and the granting of Plaintiff's motion for leave to file the Second Amended Complaint, Defendant Kingsley's motion is denied as moot.

### D.  Defendant Martuscello's Motion to Dismiss Certain Defendants' Crossclaims

Each time Plaintiff has filed an operative pleading, numerous Defendants have answered and asserted crossclaims for indemnification and contribution.   Defendant Martuscello has repeatedly moved to dismiss these crossclaims against him.  *See, e.g.,* Dkt. Nos. 295, 351, 416.  He argues, *inter alia*, that Section 1983 does not provide an express right to contribution or indemnification, Dkt. No. 295-1 at 6 (collecting cases), and that, regardless, there is no alleged basis for contribution or indemnification against him, *id.* at 6-7.  Most of the Defendants who have asserted crossclaims against Defendant Martuscello have subsequently sought to voluntarily withdraw or dismiss these crossclaims.  *See, e.g.,* Dkt. Nos. 367-68, 371, 373, 381-82.  Defendants Along and Mehmedovic have instead opposed.   Dkt. Nos. 364, 366.   In reply, Defendant Martuscello argues that their opposition is baseless.  Dkt. No. 380 at 4-6.

Defendant Martuscello's arguments have merit.  *See, e.g., Steele-Warrick v. Microgenics Corp.*, 738 F. Supp. 3d 222, 225 n.2 (E.D.N.Y. 2024) ("Several DOCCS Defendants have either withdrawn or stated that they do not oppose [the] motion to dismiss their common-law contribution and indemnification claims.  In any event, the Court dismisses these claims because there is no federal right to indemnification or contribution under § 1983.") (collecting cases); *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 301 (N.D.N.Y. 2018) ("New York District Courts have generally held that there is no right to contribution in § 1983 actions.") (collecting cases); *Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 184 (E.D.N.Y. 2010) ("To the extent the [defendant] seeks indemnification and contribution on plaintiff's § 1983 claims, they cannot do so as a matter of law.") (citation omitted).  Defendant Martuscello's motion is denied as moot,[11] however, because the forthcoming Second Amended Complaint will necessitate amended answers.

---

[11] The related requests, Dkt. Nos. 360, 362, 365, 426, are also denied as moot.

## V.     CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Plaintiff's motion for leave to file an amended complaint, Dkt. No. 428, is **GRANTED**, as set forth in Section IV.A of this Memorandum-Decision and Order, and that Plaintiff shall file and serve the Second Amended Complaint in compliance with Local Rule 15.1(c); and the Court further

**ORDERS** that Defendant Martuscello's motion for an extension of time, Dkt. No. 361, and Plaintiff' motion to submit supplemental authority, Dkt. No. 363, are **GRANTED**; and the Court further

**ORDERS** that Defendant Martuscello's motion to dismiss Plaintiff's claim against him, Dkt. No. 219, is **DENIED**, as set forth in Section IV.B of this Memorandum-Decision and Order; and the Court further

**ORDERS** that Defendant Kingsley's motion to dismiss Plaintiff's claim against him, Dkt. Nos. 309, is **DENIED as moot**, as set forth in Section IV.C of this Memorandum-Decision and Order; and the Court further

**ORDERS** that Defendant Martuscello's motions to dismiss Defendants' crossclaims against him, Dkt. Nos. 295, 351, 416, and the related requests, Dkt. Nos. 360, 362, 365, 426, are **DENIED as moot**, as set forth in Section IV.D of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 20, 2026
        Albany, New York

Anne M. Nardacci
U.S. District Judge

39