**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

BRIAN LAUDADIO,[1] Monroe County Public Administrator, in his capacity as Administrator of the ESTATE OF ROBERT L. BROOKS SR.,

          Plaintiff,

          v.

ANTHONY FARINA, MATTHEW GALLIHER, NICHOLAS ANZALONE, DAVID KINGSLEY, NICHOLAS KIEFFER, ROBERT KESSLER, MICHAEL FISHER, CHRISTOPHER WALRATH, MICHAEL ALONG, SHEA SCHOFF, DAVID WALTERS, MICHAEL MASHAW, GLENN TROMBLEY, KYLE DASHNAW, ABEDIN MEHMEDOVIC, SHERRI ABREU, STEVEN CAUFIELD, BOBBI BEDIENT, TRAVIS TABOR, JOHN BANKERT, JARED POPEIL, DANIELLE MEDBURY, MICHAEL D'AMORE, DANIEL MARTUSCELLO III, and other as yet identified individuals.

          Defendants.

**No. 9:25-cv-0068-AMN-ML**

**SECOND AMENDED COMPLAINT**

**(JURY TRIAL DEMANDED)**

---

Plaintiff BRIAN LAUDADIO, Monroe County Public Administrator, in his capacity as Administrator of the ESTATE OF ROBERT L. BROOKS SR., by his undersigned counsel, complains against Defendants ANTHONY FARINA, MATTHEW GALLIHER, NICHOLAS ANZALONE, DAVID KINGSLEY, NICHOLAS KIEFFER, ROBERT KESSLER, MICHAEL FISHER, CHRISTOPHER WALRATH, MICHAEL ALONG, SHEA SCHOFF, DAVID WALTERS, MICHAEL MASHAW, GLENN TROMBLEY, KYLE DASHNAW, ABEDIN

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Brian Laudido is substituted as a Plaintiff in this action for his predecessor in office, Cressida A. Dixon, whose name appears on the caption of Plaintiff's First Amended Complaint.

MEHMEDOVIC, SHERRI ABREU, STEVEN CAUFIELD, BOBBI BEDIENT, TRAVIS TABOR, JOHN BANKERT, JARED POPEIL, DANIELLE MEDBURY, MICHAEL D'AMORE, DANIEL MARTUSCELLO III, and other as yet identified individuals as follows:

## INTRODUCTION

1.      This is a case about a series of brutal assaults that Robert L. Brooks Sr. ("Robert") experienced in the final days of his life while in the custody of New York State Department of Corrections and Community Supervision ("NYSDOCCS").

2.      The assaults began on December 8, 2024, at Mohawk Correctional Facility ("Mohawk") and ended with a final fatal beating inside a medical examination room in the Infirmary at the Marcy Correctional Facility ("Marcy") on the evening of December 9, 2024.

3.      NYSDOCCS correctional officers were responsible for each of the beatings described in this complaint. In some instances, correctional officers directly punched, kicked, and choked Robert. In other instances, correctional staff stood by and watched Robert's beatings, knowing that Robert was exposed to excessive force and doing nothing to intervene. Still others acted with deliberate indifference to known grave dangers Robert faced as a man in New York state custody.

4.      The multiple abuses Robert experienced in the final day of his life were neither unusual nor exceptional occurrences in NYSDOCCS. They were routine, everyday occurrences, and wholly foreseeable consequences of the conditions that State leaders tolerate in New York prisons.

5.      What makes this case exceptional is that the correctional officers involved in Robert's final fatal attack at Marcy accidentally recorded it on body worn cameras ("BWCs"), unaware that they were recording the violent and fatal beating.

2

6.      The BWC video footage showing Robert's fatal assault reveals a chilling scene. It depicts several large white law enforcement officers torturing a bloodied Black man who is restrained, helpless, and struggling to maintain consciousness.

7.      Over the course of roughly ten minutes, the officers' brutality goes on and on, even beyond Robert losing the ability to sit upright and well after Robert falls into a state of semiconsciousness.

8.      Almost as disturbing as the video's depiction of violence perpetrated on Robert is the demeanor of at least nine other Marcy staff who watched or otherwise knew about brutal assaults on Robert and did nothing. Rather than expressing shock or concern about Robert's safety, these individuals calmly went about their duties as Marcy correctional officers.

9.      A few weeks after Robert's killing, New York state officials were legally required to publicly release the BWC video of Robert's killing.

10.      The images on the video were so shocking and abhorrent that the State's highest-ranking officials openly condemned the officers' actions and finally publicly acknowledge the systemic problems that they consciously allowed to fester in New York prisons for years.

11.      Governor Kathy Hochul, stated that she was "outraged and horrified" by what she saw. She described Roberts's killing as "senseless" and acknowledged that "Mr. Brooks and his family did not deserve this . . . . The system failed Mr. Brooks[.]"

12.      NYSDOCCS Commissioner Daniel Martuscello III issued a public statement that watching the video of Robert's fatal beating made him feel "deeply repulsed and nauseated." In the same statement, Martuscello acknowledged that there was "no excuse" for the officers' actions, and he recognized the need for "institutional change" to prevent future similar occurrences.

13.     The union that represents New York's correctional officers described the footage as "incomprehensible to say the least." The union further warned: "When this footage is released to the public, it will undoubtedly draw comparisons to other high-profile incidents of violence involving law enforcement. This incident has the potential to make our correctional facilities even more violent, hostile, and unpredictable than ever before."

14.     Although the video is shocking to an outside observer, it is not surprising to people with knowledge of everyday violence in New York's prisons.

15.     The Correctional Association of New York ("CANY")[2] has reported on these conditions for years. In the wake of Robert's killing, CANY recognized, "Mr. Brooks's death cast a harsh light on the grim realities of life within our state prisons, realities that have been documented by [CANY] for decades."

16.     CANY reminded New York State officials that it had been sounding alarms for years about the culture of violence at Marcy and the risk to Robert Brooks and others confined there: "The body-worn camera footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility and other prisons in the state."

17.     There can be no doubt that responsibility for the violence Robert endured extends beyond those who personally interacted with Robert. The actions of Robert's killers were a foreseeable result of NYSDOCCS leaders knowingly maintaining an utterly broken system that

---

[2] CANY is the State of New York's legal designee for providing independent oversight and monitoring of New York's prisons.

condones, tolerates, or turns a blind eye to grave dangers against incarcerated people, as those leaders have done for decades.

18.     With this lawsuit, Robert's Estate seeks to hold accountable every individual responsible for Robert's death and for the repeated instances of violence Robert endured in the period leading up to it.

## JURISDICTION AND VENUE

19.     This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Robert Brooks' civil rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution.

20.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

21.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## PARTIES

22.     Brian Laudadio is the Monroe County Public Administrator and the duly appointed Administrator of the Estate of Robert L. Brooks Sr. He was appointed to this position on November 5, 2025, replacing former Monroe County Public Administrator Cressida A. Dixon. At all times relevant to this Complaint, Robert L. Brooks Sr. was a resident of Rochester, New York and was in the care and custody of NYSDOCCS.

23.     At all times relevant to this compliant, Defendants Anthony Farina, Matthew Galliher, Nicholas Anzalone, David Kingsley, Nicholas Keiffer, Robert Kessler, Michael Fisher, Christopher Walrath, Michael Along, Shea Schoff, David Walters, Michael Mashaw, Glenn Trombley, Kyle Dashnaw, Sherri Abreu, Steven Caufield, Bobbi Bedient, Travis Tabor, Jared Popiel, and John Bankert were employees of the State of New York who worked at Mohawk or

Marcy and participated in, witnessed, or failed to protect Robert during assaults described in this complaint. At all times relevant to this complaint, Defendants Trombley and Mashaw were sergeants and Defendant Bedient was a Lieutenant serving as Marcy's acting watch commander.

24.    At all times relevant to this complaint, Defendant Abedin Mehmedovic was employed by a private staffing agency to work as a nurse at Marcy.

25.    At all times relevant to this complaint, Defendant Danielle Medbury was the Acting Superintendent of Marcy. In this role, she had subjective knowledge of Marcy policies, customs, and practices; was responsible for setting Marcy policy, customs and practices; assumed responsibility for overseeing all aspects of day-to-day life at Marcy; and was responsible for ensuring the safety of people incarcerated at Marcy. Prior to becoming Acting Superintendent, Defendant Medbury was First Deputy Superintendent and a member of the executive team at Marcy Correctional Facility who gained knowledge of Marcy customs and practices around use of force and staff misconduct.

26.    At all times relevant to this complaint, Defendant D'Amore was a high ranking NYSDOCCS official with more than 25 years of experience with NYSDOCCS. In 2022, Defendant D'Amore became First Deputy Superintendent of Marcy and in 2023 he was promoted to Superintendent of Marcy. Defendant D'Amore had subjective knowledge of Marcy policies, customs, and practices; bore responsibility for setting Marcy policy, customs and practices; assumed responsibility for overseeing all aspects of day-to-day life at Marcy; and was responsible for ensuring the safety of people incarcerated at Marcy. In 2024, D'Amore was promoted to NYSDOCCS Deputy Commissioner for Correctional Facilities, a position where he is responsible for overseeing all NYSDOCCS Correctional Facilities.

6

27.     At all times relevant to this Complaint, Defendant Daniel Martuscello III was Commissioner of NYSDOCCS. In this role, Defendant Martuscello set policies, customs, and practices for NYSDOCCS and was responsible for ensuring the safety of individuals in NYSDOCCS custody. Defendant Martuscello had expansive personal knowledge of issues affecting NYSDOCCS. Prior to becoming Commissioner, Martuscello had nearly three decades of experience working with NYSDOCCS in various capacities. For six years prior to becoming Commissioner, Martuscello served as second-in-command and principal advisor to Commissioner Anthony Annucci in the role of Executive Deputy Commissioner, where he coordinated the activities of and provided general direction to the NYSDOCCS Executive Team, with an emphasis on labor relations. Prior to that, from 2012 to 2017, Martuscello served as the Deputy Commissioner for Administrative Services, in which role he was responsible for addressing problems in the NYSDOCCS staff disciplinary system. In each of these roles, Defendant Martuscello had authority over the NYSDOCCS systems in place for investigating allegations of correctional officer abuse and kept himself informed about significant staff misconduct allegations, lawsuits, investigations, and news coverage about staff abuse within NYSDOCCS.

28.     At all times relevant to this Complaint, every Defendant named in the Complaint was acting within the scope of his or her employment and under color of law.

## FACTS

29.     On December 7, 2024, Robert was housed at Mohawk in Rome, New York.

30.     That morning, while Robert was asleep in a cubicle, located in dorm 74F, another incarcerated individual struck Robert in the face with a padlock, seriously injuring Robert.

31.     Robert reported the assault to Mohawk staff, and Robert was escorted to the Mohawk medical unit. Medical staff observed that Robert's eyebrow had a laceration, that he had

7

swelling around his eye, and that his eye movement was limited by pain. Medical staff decided to send Robert to an outside hospital for evaluation.

32.    While Robert was waiting for transportation to the hospital, he began experiencing headaches and nausea. As a result of this change in his condition, Mohawk medical called an ambulance to take Robert to the hospital.

33.    At the hospital, medical staff observed cuts and bruises to Robert's face. Robert reported that he was experiencing headache, nausea, and vomiting, as well as pain on his face and forearm. As a result, the hospital ordered X-rays of Robert's forearm, wrist, and chest, as well as CT scans of his spine, head, and jaw, all of which showed no abnormalities.

### Robert is Beaten at Mohawk on December 8 and December 9

34.    When Robert returned to Mohawk from the hospital, he was transferred to a new dorm, for his safety.

35.    Defendant Sherri Abreu was one of the correctional officers assigned to oversee Robert's new dorm, 74B. In this position, it was Abreu's job to maintain order and ensure that incarcerated individuals kept their living areas clean and sanitary.

36.    When Robert arrived at 74B, he had obvious physical injuries on his face and was unwell. Other incarcerated individuals observed that Robert appeared tired and weak and that he kept to himself. They also observed that Robert vomited on occasion.

37.    Following one of Robert's vomiting bouts, Abreu made rounds on 74B. When she reached Robert's cube, she observed vomit on the floor, and she instructed Robert to clean it up.

38.    At the time, Robert was too weak to get up. Robert told Abreu that he would clean up the vomit, but that he was too ill at that moment to do so immediately.

39.    A short time later, Abreu returned to Robert's cube and observed that Robert still had not cleaned his vomit. She yelled at Robert, again instructing him to clean up his vomit. Robert did not immediately comply, again saying he would clean it up later.

40.    Soon afterward, Abreu went to the dayroom area and summoned an incarcerated individual who went by the nickname "Swift" for a private discussion. On information and belief, Abreu and Swift communicated about Robert failing to clean up his vomit.

41.    Swift was a physically imposing man affiliated with the Bloods criminal gang and he held influence and control over other incarcerated individuals on the dorm, by threat and use of force. Swift was long housed on dorm 74B and he held an unofficial position of authority. He often helped dorm officers maintain order in the dorm, and officers treated him well in return.

42.    On information and belief, Abreu knew that Swift was willing and able to exert control over Robert through physical violence if necessary.

43.    Abreu wanted Robert to clean his vomit because it was her responsibility to maintain order and cleanliness of the dorm. Abreu knew that a sergeant would soon come through the dorm to make his rounds, and she wanted the vomit cleaned up before the sergeant arrived. Swift also wanted Robert to clean up his vomit because he wanted the dorm to be orderly and clean and because he wanted to help Abreu.

44.    Following Swift's interaction with Abreu, Swift put on a pair of gloves, approached Robert and said, "Didn't she tell you to clean the shit up?" or words to that effect. Swift and two other incarcerated individuals affiliated with Swift then proceeded to physically beat Robert.

45.    After being beaten by Swift and his affiliates, Robert cleaned up his vomit.

46.    After being beaten on December 7 and again on December 8, Robert was extremely fearful for his safety and he began to decompensate mentally.

9

47. At the same time, Robert was still physically weak and sick. He continued to vomit throughout the evening, staying in the bathroom for periods to avoid vomiting in the dorm.

48. Despite his illness and fatigue, Robert did not sleep at all that night. Instead, Robert sat awake on top of his locker so that he could keep an eye out for anyone intending to further harm him. The lack of sleep further compromised Robert's mental state.

49. In the morning, Swift discovered that Robert had vomited again in his dorm without cleaning up after himself. Following that discovery, Abreu and Swift again had an exchange.

50. Abreu then intentionally left the dorm, clearing the way for Swift and others to again assault Robert for failure to follow Abreu's commands.

51. Swift and his affiliates then approached Robert. One of Swift's affiliates stated, "Didn't I tell you don't throw up again? Didn't Miss A tell you don't throw up again?" or words to that effect. The group then began punching Robert and hitting him with a sock containing padlocks. Robert yelled out for help and crawled toward the dorm exit so that he could seek aid from correctional staff.

52. Robert eventually encountered Abreu and told her that he had been assaulted.

53. Abreu then summoned a sergeant, who removed Robert from Abreu's dorm for good.

**Mohawk Staff Decide to Transfer Robert to Marcy for His Safety**

54. The sergeant came to dorm 74B and brought Robert to Mohawk's medical unit to be evaluated. Medical staff observed a one-inch laceration and swelling on Robert's nose.

55. The sergeant also arranged for Robert to be seen by mental health staff. Following the assault, Robert made strange counter factual statements about having plans to fly to Puerto Rico that day, which the sergeant perceived as Robert possibly needing mental health support. The

10

sergeant asked Robert if he took psychiatric medication, and Robert responded that he took medication in the past but was no longer taking it.

56.     After Robert met with mental health staff, the sergeant determined that Robert would continue to be assaulted if he remained housed at Mohawk and arranged for Robert to be transferred to a different facility. In DOCCS parlance, the transfer was characterized as an "involuntary protective custody" or "IPC" transfer.

57.     For the next several hours, Robert waited to be transferred out of the facility. Defendant Steven Caufield was assigned to watch Robert during this period.

58.     During the time that Caufield supervised Robert, he learned that Robert had been involved in two prior assaults at Mohawk and that he was waiting for an IPC transfer. He also observed that Robert had visible injuries to his face and blood stains on the front of his shirt, and that Robert was putting paper towel in his nose to stop it from bleeding. Caufield also observed Robert talk to himself and call out loud to an imaginary person named "Ray-Ray."

59.     After several hours, Caufield and another officer (Buetel) were assigned the task of transporting Robert from Mohawk to Marcy.

60.     Before getting in the van, they shackled Robert's hand and feet and gathered Robert's personal property bags, which contained several thick and heavy books.

61.     Even though Robert's wrists were restrained, Caufield ordered Robert to carry his own property bags. Robert either would not or could not carry his bags as ordered, and instead he moved them by kicking them along the ground.

62.     Caufield and Buetel became irritated that Robert's actions slowed the transport process.

**Robert Arrives at Marcy With a "Problem Child" Label**

63.    Caufield, Buetel, and Robert arrived at Marcy around 9:07 p.m. on December 9.

64.    Several hours prior to their arrival, Mohawk staff sent advance notice to Defendant Bobbi Bedient and other Marcy staff, advising them that Robert would be arriving after regular business hours on IPC status.

65.    Mohawk staff conveyed this information about Robert to help Marcy staff prepare for a smooth transfer process.

66.    Marcy staff who received notice of Robert's IPC status understood it meant that Robert had been involved in physical altercations with other incarcerated individuals and that there was an urgent need to get him out of the facility.

67.    In other words, before he even got to Marcy, this information resulted in Robert being seen as a potential "problem child," the colloquial term correctional officers use to refer to incarcerated individuals who are particularly difficult to manage.

68.    As all correctional professionals know, many incarcerated individuals experience severe mental illness or addiction or other personal issues that can result in the type of persistent problematic behavior associated with a so-called "problem child." Having to deal with a "problem child" is a stressful but inevitable part of being a correctional officer.

69.    However, Robert had never been a "problem child" during his incarceration. Robert had earned his GED, worked several jobs, and studied American Sign Language while in prison. He maintained close relationships with family members, deepened his religious faith, and consistently avoided trouble. During his entire incarceration, Robert received only one misbehavior report, which was a single instance of failing to appear for a job assignment. Despite

Robert's illness, injuries, and declining mental state on December 9, Robert consistently behaved in an unthreatening manner and was never aggressive toward staff.

70. Prior to or soon after Robert's arrival at Marcy on December 9, 2024, news of Robert's potential "problem child" label spread to the other defendants in this case who were working at Marcy that night.

71. In fact, when Caufield, Buetel, and Robert arrived at Marcy, Caufield initially went inside the Marcy Administration Building alone and talked to Defendant Jared Popiel, who was assigned that night to the front lobby desk.

72. Caufield told Popeil that they would have arrived at Marcy earlier, but they were delayed because Robert failed to comply with orders about carrying his property bags. Caufield also advised Popiel that Robert was refusing to get out of the van.

73. Caufield told Popiel that Robert was "being an asshole" and that Robert "might be a real shithead."

### Marcy Staff Prepare to Deal With a "Problem Child"

74. Popiel radioed Defendant Robert Kessler, who was then working as the Marcy "draft officer."

75. As draft officer, Kessler was responsible for processing new incarcerated individuals (known as "in-drafts") into the facility. Popiel asked Kessler to come to the Administration Building to receive Robert, the new in-draft.

76. At the time, the standard procedure was that the Mohawk officers who brought Robert to Marcy were responsible for escorting Robert through the Administration Building and bringing Robert to Kessler, the Marcy draft officer.

77.     Kessler interpreted the call from Popiel as evidence that the Mohawk officers were not doing their job, creating more work for him. Kessler was already busy tagging garbage dumpsters, which was one of his required job duties that night. His shift was scheduled to end soon, and he still had to complete his garbage task.

78.     Kessler initially expressed resistance to Popiel's request, but Popiel pressed Kessler because he knew that Kessler had received special interpersonal communication training that could help Marcy staff deal effectively with Robert.

79.     For further assistance, Popiel also summoned Defendants Nicholas Kieffer and Nicholas Anzalone to help process Robert into the facility.

80.     At the time, it was part of Kieffer and Anzalone's job duties as Marcy correctional officers to assist other officers as needed to supervise and process incarcerated individuals.

81.     Upon their arrival at the Administration Building lobby, Kessler, Kieffer and Anzalone spoke with Caufield and Popiel who informed them that Robert had recently been assaulted multiple times at Mohawk, that Robert was coming to Marcy on "IPC" status, and that Robert had not complied with orders to carry his property bags to the Mohawk transport van and was now refusing to leave the van, further cementing the notion that Robert was a "problem child."

82.     Caufield, Kessler, Kieffer, and Anzalone went to the Mohawk transport van in front of the Marcy administration building to get Robert.

83.     When they encountered Robert at the transport van, they observed that Robert had injuries to his face and blood on his shirt from the prior assaults.

84.     One or more of the officers told Robert to leave the Mohawk transport van but Robert did not comply with the officers' demand.

85.    Kessler used his interpersonal communication deescalation skills to build rapport with Robert and coax him out of the van.

86.    Eventually Robert voluntarily got out of the van, and Kessler instructed him to carry his property bags.

87.    As he had done at Mohawk, Robert indicated that he either would not or could not carry his property bags.

88.    To move things along, Kessler volunteered to carry one of Robert's property bags if Robert would carry the other.

89.    For a short while, Robert carried one of his bags while Kessler carried the other, but Robert eventually dropped his bag in the lobby of the Administration Building.

90.    Kessler told Robert that if he wanted to have his property at Marcy, he needed to carry it into the facility.

91.    Robert responded "fuck the property" or similar words to the effect that he would rather relinquish his personal property than continue to carry the bag.

92.    Around this time, news of Robert's potential "problem child" status spread to other officers beyond those in the Administration Building. At some point soon after Robert's arrival, Kieffer and Popiel broadcast statements over the radio along the lines of "wait till you get a look at this guy" and "you aren't going to like this one." Their purpose in making these statements was to prepare their fellow officers for future interactions with Robert.

93.    Caufield, Kessler, Kieffer, and Anzalone continued escorting Robert through the Marcy Administration Building so that he could be processed into the facility.

94.    As the officers escorted Robert through the Administration Building, they walked past Popiel as well as Defendants John Bankert, Travis Tabor, and Lieutenant Bobbi Bedient, who each also observed that Robert had visible injuries to his face and blood on his shirt.

**Defendants Walrath, Kessler, Kieffer, and Anzalone**
**Subject Robert to Excessive Force in the Marcy Breezeway**

95.    Eventually, the group escorting Robert walked through the Administration Building double gated security entrance referred to as the "sally port" and into a small room at the back exit of the Administration Building called the breezeway.

96.    By the time the group reached the breezeway, they were joined by Defendant Walrath.

97.    Walrath joined the group because he believed Robert would be assigned to the dorm where Walrath often worked, and Walrath wanted to meet Robert based on the advanced warnings about Rober being a problem child. Walrath's purpose in doing this was to assess what, if any, special challenges Robert would present to him as a dorm correctional officer.

98.    Inside the breezeway, Caufield removed Robert's shackles, as per the usual protocol for processing in-drafts into Marcy.

99.    After Robert's shackles were removed, Kessler directed Robert to stand up and put his hands all the way in his pants pockets, which is part of standard security protocol for processing in-drafts into Marcy.

100.    Robert proceeded to put his fingers in his pockets, but he did not put his hands all the way in his pockets, as ordered.

101.    At that point, Robert had already resisted orders about getting out of the van and about carrying his own property. When Robert did not fully comply with Kessler's order about

16

putting his hands all the way in his pants, it furthered their perception that Robert was generally resistant to orders and cemented their preconceived belief that he would be a problem at Marcy.

102. Walrath proceeded to use physical force against Robert, forcefully ramming him into the breezeway wall and restraining him physically.

103. Officers Kessler, Anzalone, and Kieffer were not sure why Walrath decided to use force at that moment, but they reflexively joined Walrath in the use of force, striking Robert multiple times.

104. When Kessler, Kieffer, and Anzalone reflexively joined Walrath, their objective was to assist a fellow officer engaged in the use of force pursuant to well-established custom.

105. The force that Kessler, Kieffer, Anzalone, and Walrath used against Robert in the breezeway was excessive. As the assault progressed, each of the officers went way too far.

106. What began as a misplaced and unnecessary effort to obtain compliance from Robert turned into a dangerous beating that did not serve any legitimate law enforcement purpose. Robert did not physically resist the officers in any way, and he was not a threat to them.

107. On information and belief, at least three factors contributed to Walrath, Kessler, Kieffer, and Anzalone using excessive force against Robert in the breezeway.

108. *First*, due to critical understaffing, each was operating on a very short fuse, nearing the end of 16-hour double-shifts in a dehumanizing, stressful, and under-resourced setting. At the time, Marcy housed a disproportionate number of incarcerated individuals with serious mental illness and was critically understaffed. Marcy correctional officers were routinely mandated to work double (and sometimes triple) shifts with a difficult population, depriving them of needed rest and time with loved ones, and depleting their emotional resources. Inevitably, correctional

17

officers working under these circumstances run short on patience and are quick to overreact when they encounter resistance to their orders.

109.    When Kieffer, Kessler, Walrath, and Anzalone encountered Robert, each of them was fatigued and emotionally depleted. Thus, when Robert passively resisted their orders, they took their frustrations out on Robert.

110.    *Second*, as described in further detail below, using excessive force was part of a longstanding and condoned strategy at Marcy for maintaining order in the facility. At the time, Marcy was known among incarcerated individuals and correctional officers as a "hands on facility," where staff would not hesitate to use physical force to maintain order, especially when it came to "problem child" incarcerated individuals.

111.    Based on the officers' experience on the job at Marcy, each of them believed that preemptive use of excessive force was an effective tool for warning incarcerated individuals, especially new arrivals, at Marcy that they must behave submissively and comply with officers' orders.

112.    *Third*, the officers reasonably believed there would be no meaningful consequences to their actions because NYSDOCCS maintained an unofficial code of silence policy, whereby the use of excessive force was covered up as a matter of course.

113.    Although NYSDOCCS had written policies prohibiting the use of excessive force and requiring truthful report writing, the actual unwritten but customarily followed policy was that correctional officers could do whatever they wanted to maintain order, including resorting to violence, so long as misconduct was not captured on camera and could be plausibly covered up.

114.    Along the same lines, NYSDOCCS had written policies requiring Marcy officers to activate BWC while interacting with incarcerated individuals, but the actual unwritten but

18

customarily followed policy was that they could do whatever they wanted when it came to BWC usage. As a result, none of the officers who interacted with Robert felt the need to activate their BWCs as required, and none were deterred from using excessive force.

115.    Thus, when the officers assaulted Robert in the breezeway, they knew from experience that they would suffer no adverse consequences because there were no cameras recording them, their fellow officers would never truthfully report them for using excessive force, and their supervisors would assist them by covering up their actions.

**Defendants Caufield, Tabor, Bankert, Bedient, and Popiel**
**Witness the Marcy Breezeway Assault**

116.    During the breezeway assault, Caufield, Tabor, Bankert, Bedient, and Popiel were all present in the Marcy Administration Building and witnessed at least portions of the assault.

117.    During the breezeway assault, Walrath went so far as to put Robert in a chokehold, which is an extremely dangerous technique that may be used only when deadly force is warranted.

118.    Walrath's use of deadly force against Robert was an indication to all officers who witnessed the assault that Walrath had lost control and that Robert was in grave danger.

119.    The officers' assault on Robert in the Marcy breezeway lasted approximately 60-90 seconds.

120.    At the conclusion of the assault in the breezeway, Kieffer instructed Caufield "you didn't see anything" or words to that effect, communicating Kieffer's expectation that Caufield not tell anyone anything about the excessive force he just witnessed.

121.    As a result of the breezeway assault, Robert was seriously physically injured and in extreme pain. The injuries Robert sustained in the beating caused him to bleed so much that he left bloodstains on a chair and on a wall. A pool of Robert's blood approximately 12- to 18-inches in diameter also collected on the breezeway floor.

19

122.    Based on everything they had seen and heard, Caufield, Tabor, Bankert, Bedient, Popiel, Walrath, Kieffer, Kessler, and Anzalone all knew that Robert came to Marcy with serious injuries to his face, that Marcy officers used excessive and potentially deadly force against Robert in the breezeway, and that Robert was in grave physical danger during and after the breezeway assault. Nevertheless, none of these Defendants took any action to intervene or protect Robert from further harm.

123.    Notably, Bedient held the rank of lieutenant, and she was working as Marcy's watch commander at the time. She was the highest-ranking officer on duty. Rather than asserting her authority to stop her subordinates' dangerous misconduct toward Robert during the assault, she casually called out "Don't kill him, boys," or words to that effect. By making this statement, Bedient demonstrated her subjective awareness (and put other officers around her on notice) that her subordinates' actions would continue and could potentially result in his death.

124.    Correctional professionals know that officers who use force against incarcerated individuals (justified or not) are required to disengage from the incarcerated individual as soon as possible once the incarcerated individual is controlled following the use of force.

125.    All defendants knew about this professional standard, which exists because officers who engage in uses of force are likely to experience rushes of adrenaline, post-incident stress, and feelings of anger, irritation, and frustration at the incarcerated individual.

126.    A foreseeable consequence of allowing officers to continue to engage with an incarcerated individual after using force against him is that the officers will take their frustrations out on the incarcerated individual with excessive force that serves no legitimate purpose and spins dangerously out of control.

127.    In a similar vein, correctional professionals, including all defendants, know that when they witness a fellow officer using excessive force against an incarcerated individual, they are supposed to intervene to stop the use of excessive force. This professional standard exists because an officer engaged in the use of force against an incarcerated individual can easily lose perspective and self-control during such incidents.

128.    In other words, a foreseeable consequence of employing correctional officers who are authorized to use force in some instances is that they will on occasion go too far and proceed to use force against incarcerated individuals that serves no legitimate purpose, and that those occurrences can spin dangerously out of control if not handled properly.

129.    Each officer who witnessed Walrath, Kieffer, Kessler or Anzalone assault Robert in the breezeway knew that their failure to protect Robert from such Defendants' overreaction would likely result in further grievous harm to Robert.

130.    This was especially true in Robert's case because the officers knew the following: Robert was already seriously injured when he arrived at Marcy, Robert arrived at Marcy with a "problem child" label, Robert was non-confrontational since his arrival, and Robert's difficulty complying with the orders was passive.

131.    In addition, some of these Defendants—including Walrath, Kessler, and Anzalone—were particularly known among their fellow Marcy officers as overly aggressive hotheads who were prone to using excessive force against incarcerated individuals.

132.    Despite their knowledge of the serious risks to Robert, none of the Defendants made any effort to separate Walrath, Kieffer, Kessler, or Anzalone from Robert, thereby subjecting Robert to risk of additional harm.

**Defendants Kieffer, Kessler, and Anzalone Escort
Robert Down the Walkway and Continue to Use Excessive Force Against Him**

133.    After they finished assaulting Robert in the breezeway, Kieffer, Kessler, and Anzalone began escorting Robert out of the Administration Building and toward the Infirmary. This movement was part of standard intake procedures at Marcy because all new indrafts need to undergo a medical intake screening.

134.    To get to the Infirmary, Robert and the officers had to leave the Administration Building and walk along an outdoor walkway. As they proceeded along the walkway, Anzalone and Kessler each held one of Robert's arms and Kieffer walked behind them.

135.    Robert did not proceed along the walkway as quickly as the officers desired, most likely because he had just been beaten.

136.    In response, the officers initiated another use force to gain Robert's compliance. Specifically, in an area of the outdoor walkway near a building called the "package room," one or more of the officers forced Robert face down on the ground, pepper sprayed him, got on top of him, handcuffed him behind his back, and then pulled him back up to standing on his feet.

137.    This use of force against Robert on the walkway was excessive, unjustified, and served no legitimate law enforcement purpose. Although Robert was walking more slowly along the walkway than the officers wanted, Robert was not resisting in any way.

**Defendant Kieffer Calls a "Red Dot" Response to the Package Room Area**

138.    Following the pepper spray incident, Kieffer went on his radio to call a "red dot" response to the walkway outside the package room.

139.    Calling a red dot is an indication that an officer has an urgent need for assistance from other officers, most likely because force is being used on an incarcerated individual.

140. When a "red dot" is called, fellow officers are expected to respond immediately to come to the assistance of officers involved in the use of force incident with an incarcerated individual.

**Defendants Caufield, Tabor, Bankert, Bedient, and Popiel, Meanwhile, Remain Deliberately Indifferent**

141. After witnessing Walrath, Kessler, Anzalone, and Kieffer assault Robert in the breezeway, Caufield left the breezeway and proceeded back through the Marcy administration building so that he could return to his Mohawk transport van.

142. Before leaving the Marcy administration building, Caufield stopped in the Administration Building lobby and commented aloud on what he just witnessed, saying "you Marcy guys don't fuck around," or words to that effect. In agreement that it was a common practice to use excessive force at Marcy to demonstrate to incarcerated individuals that any perceived lack of compliance with officers' orders would result in physical injury, Tabor responded, "you're right."

143. Soon thereafter, Popiel, Bankert, Tabor, Bedient and Caufield heard Keiffer's "red dot" to the area outside the package room, which told them that Robert had almost certainly been subjected to additional use of force by officers who assaulted him in the breezeway, and that the officers would likely continue to assault him.

144. Despite their knowledge that the officers abuse of Robert continued beyond the assault they witnessed in the breezeway, none of these officers took any steps to prevent Robert from further harm.

**Defendants Trombley, Mashaw, Farina, Galliher, and Kingsley
Join the Group on the Walkway**

145.    Around the time that Kessler first encountered Robert at the Marcy Administration Building, he radioed Defendant Glen Trombley to let him know about Robert's arrival.

146.    Trombly, who was at the Gymnasium when he received Kessler's radio transmission, was Marcy's "draft sergeant" on the night of December 9, which meant he was required to conduct formal security screening interviews of indrafts such as Robert.

147.    Because after-hours indraft security screenings were conducted in the Infirmary, Trombley asked Defendant Anthony Farina, whose job duties that evening included driving a Marcy van, to drive Trombley from the Gymnasium to the Infirmary.

148.    One of Farina's other job duties that evening was to gather intelligence from incarcerated individuals.  In that capacity, Farina also planned to participate in interviewing Robert in the Infirmary, as part of the indraft process.

149.    Defendant Michael Mashaw joined Trombly and Farina because he was responsible for supervising activity on the Marcy walkways at the time and he was responsible for supervising the officers escorting Robert along the walkway to the Infirmary.

150.    Trombley, Farina, and Mashaw arrived at the Infirmary before the officers escorting Robert arrived, so they sat and waited in the van outside. From inside the van, they were able to see into the Administration Building breezeway window. From their vantage point, they could see an incarcerated individual being pushed up against the wall by several officers.

151.    Based on what they could see, they deduced that their fellow correctional officers were involved in a use of force against the new in-draft (Robert) in the breezeway area. Inside the van, they spoke about how the use of force they were observing would now require the completion of certain paperwork.

152. While still inside the van, Trombley, Farina, and Mashaw then observed Kessler, Kieffer, Anzalone, and Robert leave the breezeway and proceed down the walkway toward the Infirmary, allowing them to deduce that Kessler, Kieffer, and Anzalone were involved in the breezeway use of force incident and that the incarcerated individual they saw assaulted in the breezeway was Robert.

153. While inside the van watching the officers escort Robert toward the Infirmary, Farina told Trombley and Mashaw information he had already gathered about Robert. Farina told them that Robert had been assaulted at Mohawk and that he had gotten into trouble with the Bloods at Mohawk (in fact, Swift—who had beaten Robert at Mohawk that morning—was affiliated with the Bloods), indicating that Robert might pose security issues at Marcy.

154. While observing the officers on the walkway, Trombly, Farina, and Mashaw then saw Kessler, Keiffer, and Anzalone force Robert to the ground on the walkway outside of the package room, pepper spray him, handcuff him, and then pull him back up on his feet. They also heard Kieffer call the "red dot" to the package room area.

155. As a result of these observations, Trombley, Farina, and Mashaw exited the van and walked to where Kessler, Kieffer, Anzalone, and Robert were located near the package room.

156. At the same time, David Kingsley and Matthew Galliher were on duty as Marcy correctional officers, with miscellaneous job duties, including responding to red dot calls.

157. When Kieffer, Kessler, and Anzalone used excessive force on the walkway outside the package room, Kingsley and Galliher were standing outside the front door of the Infirmary building, with a clear view of the use of force.

25

158. When Galliher and Kingsley heard Kieffer's red dot call, they immediately got into a van outside of the Infirmary, made the short drive to the walkway outside the package room, and met up with the group of officers now surrounding Robert on the walkway.

159. In taking the actions described above, Trombley, Farina, Mashaw, Kingsley, and Galliher were each following standard procedure for processing indrafts and responding to red dot radio calls at Marcy.

160. When Galliher, Kingsley, Trombley, Farina and Mashaw responded to Kieffer's red dot call and arrived on the walkway, Robert was cuffed and restrained by multiple officers and did not pose a threat to anyone. The eight correctional officers present had the situation fully under control.

161. At this point, Trombly, Farina, Mashaw, Kieffer, Kessler, and Anzalone each knew that Robert had already been subject to two uses of force, one in the breezeway and one on the walkway. Kingsley and Galliher knew that Robert had already been subject to at least one use of force on the walkway. They also could all see that Robert was bleeding and had visible injuries to his face, and all knew that Kessler, Anzalone, and Farina had reputations for using excessive force on incarcerated individuals. Accordingly, each of them knew that allowing Kieffer, Kessler, and Anzalone to continue to engage with Robert posed a substantial risk of further serious harm to Robert, and that those officers needed to be physically separated from Robert.

162. Nevertheless, none of the officers made any effort to separate Kieffer, Kessler, or Anzalone from Robert at that time.

163. Instead, the entire group proceeded along the walkway with Robert, who was handcuffed and not resisting in any way, toward the Infirmary.

26

164.    As the group proceeded along the walkway, one or more of the officers continued to use additional excessive force against Robert.

165.    For example, Anzalone and Kessler bent Robert over at the waist and forced Robert's cuffed arms high up behind his back in a stress position. They forced him to continue to walk down the walkway in this position, while Farina watched.

166.    As the group proceeded toward the Infirmary, Kessler also punched Robert in the ribs and Kingsley pulled Robert's feet out from under him.

167.    With Kessler and Anzalone holding Robert's arms up behind his back, and with Kingsley at Robert's feet, Robert was being carried face-down in an hogtie position (as pictured below) and remained in that position as he was carried into the Infirmary building and then into the Infirmary's so-called "ER room."



**Defendants in the Infirmary Know Robert Faces a Substantial Risk
of Serious Harm in the Infirmary ER Room**

168.    By the time Robert was carried into the ER room, Defendants knew that Robert faced a substantial risk of being subject to harm there by Kessler, Anzalone, and others.

169. In the period just prior to Robert's arrival at the Infirmary, Defendants Galliher, Kingsley, Walters, Along, Dashnaw, and Mehmedovic were each posted there awaiting Robert's arrival.

170. Each of them knew that the Infirmary examination rooms were "blind spots" in the prison, with no fixed cameras to record the use of excessive force. They also knew that officers were more likely to use excessive force on incarcerated individuals in blind spots, and that incarcerated individuals were commonly taken to exam rooms for the specific purpose of subjecting them to excessive force.

171. Each of them also knew that Anzalone, Farina, and Kessler were officers with reputations for using excessive force.

172. In addition, prior to Robert's arrival in the Infirmary, through various modes of communication (including but not limited to the radio communications referenced above) they received the message that Robert was a "problem child."

173. While awaiting Robert's arrival at the Infirmary, Galliher went to the nursing station to alert Dashnaw and Mehmedovic to the situation. Prior to arriving in the Infirmary, Dashnaw and Mehmedovic knew that Robert had been injured by other incarcerated individuals at Mohawk, Additionally, Galliher or Walters told Dashnaw and Mehmedovic that Robert was "coming in hot," a term that meant he was causing problems for staff and that force had been used against him.

174. The defendants in the Infirmary were also each subjectively aware that Robert needed medical attention because force had already been used against him and he was carried into the building bleeding in a hogtie position. Consistent with their subjective knowledge that Robert

needed medical attention, Dashnaw and Mehmedovic approached the medical exam room as the officers brought Robert in.

175.    As they approached the room, however, Walters made a hand gesture indicating that officers wanted to be left alone with Robert in the exam room and said "hold off a minute" or words to that effect.

176.    Upon information and belief, Dashnaw and Mehmedovic understood Walters's hand gesture to mean that correctional officers would likely continue to use excessive force against Robert in the exam room and did not want the two nurses to witness what was about to happen.

177.    Instead of taking any action to protect or provide medical attention for Robert or determine his physical condition, Dashnaw and Mehmedovic promptly retreated into the nurse's office to avoid witnessing what was about to occur.

178.    Likewise, Galliher, Along, and Walters took no steps to protect Robert from the substantial risk of serious harm they knew he faced in the exam room, whether by separating Kessler, Anzalone, and Kingsley from him, or by any other means.

179.    According to NYSDOCCs policy, Kessler, Anzalone, and Kingsley should have been physically separated from Robert after the prior uses of force—and certainly by the time they reached the ER room. There were now multiple other officers present who could and should have relieved these officers, who had been involved in prior use of force against Robert. But because no one did so, Kessler, Anzalone, and Kingsley freely continued to engage with Robert, placing his life and safety in extreme peril.

180.    The brutal nature of the beating Kessler, Anzalone, and Kingsley then proceeded to inflict on Robert in the exam room was foreseeable because, by that point, they were angry,

29

agitated, and adrenaline filled after their prior interactions with him and they believed he was a problem child who needed to be taught a lesson about how to behave at Marcy.

**Robert Is Beaten Inside the Infirmary ER Room Between 9:22 p.m. and 9:32 p.m.**

181.    Kessler, Anzalone, and Kingsley arrived in the ER room with Robert at approximately 9:22 p.m.

182.    Between 9:22 p.m. and 9:32 p.m., Robert was subjected to a protracted brutal beating, approximately five minutes of which was captured on passively recording body worn cameras belonging to Trombley, Along, Galliher, and Fisher.

183.    Within the five minutes of footage, Farina, Anzalone and Kingsley can be seen engaging in brutal violence toward Robert. The images are disturbing and grotesque.

184.    Among other things, Farina, Anzalone, and Kingsley can be seen punching Robert in the face and neck, putting pressure on top of Robert's body, putting pressure on Robert's neck, yanking Robert around the room by his neck, kicking Robert in the groin, and raising Robert's body up off of the gurney and slamming him back down onto those surfaces.

185.    Based on the available footage, the violence became most severe around 9:25pm.

186.    On information and belief, Robert expressed distress around this time relating to having difficulty breathing. (After having been beaten and pepper-sprayed, there was blood, mucus, and pepper-spray on his face.)

187.    In response, Farina said, "Here, I'll wipe your face," or words to that effect, and he proceeded to aggressively rub a white cloth into Robert's face and mouth, at times forcing the cloth and his hand in Robert's mouth. As Farina did this, Defendant Kinglsey kept both of his hands grasped around Robert's neck.

188. On information and belief, Robert either instinctively or defensively bit down on Farina's finger as Farina forced the cloth in his mouth. At the time, Robert was handcuffed with his breathing restricted, and biting was the only defense available to him.

189. Robert's bite caused Farina, Kingsley, and Anzalone to become even more angry and agitated and rapidly escalated their use of force.

190. Specifically, Anzalone grabbed the front of Robert's shirt and Kingsley pulled back on Robert's neck as Defendant Farina rapidly punched Robert in the face and neck or shoulder area, with hard closed-fist blows, at least six times.

191. The violence toward Robert in the ER room continued, apparently motivated at least in part to punish Robert for biting Farina.

192. This force—and all the force that was subsequently used against Robert in the ER room—went far beyond anything that was reasonably necessary, was clearly intended to harm, and served no legitimate purpose whatsoever.

193. Farina, Anzalone, and Kingsley are not the only officers who can be seen on video putting hands on Robert over this period. For example, Walrath delivered several punches to Robert's legs and Galliher helped his fellow officers restrain Robert's legs and body while the other officers inflicted more violence on Robert.

194. At the same time, Trombley, Kieffer, and Walters began the normal procedures required by NYSDOCCS policy following the use of force.

195. For example, when officers use force against an incarcerated individual, they must prepare a set of paperwork and arrange for the incarcerated individual to be photographed and examined by nursing staff to document any injuries. By approximately 9:25 p.m., Trombley, Kieffer, and Walters had all gotten started on their respective paperwork.

31

196.    At approximately 9:27 p.m., Trombley began instructing Robert that he would need to remove his clothing and stand on a mat in the corner of the ER room to be seen by medical staff and photographed. Trombley asked Robert if he would do so voluntarily or if the officers would need to use force to accomplish these tasks.

197.    Robert responded verbally, but his words were garbled and did not make sense.

198.    Robert's response indicated to Trombley and the other officers that Robert either would not or could not cooperate in the effort to document his injuries.

199.    Robert's failure to cooperate further angered Farina, Kingsley, and Anzalone, who continued to use force against him.

200.    As the force continued, Robert was very obviously in physical distress and in need of medical help. Robert can be seen on the BWC becoming limp and going in and out of consciousness.

201.    Robert's apparent medical distress further angered Farina, Kingsley and Anzalone and likely caused them to panic. It forced them to realize how seriously they had injured Robert and how difficult it might be to cover up their actions. Rather than getting immediate medical help for Robert, however, they took their feelings of anger and panic out on Robert by continuing to use force against him.

202.    Unable to gain Robert's cooperation as a result of his physical condition, Anzalone and Kingsley ultimately dragged Robert by the neck or shirt collar over to the mat in the corner so that his injuries could be documented.

203.    Once they got to the corner, Trombley went to the Infirmary lobby to call Sergeant Christine Ploss, who was in the Administration Building. He asked her to come to the Infirmary to assist with the paperwork and to bring a camera to document Robert's injuries. (At the time,

32

Ploss had supervisory authority over the Administration Building, where the use of force began, and so she was presumptively responsible for handling the paperwork.) While in the Infirmary lobby, Trombley and Kieffer conferred about the paperwork Kieffer was completing.

204.    Back in the ER room, Anzalone and Kingsley attempted to make Robert stand up on his own in the corner. Despite their efforts, Robert could not stand up on his own, as Anzalone and Kingsley wanted.

205.    Robert's inability to stand on his own in the corner further angered Anzalone and Kingsley. They continued to use additional force against Robert by pinning him against the wall, yanking him into a standing position, and likely using other excessive force that cannot be seen on camera.

206.    As the officers tried to force Robert upright in the corner, it became clear to everyone that Robert needed immediate medical assistance and to be taken to the hospital for emergency medical intervention.

207.    To that end, one of the officers verbalized to the others that they needed to prepare Robert for a trip to the hospital.

208.    In furtherance of the effort to get Robert to the hospital, Kessler went to Robert's feet to remove his leg irons while Kingsley and Anzalone still had Robert pinned to the wall in the corner.

209.    Kessler did this because anytime an incarcerated individual goes to an offsite hospital, NYSDOCCS policy requires correctional staff to first strip search the incarcerated individual for contraband. Kessler knew that Robert's pants would need to be removed for the strip search, which required Robert's leg irons to be removed.

33

210.    Once Robert's leg irons were removed, around 9:32pm, the effort to photograph Robert was abandoned and Kingsley and Anzalone moved Robert back onto the gurney, leaving a visible blood stain on the wall where they had just pinned Robert in the corner.  They then began removing Robert's clothes, both to aid the strip search and to facilitate the emergency medical attention that Robert so obviously needed.

**Defendants Fail to Intervene and Protect Robert Between 9:22 p.m. and 9:32 p.m.**

211.    During the ER room beating described above, Farina, Kessler, Anzalone, Kingsley, Walrath, Trombley, Mashaw, Fisher, Schoff, Along, Walters, Dashnaw, Kieffer, and Mehmedovic were all present in the Infirmary and witnessed at least a portion of the excessive force used against Robert.

212.    Each of them knew that Robert faced a substantial risk of serious harm in the ER room and acted with indifference to that risk of harm. At various points during the beating, some of them were present in or near the ER room, both knowing for certain that excessive force was being used against Robert and having the opportunity to intervene, but they took no action whatsoever to try and stop the beating.

213.    While some of these individuals—for example Along, Kieffer, Dashnaw, and Mehmedovic—witnessed only a limited amount of the force used against Robert in the Infirmary, each of them had more than enough information about the surrounding context to know Robert faced a substantial risk of serious harm during his time in the ER room, but took no action whatsoever to protect him.

214.    As noted above, each of these individuals knew that Anzalone, Kessler, Kingsley and others had previously used force against Robert and that Anzalone, Kessler, and Kingsley carried Robert into the ER room in a stress hog-tie position. On information and belief, each of

these individuals also knew that the Marcy ER room was a blind spot from cameras, that it was common for Marcy officers to use that room for the specific purpose of inflicting excessive force, that Marcy had a culture of officers using excessive force to threaten or warn incarcerated individuals to be compliant, and that Kessler, Anzalone, Farina, and Walrath in particular had reputations for using excessive force against incarcerated individuals.

215.    In addition, upon entry into the ER room, Walters told Dashnaw and Mehmedovic to "give them a minute" before coming in to examine Robert, sending the message that the officers were about to engage in conduct that should not be witnessed. Consistent with that communication, Dashnaw and Mehmedovic retreated fully from the scene and into a separate room in the Infirmary for the next several minutes.

216.    Likewise, Along took a brief look into the ER room soon after Robert was carried in.  Along saw Anzalone, Kessler, and Kingsley piled on top of Robert, who was lying face down flat on the gurney, with Kingsley pinning Robert down with his knee.  Seeing this, Along promptly turned away and retreated to the Infirmary lobby area.

217.    On information and belief, when Dashnaw, Mehmedovic, and Along retreated from ER room, they did so because they knew Robert was being subjected to excessive force in the ER room and that such force was likely to continue, and rather than take any action to protect Robert, they simply and deliberately sought to avoid witnessing it.

218.    At approximately 9:29 p.m., Dashnaw and Mehmedovic returned to the hallway outside the open door of the ER room where Robert was being beaten.  They occasionally peered into the ER room and when they were not looking in, they were well within earshot of the sounds attendant to Robert's beating.  Again, Dashnaw and Mehmedovic took no action to protect Robert and, instead, simply lingered in the hallway.

35

219.    Defendants Trombley, Mashaw, Galliher, Walrath, Anzalone, Kingsley, Kessler, Farina, Fisher, Schoff, and Walters each also spent time inside or immediately outside the ER room during Robert's beating. At various points, each had clear extended views of their fellow officers' use of excessive force in the ER room. Each had a reasonable opportunity to intervene and stop their fellow officers, but each of them failed to do so.

**All Marcy Defendants Were Acting Within The Scope of Their Employment, Despite Their Misconduct**

220.    Notwithstanding the severity of the Marcy defendants' misconduct toward Robert, each of them was acting within the scope of their employment for NYSDOCCS and performing job duties as Marcy staff while they used excessive force on Robert and while they failed to intervene or otherwise protect Robert from excessive force, as applicable.

221.    As described in further detail above, each of the defendants who interacted with Robert at the Marcy Administration Building and on the walkway did so as part of their job duty to process and supervise incarcerated individuals. Although officers used excessive force and otherwise failed to protect Robert during these encounters, all the officers' actions and omissions were foreseeable given the officers job duties, working conditions, and the de facto policies and customs described in this complaint.

222.    Likewise, every defendant who interacted with Robert in the Infirmary was acting within the scope of his employment.

223.    Even as Anzalone, Kingsley, and Farina were engaged in the worst violence inside the ER room, everyone in the Infirmary and in the ER room was there as part of standard and customary procedures for processing new indrafts, responding to red dot calls, responding to use of force incidents, and responding to incarcerated individuals' medical needs.

224.    They acted with complete indifference and used indefensible judgement while present at the scene in connection with these job tasks, but they were there to perform job tasks nonetheless.

225.    For example, after responding to Kieffer's red dot call, Sergeants Trombley and Mashaw needed to stay present on scene with Robert to direct their subordinates during the use of force and subsequent medical response incidents and to ensure the completion of all necessary paperwork.

226.    Likewise, Officers Galliher, Farina, Kingsley, and Mashaw all initially responded to the red dot and came to the ER room to be of assistance to their fellow officers following the walkway use of force.  A short time later, Officers Fisher and Schoff also arrived at the ER room to assist their fellow officers after hearing the red dot call.

227.    Officers Walters and Along were assigned to work in the Infirmary that night, and so it was their job to stand by and remain attentive to what was occurring in the ER room.

228.    Further, under NYSDOCCS policy, ranking officers at the scene of use of force incidents are expected to direct subordinate correctional officers, who are in turn expected to stand by and take direction from ranking officers.

229.    All subordinate correctional officers present in the Infirmary between 9:22 p.m. and 9:32 p.m.—namely Anzalone, Kessler, Kieffer, Farina, Kingsley, Walrath, Galliher, Walters, Along, Fisher, and Schoff—acted within this policy during their interactions with Robert that night by remaining present to receive orders from Sergeants Trombley and Mashaw, who were the ranking officers on scene.

230.    For example, while inside the ER room, Trombley directed Galliher to go to his van and retrieve a set of leg irons to assist his fellow officers. Galliher did as he was told and when

37

he returned to the ER room with the leg irons, he placed them on Robert's legs to assist his fellow officers.

231.    Similarly, Trombley gave Kieffer and Walters instructions regarding completion of Use of Force paperwork, and he also directed Anzalone and Kingsley to bring Robert to the corner of the ER room for documentation of his injuries. Kieffer, Walters, Anzalone, and Kingsley did as they were told by their superior officer.

232.    Fisher, Schoff, and Along also acted within the scope of their employment as correctional officers when they stood by at the scene where force was being used and awaited direction from their superior officers.

### Marcy Medical Staff Finally Enter the ER Room at 9:32 p.m.

233.    Around the same time that officers moved Robert back to the gurney from the corner of the room, Dashnaw and Mehmedovic entered the ER room at approximately 9:32 p.m. Upon entering the room, Dashnaw and Mehmedovic and everyone else in and near the ER room (including but not necessarily limited to Kingsley, Anzalone, Galliher, Schoff, Kessler, and Mashaw) could plainly see that Robert was seriously injured, unconscious, and unresponsive to a sternal rub. Dashnaw and Mehmedovic also observed that Robert's breathing was very shallow and labored.

234.    Despite these observations, neither Dashnaw nor Mehmedovic gathered any history of how Robert had become unresponsive or why he was actively bleeding.

235.    Further, despite Robert's medical state obviously warranting urgency, Dashnaw and Mehmedovic acted with none. They waited three full minutes (until 9:35 p.m.) to take any vital signs from Robert. At that point, Dashnaw observed Robert's blood oxygen saturation was in

38

the upper 70% range, which all nurses know is critically low and requires immediate resuscitation to avoid anoxic brain injury.

236.    Despite knowing the extremely serious risks Robert faced without immediate resuscitative and medical intervention, no one summoned an ambulance for Robert until 9:40 p.m., and no one began cardiopulmonary resuscitative efforts until approximately 9:42 p.m.

237.    Resuscitative efforts began only after Lieutenants Jarad Brown and James Zike entered the ER room and ordered everyone to activate their body worn cameras and begin cardiopulmonary resuscitation ("CPR").

238.    Around 9:50 p.m., Kunkel ambulance arrived on scene and took Robert to Wynn Hospital where he would be pronounced dead within a few hours.

239.    The Onondaga County Medical Examiner later determined that Robert died because of asphyxia due to compression to the neck and multiple blunt force injuries throughout his body and termed his manner of death a homicide.

### Ranking Officers Coordinate a Cover Up

240.    Soon after Robert left Marcy in the ambulance, Lieutenant Brown put a process into place to cover up his subordinates' misconduct.

241.    On information and belief, Brown facilitated the cover up of the officers' misconduct immediately and reflexively—without any advanced thought or deliberation—pursuant to the long-standing and well-established NYSDOCCS custom of writing use of force reports to favor officers and disfavor incarcerated individuals, regardless of the true facts.

242.    As soon as Brown learned that Kieffer, Kessler, and Anzalone were involved in the use of force that led to the "red dot," he called them to his office for a private conversation.

243.    Lieutenant Brown's objective in holding this meeting was to advise his subordinate officers about how to prepare use of force reports in a way that would provide maximum protection to all correctional officers involved.

244.    During the meeting, Kessler began telling Brown about the use of force in the Administration Building breezeway, and Brown told him to stop talking.

245.    Brown told the officers he did not care about what happened in the Administration Building because the use of force reports should include only the use of force that occurred on the walkway to the Infirmary.

246.    On information and belief, Brown selected the walkway incident as the only use of force to be written up because it was witnessed by the fewest number of officers and it involved the most easily justifiable use of force—pepper spray—and because pepper spray quantities were monitored so this use would have to be accounted for.

247.    While advising his officers, Brown demonstrated no care, concern, or alarm about the fact that his subordinates had obviously just killed a man. To the contrary, Brown posed wisecrack rhetorical questions along the lines of "What, you killed another one?" and "You guys had to dump the smallest convict in the history of man?  You couldn't have found a bigger guy?"

248.    With these statements, it was patently clear that Brown's only concern was the impact his subordinates' actions might have on other correctional officers, and not the risk his subordinate correctional officers might pose to incarcerated individuals.

249.    Ultimately, Brown instructed Kessler, Kieffer, and Anzalone to work with Sergeant Trombly in preparing their use of force reports that addressed only the use of force on the walkway. That evening, Brown told all of them (Kessler, Kieffer, Anzalone, and Trombley) to "get their stories straight."

40

250.    Consistent with those instructions, Kessler, Kieffer, and Anzalone worked together to craft a false narrative of what transpired on the walkway to justify the use of pepper spray. The false narrative they decided to write up was that Robert screamed at and swung his arms at Kessler along the walkway and then violently struggled with Kessler on the ground. This narrative was a complete fabrication.

251.    They submitted draft reports to Trombley including the false narrative, and Trombly instructed them to revise the reports several times to make the story more consistent and plausible. Among other things, Trombley directed Kessler, Kieffer, and Anzalone to make the fabricated location of the pepper spray incident as close to the Infirmary as possible. After going back and forth on several drafts, Trombly finally accepted a false set of reports from the officers.

252.    Trombley adopted the narrative he knew to be false in a memo he wrote, directed to Acting Superintendent Medbury, as part of the package of required paperwork.

253.    To further advance the false narrative, Trombley went to so far as to prepare a bogus disciplinary ticket against Robert (who was likely already dead), repeating the officers' lies, as shown below.

254.    Lieutenants Bedient and Brown repeated the false narrative in official reports they submitted up the NYSDOCCS chain of command and to investigators in the aftermath of Robert's death.

255.    The cover up went both far up the Marcy chain of command, and also wide among Marcy staff. At the time, NYSDOCCS written policy required every single officer who witnessed any use of force against Robert to write a report of their observations. In this case, that requirement extended to Defendants Caufield, Bedient, Popiel, Bankert, Walrath, Kessler, Keiffer, Anzalone, Trombley, Farina, Mashaw, Galliher, Kingsley, Along, Walters, Fisher, Schoff, and Dashnaw. Yet

none of these eighteen (18) defendants (two of whom were sergeants and one of whom was a lieutenant) who witnessed force in the breezeway or ER room reported it.

256.    Defendants Kingsley and Walrath, who went to Wynn Hospital with Robert, also lied to hospital staff about the circumstances preceding Robert's cardiac arrest. They told hospital staff that Robert was acting erratically, complained of pain, and then collapsed and hit his head.

257.    All the officers' actions in furtherance of the coverup were undertaken pursuant to long-standing Marcy customs and practices about covering up the use of excessive force that caused injuries to incarcerated individuals. As Brown and other ranking Marcy correctional officers would later admit, it was customary for Marcy officers to create use of force paperwork in a manner that protected officers from discipline. Protecting fellow officers from the consequences of their actions was seen as paramount over revealing the dangers correction staff pose to incarcerated individuals.

### Defendants Martuscello, D'Amore, Medbury, and Other As Yet Known Supervisory Defendants Are Responsible for Robert's Fatal Beating

258.    The fact that over a dozen people casually carried out or watched Robert's fatal beating without even bothering to shut the door of the room where he was being killed, and that even more people witnessed the earlier uses of excessive force, all without making any effort to intervene, to separate or otherwise protect Robert from his beaters, or to document the excessive force they witnessed is indisputable evidence that institutional tolerance of staff brutality against incarcerated people permeates Marcy's culture.

259.    As Governor Hochul acknowledged, the State's prison system failed Robert. She ordered Defendant Medbury to be removed from her position as Marcy's top leader soon after Robert's fatal attack.

260.    As Defendant Martuscello admitted, institutional change is required to prevent similar acts from happening in New York's prisons.

261.    As CANY reminded the public in the wake of Robert's killing: "The body-worn camera footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility and other prisons in the state."

262.    The responsibility for Robert's killing extends beyond the Marcy staff present at the scene of his fatal beating. Robert's killers did not act in a vacuum. Their actions were the entirely foreseeable result of maintaining an utterly broken system that tolerates staff violence against incarcerated people, as NYSDOCCS leadership has done for decades.

263.    Defendants Martuscello, D'Amore, and Medbury (the "Supervisory Defendants") are personally involved in and liable for Robert's death because they were each aware of and deliberately indifferent to the substantial risk of serious harm to incarcerated individuals like Robert.

264.    On information and belief, all supervisory personnel within NYSDOCCS, including the Supervisory Defendants, knew that correctional officers may be inclined to overreact and use excessive force against incarcerated individuals at times, especially when they are fatigued and emotionally depleted from working mandated double shifts in chaotic dehumanizing settings.

265.    On information and belief, a well-settled and widespread de facto policy has long existed across NYSDOCCS, including in the period leading up to Robert's killing, of failing to hold correctional officers accountable for using excessive force against incarcerated individuals. Part and parcel of this de facto policy is maintaining a strict code of silence, pursuant to which

NYSDOCCS correctional officers uniformly look the other way or assist in covering up abuse of incarcerated individuals.

266.    Under this de facto policy, correctional officers are permitted to maintain order and control over incarcerated individuals by any means they deem necessary, meting out violence at will, so long as their misconduct can be plausibly covered up. As a result of this de facto policy, correctional officers can freely assault incarcerated individuals, safe in the knowledge that their actions will never be subject to any meaningful scrutiny.

267.    This de facto policy benefits NYSDOCCS because it helps maintain the appearance of order in its facilities, albeit at the expense of incarcerated individuals, whose accounts of abuse are disregarded.

268.    It is only in the most exceptional cases, where (as here) incontrovertible evidence of clear abuse comes to light, that meaningful action is taken to hold officers accountable.

269.    The de facto policy described above posed a substantial risk of harm to incarcerated individuals like Robert and was a moving force behind Robert's killing.

270.    At the time of Robert's killing, this de facto policy was so well-settled and widespread that the officers who beat Robert and those who looked on while it occurred were emboldened, and indeed encouraged, to brutalize Robert or allow Robert to be brutalized with impunity. These officers were confident in the knowledge that their misconduct would be easily concealed and would not be subject to any meaningful examination or investigation.

271.    Indeed, two Sergeants watched their subordinates use deadly force against Robert in the ER room, a Lieutenant immediately set a coverup into motion afterward, and none of the eighteen (18) individuals who witnessed uses of force against Robert in the breezeway and ER room made any report of what occurred. These things do not happen by accident—they are the

44

result of a de facto policy that flourished and became engrained in Marcy culture in the years leading up to December 9, 2024, under the leadership of the Supervisory Defendants.

272. On information and belief, the Supervisory Defendants were personally aware of this de facto policy. Additionally, as discussed in further detail below, this de fact policy has been thoroughly documented, publicized, and confirmed by, among others, independent research organizations, federal and state prosecutors, criminal and civil juries, the news media, internal complaints by incarcerated people at Marcy, and a multitude of civil rights lawsuits.

273. On information and belief, the Supervisory Defendants were also personally aware that this de facto policy posed a substantial risk of serious harm to incarcerated individuals like Robert.

274. In the period leading up to Robert's killing, the Supervisory Defendants were each personally responsible for ensuring the safety of individuals in NYSDOCCS custody and at Marcy. They each had the authority and responsibility to set policy, make rules, communicate expectations, and control the correctional officers who worked under their command.

275. Despite their knowledge and authority, none of the Supervisory Defendants took any meaningful action to abate the risk of harm that this de facto policy posed to incarcerated individuals like Robert. To the contrary, each of them allowed the policy to flourish on their watch.

276. As a direct and proximate result of the Supervisory Defendants' deliberate indifference to this de facto policy, Defendants Kieffer, Kessler, Anzalone, Farina, Walrath, and Kingsley brutalized and killed Robert while Defendants Trombley, Mashaw, Along, Fisher, Schoff, Dashnaw, Mehmedovic, Caufield, Bedient, Tabor, Bankert and Popiel looked on and failed to intervene or otherwise protect Robert, or report what they witnessed.

**Illustrations of the De Facto Policy At Marcy Correctional Facility**

277.    Well before Robert was beaten to death, the Supervisory Defendants knew that people incarcerated at Marcy faced a substantial risk of serious harm at the hands of correctional officers.

278.    In October 2022, CANY conducted an in-depth two-day monitoring visit at Marcy ("Monitoring Visit"). During the Monitoring Visit, CANY interviewed over 100 incarcerated people, met with executive staff, medical staff, and union representatives, and visually inspected the facility.

279.    Following the Monitoring Visit, on October 21, 2022, CANY Executive Director Jennifer Scaife sent an email directly to Defendant Martuscello, outlining "key areas of concern" at Marcy that would be further detailed in a report ("Marcy Visit Email").

280.    The key areas of concern in Scaife's Marcy Visit Email included "numerous allegations from incarcerated people of physical abuse by staff," and "multiple individuals who expressed fear of retaliation for speaking with CANY representatives," including reports that individuals were "warned by security staff not to speak with us."

281.    Martuscello read and forwarded the Marcy Visit Email, which soon made its way to Defendants Medbury and D'Amore as well.

282.    At the time Martuscello, D'Amore, and Medbury received the October 21, 2022 Marcy Visit Email, they all held positions in NYSDOCCS where they were expected to read the email, know its contents, and take appropriate steps in response to protect the safety of incarcerated individuals at Marcy.

283.    In July 2023, CANY published a comprehensive "Post-Visit Briefing and Recommendations" report about its Marcy Monitoring Visit ("CANY Report").[3]

284.    As reflected in the ***CANY Report***, incarcerated individuals at Marcy reported "rampant abuse by staff, including physical assaults" and "a significant number of instances of racialized abuse." CANY found a "higher instance of staff abuse" at Marcy compared to other NYSDOCCS facilities.

285.    Specifically, the CANY Report indicates that a shocking 80 percent of respondents at Marcy reported having seen or been personally subjected to verbal, physical, or sexual abuse by staff, and 70 percent reported racial discrimination or bias.

286.    The CANY Report further documents that people "in general population units detailed experiencing or witnessing a range of abusive behaviors by staff, such as *physical assaults in locations where cameras are absent* including between the gates, in vans, and in showers. They also described staff engaging in verbal harassment and using pepper spray." (emphasis added).

287.    The CANY Report quotes one incarcerated person as saying, "Physical abuse is rampant; the CO told me when I got here this is a 'hands-on facility,' we're going to put hands on you if we don't like what you're doing."

288.    The CANY Report quotes another incarcerated person as saying, "Vibes in this jail with staff are off - they brag and intimidate us about the number of people they've beat or sprayed."

289.    The CANY Report reflects that Marcy's Incarcerated Liaison Committee reported a pattern of staff regularly engaging in physical abuse.

---

[3] *Post-Visit Briefing & Recommendations No.22-10: Monitoring Visit to Marcy Correctional Facility - October 11-12, 2022,* CANY, https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-10-marcy (last visited Jan. 10, 2025).

290.    In addition, "CANY monitors observed a pervasive culture of fear and retaliation at Marcy. On the second day of CANY's visit, several incarcerated individuals confided in CANY monitors that staff had walked through the housing units the night prior announcing threats of physical harm in retaliation for speaking with CANY."

291.    Notably, while incarcerated people at Marcy reported rampant physical staff abuse, especially in locations without cameras, "Executive team members reported [to CANY] that the RMHU [Residential Mental Health Unit] [was] the only housing unit at Marcy currently equipped with stationary cameras."

292.    CANY implored the NYSDOCCS Office of Special Investigations ("OSI") and Inspector General to "investigate the widespread claims of abuse at Marcy and make the findings and measures taken to address them reported to the public upon completion."

293.    On information and belief, Supervisory Defendants Martuscello, D'Amore, and Medbury were each subjectively aware of the contents of the July 2023 CANY Report, including CANY's findings of rampant staff abuse at Marcy and CANY's recommendation that OSI and the New York Inspector General needed to investigate and take steps to address the problem. On information and belief, none of the Supervisory Defendants ever took any steps to implement CANY's recommendation or meaningfully address, much less abate, the problem of rampant staff violence at Marcy.

294.    Following Robert's death, CANY Executive Director Jennifer Scaife issued a statement that the video of his fatal attack would allow the public to "witness the brutality that [CANY] has documented . . . at Marcy as recently as two years ago."[4]

---

[4] *Correctional Association of New York (CANY) Statement on the Death of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 23, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy.

295. Ms. Scaife pointed out that CANY had previously "called upon DOCCS' Office of Special Investigations and the New York State Inspector General to investigate the serious and pervasive allegations at Marcy Correctional Facility."

296. Ms. Scaife also indicated that CANY notifies NYSDOCCS and other state agencies several times per week about allegations of abuse, maltreatment, neglect, or violations carried out by staff in New York's prisons.

297. Several days later, following release of the video showing how Robert was killed, CANY issued another statement that the "footage depicting correctional officers killing Robert Brooks while handcuffed as other state employees look on is sickening and appalling, *but not surprising given the reports of violence and abuse that [CANY] has documented at Marcy Correctional Facility* and other prisons in the state." (emphasis added).[5]

298. The experience of ***Juan Rivas*** strongly corroborates the 2022 CANY Report.

299. In September and October 2024, Mr. Rivas was violently assaulted by Marcy correctional officers. Three officers who were involved in Robert's killing – Defendants Kessler, Farina, and Anzalone – participated in the final assault of Mr. Rivas, which left him grievously injured.

300. While in a blind spot with no fixed cameras, Defendant Kessler choked Mr. Rivas with his hands and repeatedly struck Mr. Rivas in the torso with his knee while Defendant Farina used a rope to choke Mr. Rivas, leaving ligature marks on his neck.[6]

---

[5] *Correctional Association of New York (CANY) Statement on the Release of Video Depicting the Killing of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 27, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy-zax6a.

[6] *Rivas v. Kessler et al.*, No. 9:25-cv-253 (N.D.N.Y. Mar. 31, 2025), Dkt. No. 5 (First Amended Complaint).

301. Mr. Rivas's injuries from this attack were so severe that he spent nearly two weeks in the hospital following the beating. His ribs were broken so badly that his lung was punctured, requiring extensive surgery that necessitated freezing Rivas's nerves due to the severity of his pain.

302. On October 21, 2024, Rivas's attorney sent a letter by Fed Ex overnight delivery directly to Defendant Martuscello and the Marcy Superintendent, detailing the harrowing violence Rivas experienced at Marcy.

303. On information and belief, between the date of the Rivas Letter and Robert's deadly assault, the Supervisory Defendants took no meaningful action to prevent Robert and other individuals at Marcy from being similarly subjected to unlawful physical assaults and violent acts of retaliation by Defendants Kessler, Farina, Anzalone or any other Marcy correctional officers.

304. The experience of *Williams Alvarez* also strongly corroborates CANY's findings about Marcy.

305. In September 2020, Defendants Trombly, Farina, and three other Marcy officers brutally attacked Alvarez.

306. The attack began with an officer pepper spraying Alvarez without provocation while Alvarez was cleaning floors in a shower area.

307. The officer ordered Alvarez to a vestibule away from other incarcerated individuals, where he stood with his hands against a wall while Defendants Trombly, Farina, and two additional officers beat him.

308. The officers slammed his head against the wall multiples times, handcuffed him, and then kicked him multiple times in the head and body as he fell to the ground.

309. During the attack, Alvarez heard officers laughing and no one intervened to help him.

310.    The beating caused fractures to Alvarez's face so severe that they required surgical repair and left him with a permanent facial deformity. His attackers also shattered his ankle bone, which likewise required surgery.

311.    After beating Alvarez, one of the officers created false disciplinary charges against him to cover up their actions. As a result of the false reports, Alvarez was sent to Marcy's Special Housing Unit (*i.e.* solitary confinement), discharged from an early release program that Alvarez was about to complete, and transferred to a maximum-security facility.

312.    In 2022, Alvarez filed a lawsuit in federal court, describing his attack as explained above. Defendants Trombly and Farina were named as defendants in Alvarez's suit.[7]

313.    At his deposition, Alvarez testified, under oath, that corrections officers at Marcy have a designated "beat-up squad" of officers who "go around and do . . . the assaults and rough handling the people [incarcerated at Marcy]." Alvarez identified Defendant Trombly as the "sergeant in charge of the beat-up squad."[8]

314.    The experience of ***Adam Bauer*** also strongly corroborates CANY's findings about Marcy.

315.    In February 2020, Defendant Anzalone and several other officers brutally attacked Bauer in a bathroom at Marcy.

316.    During the attack, an officer punched Bauer in the head, threw him to the ground, and kicked him in the side.

---

[7] Amended Complaint, *Alvarez v. Bause et al.*, No. 22-CV-0186, (N.D.N.Y Mar. 29, 2022), Dkt. No. 12.

[8] Deposition of William Alvarez at 25, 34, *Alvarez v. Bause et al.*, No. 22-CV-0186 (N.D.N.Y Sept. 25, 2024), Dkt. No. 49-2.

317.    Defendant Anzalone and two sergeants entered the bathroom and either joined in kicking Bauer or witnessed and did not stop the attack.

318.    At one point, one of the sergeants smashed a clipboard over Bauer's head, leaving a deep laceration. Bauer's attackers then brought him to the Marcy Infirmary where Defendant Anzalone kicked Bauer's feet while he was forced to lie face down on the floor and took the photo of Bauer's injuries, depicted below.

319.    To cover up their brutal assault, the Marcy officers concocted a series of lies about how Bauer sustained his injuries. The lies they told various medical personnel included that Bauer's injuries were self-inflicted, that the injuries were inflicted by another incarcerated person, and that the injuries "occurred by a seatbelt."

320.    To further try and cover up their misconduct, the officers fabricated disciplinary charges against Bauer, threatened him not to disclose the assault to anyone, and then placed him in solitary confinement.

321.    In 2022, Bauer filed a lawsuit in federal court detailing the above facts of his assault and the subsequent cover up.[9]

322.    The extensive contact New York civil rights attorney **Amy Jane Agnew** has had with incarcerated individuals and staff at Marcy since 2019 further corroborates the CANY Report.

323.    Agnew represents dozens of individuals at Marcy in connection with class action litigation against NYSDOCCS. Agnew's clients have consistently reported experiencing retaliation and violence when they attempt to assert their legal rights. Marcy staff have also retaliated against Agnew personally for helping her clients expose misconduct at the facility. Marcy staff has left threatening notes on her car, eavesdropped on her attorney-client

---

[9] *Bauer v. Iodice et. al*, No. 22-CV-1007 (N.D.N.Y. Sept. 23, 2022), Dkt. No. 1.

communications, denied her access to her clients, and concocted false and defamatory reports to justify their actions. Marcy staff made it so difficult for Agnew to represent her clients that in 2024 she personally filed a lawsuit against Marcy officials, asking the Court to enjoin their misconduct.[10]

**Evidence of the De Facto Policy Across NYSDOCCS Facilities**

324. The documented pattern of brutal staff violence against individuals incarcerated at Marcy is representative of how this de facto policy expresses itself in correctional facilities across the state because NYSDOCCS leaders, including but not limited to Supervisory Defendants Medbury, D'Amore and Martuscello, turned a blind eye to the epidemic of violence, rather than taking any meaningful action to correct it.

325. The Marshall Project and The New York Times highlighted some of the many cases of excessive force and cover ups in NYSDOCCS prisons as part of an exhaustive investigation in 2015-2016 (the "2015-2016 MP/NYT Investigation"), which concluded that "a culture of brutality has been allowed to thrive in the prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other way."

326. Beginning with a front-page story on February 28, 2015, the findings of the *2015-2016 MP/NYT Investigation* were published in a series of *New York Times* articles, which examined brutality by NYSDOCCS officers at prisons across the state and how they are rarely held accountable. Horrific experiences of incarcerated individuals that were highlighted in the series are summarized below:

(a)    As the result of a near-fatal beating by officers at Attica Correctional Facility ("Attica"), *George Williams* sustained a broken shoulder, several cracked ribs, and two broken legs. He also had a severe fracture of the orbit surrounding his left eye, a large amount of blood lodged in his left maxillary sinus, and multiple cuts and bruises. After

---

[10] *Agnew v. D'Amore et. al*, No. 6:23-CV-1610 (N.D.N.Y Feb. 7, 2024), Dkt. No. 12.

nearly killing Williams, the officers engaged in an elaborate cover up, falsifying official reports and destroying evidence. Williams' case was the impetus for the MP/NYT investigation because it offered "a vivid lesson in the intractable culture of prison brutality."[11]

(b)      After a 2015 escape at Clinton Correctional Facility ("Clinton"), officers subjected *dozens of people* to days of unjustified violence in "what seemed like a campaign of retribution . . . . In letters reviewed by the Times, as well as prison interviews, [incarcerated people] described a shockingly similar catalog of abuses, including being beaten while handcuffed, choked and slammed against cell bars and walls." One notoriously violent officer at Clinton, known as "Captain America," would tie plastic bags around incarcerated people's necks and tighten them until the incarcerated people passed out.[12]

(c)      *Samuel Harrell and other people* incarcerated at Fishkill Correctional Facility ("Fishkill") were subjected to an organized "Beat Up Squad," which consisted of a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people and thereafter engaging in elaborate cover ups of their misconduct (similar to the Beat Up Squad that William Alvarez testified in 2023 had beat him and others at Marcy). The Beat Up Squad unjustifiably attacked and brutally killed Harrell in a prison building that was long "singled out as a violent place," including by CANY, which had previously specifically briefed the NYSDOCCS Commissioner on the unjustified abuse that routinely took place there.[13] In December 2020, various Fishkill staff settled state and federal court claims against them for an undisclosed amount for Harrell's brutal assault and death. *See Harrell v. New York State Dep't of Corr. and Cmty. Supervision*, No. 15-cv-7065 (S.D.N.Y. Dec. 7, 2020), Dkt. Nos. 214, 238.

(d)      *Ramon Fabian* was brutally assaulted by an officer at Ulster Correctional Facility as part of a troubling pattern of brutality, that, according to CANY, NYSDOCCS "has often ignored."[14]

---

[11] Tom Robbins, *A Brutal Beating Wakes Attica's Ghosts*, NEW YORK TIMES (Feb. 28, 2015), https://www.nytimes.com/2015/03/01/nyregion/attica-prison-infamous-for-bloodshed-faces-a-reckoning-as-guards-go-on-trial.html.

[12] Michael Schwirtz and Michael Winerip, *After 2 Killers Fled, Prisoners Say, Beatings Were Next*, NEW YORK TIMES (Aug. 11, 2015), https://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html.

[13] Michael Schwirtz and Michael Winerip, *Prison Guard 'Beatup Squad' is Blamed in New York Inmate's Death*, NEW YORK TIMES (Aug. 18, 2015), https://www.nytimes.com/2015/08/19/nyregion/fishkill-prison-inmate-died-after-fight-with-officers-records-show.html.

[14] Tom Robbins, *Guarding the Prison Guards: New York State's Troubled Disciplinary System*, NEW YORK TIMES (Sept. 27, 2015), https://www.nytimes.com/2015/09/28/nyregion/guarding-the-prison-guards-new-york-states-troubled-disciplinary-system.html.

54

(e)    *Leonard Strickland* was pushed down a flight of stairs and viciously beaten, nearly to death, by a group of officers at Clinton, fitting yet again into "a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department that rarely holds anyone accountable."[15] NYSDOCCS' then-Commissioner Anthony Annucci declined to be interviewed about Strickland's attack and the lack of accountability associated with it.

327.    In addition to detailing incidences of NYSDOCCS staff brutalizing incarcerated individuals, the 2015-2016 MP/NYT Investigation examined the significant liability the State had faced, requiring hundreds of payouts to incarcerated victims of unconstitutional excessive force. The investigation found that between 2010 and 2015, the State paid out at least $8.8 million in settlements or jury awards in cases where officers were accused of prisoner abuse or excessive force. The MP/NYT Investigation also noted that "[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly."[16]

328.    Defendant Martuscello was interviewed in connection with the 2015-2016 MP/NYT Investigation. Although Martuscello was not yet Commissioner at the time, NYSDOCCS put Defendant Martuscello forward for the 2015-2015 MP/NYT Investigation because he was the NYSDOCCS Executive Team member most knowledgeable about the agency's history of failing to hold abusive officers accountable. In connection with the interview, Martuscello posed for photos with a *New York Times* photographer and told reporters that he was "ready to take the battle to the prison guards' union."

---

[15] Michael Winerip and Michael Schwirtz, *An Inmate Dies, and No One Is Punished*, NEW YORK TIMES (Dec. 13, 2015), https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html.

[16] Tom Robbins, *New York State Prisons Take Steps to Track Complaints About Guards*, NEW YORK TIMES (Dec. 20, 2015), https://www.nytimes.com/2015/12/21/nyregion/new-york-state-prisons-take-steps-to-track-complaints-about-guards.html.

329.    As with the accounts of brutalization reported in the 2015-2016 MP/NYT Investigation, the highly publicized attack on *Kevin Moore* at Downstate Correctional Facility in 2013 demonstrates that NYSDOCCS has been on notice of systemic staff brutality for more than a decade. Officers beat Moore in an unprovoked attack so severe that his ribs and facial bones were broken and one of his dreadlocks was ripped out of his head. One officer kept Moore's dreadlock as a "trophy."

330.    On September 21, 2016, then-United States Attorney Preet Bharara announced federal charges against five of the officers involved in the attack on Moore, including separate charges related to the use of excessive force and filing of false reports. At the announcement, Bharara stated:

> Today's charges allege a brutal beating and a brazen cover-up by five state correction officers that left Kevin Moore, a 54-year-old inmate, with life-threatening injuries and in the hospital for 17 days. [Incarcerated people] may be walled off from the public, but they are not walled off from the Constitution. And when correction officers viciously beat an inmate in their charge, then collude among themselves to cover it up—as alleged here—they trample on the Constitution and the very laws they have sworn to uphold.[17]

331.    As Bharara succinctly put it in a statement still devastatingly applicable today:

"*Excessive use of force in prisons . . . has reached crisis proportions in New York State*."[18]

332.    Each of the five officers involved in Moore's beating was convicted on all charges. Two were convicted following a jury trial and received 100- and 87-months of incarceration,

---

[17] Press Release, *Five Correction Officers Charged With Federal Crimes In Beating Of Inmate At Downstate Correctional Facility And Cover-Up*, U.S. DEP'T OF JUSTICE (Sept. 21, 2016), https://www.justice.gov/usao-sdny/pr/five-correction-officers-charged-federal-crimes-beating-inmate-downstate-correctional.

[18] Tom Robbins, *'I Was Terrified': Inmates Say They Paid a Brutal Price for a Guard's Injury*, NEW YORK TIMES (Nov. 15, 2016), https://www.nytimes.com/2016/11/15/nyregion/new-york-prison-inmates-guards-beatings.html.

respectively, and their convictions and sentences were affirmed by the Second Circuit. *See United States v. Scott*, 979 F.3d 986, 988 (2d Cir. 2020). The other three officers pled guilty, with one receiving 40 months of incarceration and the others receiving sentences of time served.

333. More ***recent jury verdicts, settlements, criminal pleas, and judicial findings*** lay bare that NYSDOCCS has allowed a culture of staff brutalization to persist and flourish even after the Moore case, even after the many accounts widely publicized in the MP/NYT Investigation, and even after countless more heinous acts came to light from earlier findings of liability.

334. The following summaries of cases resolved since 2020 demonstrate that officers and other staff continue to routinely engage in extreme violence in New York prisons, operating with impunity because NYSDOCCS has allowed them to believe it will be tolerated. The cases summarized are merely exemplary; on information and belief they reflect just a small fraction of the many other instances of excessive staff force in NYSDOCCS' facilities:

(a) In December 2024, New York Court of Claims Judge Anthony Brindisi ruled in favor of ***28 people incarcerated at Marcy's sister facility, Mid-State Correctional Facility*** ("Mid-State"),[19] holding that 30 officers acted in concert to commit assault and battery on them during a 2016 raid. *Aliaga v. State of New York*, 84 Misc. 3d 1246(A) (N.Y. Ct. Cl. Dec. 2, 2024). Judge Brindisi determined that the officers had subjected the men to, among other things, being kicked in the mouth "like a football punt," being used by an officer "like a trampoline," having genitalia harmfully touched by officers, and even being sodomized by officers inserting objects into their anus or rectum, while officers asked "how does it feel to be helpless." Judge Brindisi found it evident "from the testimony of both claimants and officers that supervisors, including the Superintendent and senior staff, were present at various points during the raid, observing the damage to the dorm and appearing pleased with the result." Judge Brindisi ultimately characterized the raid and atrocious physical abuse inflicted by the officers as a "modern-day 'salting the earth.'"

(b) In October 2024, officers Rohail Khan and Michael Williams pled guilty to deprivation of rights under color of law in violation of 18 U.S.C. § 242 for the brutal beating of ***James Barton*** at Mid-State. *See United States v. Khan*, No. 5:24-CR-391 (N.D.N.Y. Oct. 29, 2024), Dkt. No. 4; *United States v. Williams*, No. 5:24-cr-00323 (N.D.N.Y. Oct. 23, 2024), Dkt. No. 5. Khan and Williams assaulted Barton in a brutal attack they called the

---

[19] Mid-State is directly across the street from Marcy, and on information and belief, the two facilities often share staff.

"George Floyd challenge." Khan and Williams, along with several other officers spent more than ten minutes punching Barton in his head, face, eyes, chest, back, stomach, legals, buttocks, and groin until he fell to the floor. The officers then proceeded to kick and stomp Barton, put him in a chokehold, and punch him further. The officers' plea agreement acknowledged the truth of these and many of the facts Barton alleged in a subsequent civil lawsuit. *See Barton v. Khan et al.*, 24-cv-01433 (N.D.N.Y. Nov. 25, 2024), Dkt. No. 1.

(c)     In November 2023, a federal jury awarded the family of **Terry Cooper** $9.25 million in connection with his fatal beating by Clinton officers who beat Cooper so severely it caused a fatal asthma attack, deprived him of his asthma pump, then covered up the attack and denied the use of force. *See Cooper v. Clancy, Case* No. 9:19-cv-00362 (N.D.N.Y. Nov. 23, 2023), Dkt. Nos. 52, 226.

(d)     In 2021 and 2022, NYSDOCCS settled three separate federal lawsuits on behalf of at least 20 officers who worked at Green Haven Correctional Facility ("Green Haven"). One suit involved the brutal assault of **Carlos Garcia** by six officers who put him into a chokehold until he lost consciousness then slammed his head against a wall while he was handcuffed. The second suit involved three separate assaults on **Benjamin Stephens** by nine officers whose abuses included smashing his head so hard he had seizure and choking him. The third suit was brought by **Nakia Rose** against five officers who, among other things, at a sergeant's direction, cuffed him, brought him to the floor, kicked and punched him and twisted his ankles. *See Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y Feb. 7. 2022), Dkt No. 101; *Stephens v. Venetozzi*, No. 13-cv-5779 (S.D.N.Y. Feb. 7, 2022), Dkt. No. 381; *Rose v. Garritt*, No. 16-cv-3624 (S.D.N.Y. July 30, 2021), Dkt. No. 128.

(e)     In July 2022, officer Aaron Finn pled guilty to violating 18 U.S.C. § 242 in connection with the brutal beating of **Melvin Virgil** at Green Haven. *United States v. Finn*, No. 7:21-cr-00650-NSR (S.D.N.Y Oct. 26, 2022), Dkt. No. 28. As alleged in Virgil's subsequent civil case and acknowledged in large part in Finn's plea, Finn handcuffed Virgil and repeatedly smashed his head into a wall and steel bars as other officers silently watched. Multiple officers fabricated reports of misconduct against Virgil. Finn's attack only was uncovered because BWCs had captured it. *See Virgil v. Finn*, No. 22-cv-3169 (S.D.N.Y. Mar. 24, 2023), Dkt. No. 74.

(f)     In April 2021, three Fishkill officers were found liable by a jury for using excessive force against **Nicholas Magalios** in the amount of $1 million. *Magalios v. Peralta*, No. 19-cv-6188 (S.D.N.Y. June 1, 2021), Dkt. No. 44. One officer held down Magalios and other officers brutally kicked and punched him while others looked on and did nothing. Magalios suffered significant bruising, marks, abrasions, lacerations and aggravation of a pre- existing shoulder injury, which required surgery. Judge Seibel remarked that the "Defendants' conduct was reprehensible, violent, deceitful, and malicious."

(g)     In May 2020, Sullivan Correctional Facility ("Sullivan") officers whose excessive force killed **Karl Taylor** settled claims against them for $5 million. *See Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (S.D.N.Y. May 5, 2020), Dkt. No. 429. One officer struck

58

Taylor in the back of his head several times with his fists and a number of other officers beat him on his way to the infirmary (where he was later pronounced dead), leaving an extensive pool of blood that took 1.5 hours to clean up.

   (h)    In February 2020, a U.S. district court jury awarded *Jerome Anderson* $650,000 after finding a sergeant and three officers at Green Haven liable for excessive force. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Feb. 24, 2020), Dkt. No. 133. The officers coordinated an attack on Anderson by taking him to an area lacking surveillance where they punched, stomped, and kicked him for several minutes. *See id.*, Dkt. No. 161.

   (i)    In March 2025, for $1.2 million plus legal fees, Auburn Correctional Facility ("Auburn") officers settled claims that a Lieutenant waterboarded and violently assaulted *Matthew Raymond* while he was shackled and defenseless, inflicting permanent injuries to his genitals and bladder, while a Sergeant and other officers stood by and did nothing to stop the attack. *See Raymond v. Mitchell*, No. 18-cv-1467 (N.D.N.Y., Mar. 1, 2019), Dkt. Nos. 20, 201.

335.    On information and belief, since approximately 2017, Defendant Martuscello was made personally aware of significant legal cases like these, including settlements and jury verdicts involving allegations of excessive force by NYSDOCCS staff as well as criminal charges against correctional officer defendants involving excessive force and cover ups.

336.    Unsurprisingly, many of the cases summarized above involved egregious cover ups by NYSDOCCS officers, reflecting the existence of a widespread and well-settled code of silence among NYSCOSS staff. For example:

   (a)    Following Kevin Moore's "brutal gang-style assault," the officers involved conspired to "engage[] in an elaborate cover-up of the crime they had committed." Their cover-up included manufacturing fake injuries to make it appear that Moore had been the aggressor and creating false records, including false use of force reports, that memorialized the fabricated conspiratorial story the officers had made up. Five of the officers involved either were convicted by a jury of, or pled guilty to, among other things, violations of 18 U.S.C. § 1519, which criminalizes the falsification of records.

   (b)    Evidence in the Nicholas Magalios case showed that the officers involved "created false reports and gave false testimony that categorically denied using any force against Plaintiff and contended that Plaintiff fabricated the story entirely." According to Judge Seibel, the jury "necessarily found that Defendants lied repeatedly through those reports and that testimony, demonstrating the malicious and deceitful nature of their conduct." In affirming an award of punitive damages, Judge Seibel specifically noted that "similar acts often go undetected in correctional facilities." Judge Seibel also explained that

59

"'[r]eprehensible' may not be a strong enough word to describe Defendants' conduct here. They have disgraced themselves and their office, and such conduct seems to be all too acceptable among certain employees of New York's prison system."

(c)    The judge in the Jerome Anderson case noted evidence that each of the officers involved concocted a fabricated story to cover up their assault of Anderson. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Oct. 20, 2020), Dkt. No. 161.

(d)    In the case of Samuel Harrell, when officers and medical personnel could not resuscitate Harrell after the beating and finally called an ambulance, they fabricated that he had overdosed and the NYSCOBA spokesperson falsely informed media he had overdosed, all while Harrell's autopsy determined there were no illegal drugs in his system and his cause of death was a homicide caused by physical altercation with correction officers. Officers further falsely that claimed Harrell had falsely assaulted them. *See Harrell v. New York State Department of Corrections and Community Supervision*, No. 15-cv-7065 (S.D.N.Y. Aug. 14, 2019), Dkt. No. 214.

337.    Other recent examples of NYSDOCCS covering up their unlawful assaults of incarcerated people include those documented in *Keyes v. Annucci*, No. 18-cv-0372 (N.D.N.Y. Sept. 6, 2022), Dkt. No. 128 (officers settled claims against them alleging that they filed false misbehavior reports to retaliate against several incarcerated people that had reported officers' excessive use of force); *Patterson v. Patterson*, No. 16-cv-00844 (W.D.N.Y. Jan. 29, 2020), Dkt. Nos. 29, 66 (several officers settled claims that they deliberately falsified an incarcerated person misbehavior report as part of a conspiracy to cover up their assault of incarcerated person John P. Patterson); and *Walker v. Williams*, No. 16-cv-645 (W.D.N.Y), Dkt. No. 1, 69-78 (officers settled claims that they struck incarcerated person Jerard Walker many times with a baton on his ribs, back, and head, and then submitted false misbehavior reports to cover up their assault).

338.    Most recently, officers at Mid-State went to great lengths to cover up their fatal attacks on Messiah Nantwi. In an all-too-familiar pattern, those involved in the murder either were not wearing their BWCs, turned off their BWCs, or turned their backs to prevent damning footage from being captured on their BWC during Nantwi's assaults. The next day, the perpetrators met to concoct and coordinate a false narrative, blaming Nantwi for his own killing

60

and falsely claiming that Nantwi possessed a weapon that was in fact planted by a correctional officer.

339.    On information and belief, as with the summaries of excessive force described herein, the above illustrations are merely examples of how NYSDOCCS' widespread de facto code-of-silence policy plays out after officers engage in abusive conduct of incarcerated individuals.

340.    Indeed, in 2023, the New York Times published the results of another investigation focused on analysis of 5,600 NYSDOCCS disciplinary records dating back to 2010 ("MP/NYT Disciplinary Record Investigation").[20]

341.    The 2023 *MP/NYT Disciplinary Record Investigation* found that staff cover ups of excessive force incidents were "commonplace" across NYSDOCCS. [21]

342.    As reported in the New York Times, "[t]he records illustrate how cover ups make it difficult to hold officers accountable using excessive force. They also reveal a typical playbook: Guards often work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims and have them sent to solitary."

343.    Defendant Martuscello was interviewed in connection with the 2023 MP/NYT Disciplinary Record Investigation. He told reporters that he was not surprised that false reports often accompany instances of excessive force. "There has to be some manipulation of facts," Martuscello said.

---

[20] Alysia Santo, Joseph Neff, and Tom Meagher, *Guards Brutally Beat Prisoners and Lied About it. They Weren't Fired*, NEW YORK TIMES (May 25, 2023), https://www.nytimes.com/2023/05/19/nyregion/ny-prison-guards-brutality-fired.html.

[21] Joseph Neff, Alysia Santo, and Tom Meagher, *How a 'Blue Wall' Inside N.Y. State Prisons Protects Abusive Guards*, NEW YORK TIMES (May 22, 2023), https://www.nytimes.com/2023/05/22/nyregion/ny-state-prison-guards-abuse.html.

344.     Yet, on information and belief, the Supervisory Defendants took no action to prevent correctional officers from continuing to operate the familiar playbook.  Rather, under the Supervisory Defendants' leadership, on information and belief, neither Marcy nor NYSDOCCS more broadly, have routinely investigated whether officers' use of force reports are true or punished officers who submit reports that are false.  Failing to do so has emboldened officers to continue covering up their unlawful conduct by lodging false reports against their victims.

345.     The 2023 MP/NYT Disciplinary Record Investigation highlighted the case of **Chad Stanbro**, who was paralyzed in 2018 after a guard knelt on his neck while he received offsite dental treatment. At some point during the procedure, Mr. Stanbro lost consciousness and when he awoke one officer was kneeling on his neck while the other two held him down on the ground. In the aftermath of the incident, all three guards wrote false reports about how Mr. Stanbro sustained his injuries. Among the many lies they told was that Mr. Stanbro assaulted them, for which the newly paralyzed Mr. Stanbro had to spend 40 days in solitary confinement. Mr. Stanbro later sued the officers, and a federal jury awarded him over $1.6 million in damages against the officers. *See Stanbro v. Palou*, No. 7:20-cv-01591-KMK (S.D.N.Y. Feb. 21, 2023), Dkt. No. 238.

346.     The 2023 MP/NYT Disciplinary Record Investigation also highlighted the case of **Roy Harriger**, who was beaten in the back of his head with a nightstick by an unidentified guard at Attica.  The assault occurred sometime after a guard picked him up at a sergeant's office on his cell block and before he arrived unconscious at the infirmary. To cover up the beating, Attica guards concocted a story about Mr. Harriger falling in the shower. Ruling in Mr. Harriger's favor in his subsequently filed lawsuit, New York Court of Claims Judge Minarik said she was "appalled." She also ruled that Attica staff's story that Mr. Harriger had fallen in the shower was

a "fabrication," and she awarded him $2 million. *See Harriger v. State of New York*, Claim No. 126681 (Nov. 18, 2018 and Nov. 24, 2020).

347.    On information and belief, Defendant Martuscello was familiar with all the news reports described in this Complaint, including the Marshall Project/New York Times Investigative reports discussed herein. As a member of the NYSDOCCS Executive Team, Defendant Martuscello was provided with (and would regularly read) news clips containing information about NYSDOCCS, that would contain articles like the ones described in this Compliant.

348.    In the period leading up to Robert's killing, prisoners' advocacy organizations also made Defendant Martuscello aware of risks NYSDOCCS's de fact policy posed to incarcerated individuals like Robert.

349.    On August 27, 2024, prisoners' rights advocates met with Defendant Martuscello and warned that correctional officers throughout NYSDOCCS were regularly beating incarcerated people without consequence (the "August Meeting").

350.    Many advocates at the August Meeting were formerly incarcerated individuals with firsthand lived experience in NYSDOCCS and others worked closely with incarcerated individuals.

351.    The advocates told Defendant Martuscello about the prevalence of "beat up squads" and implored Martuscello to stop the systemic abuse by, among other things, closing the most problematic facilities. They included Marcy in the group of facilities that should be closed due to rampant staff violence.

352.    According to a participant at the August Meeting, Martuscello dismissed the advocates' warnings, stating that there were too many cameras inside correctional facilities for staff abuse to occur.

63

353. Meanwhile, for approximately two years leading up to the August Meeting, Defendant Martuscello had quarterly conference calls with non-profit organizations whose representatives, likewise, repeatedly and consistently raised alarms about assaults by correctional officers. Each time, Martuscello acknowledged the concern and then quickly deflected by moving on to a new topic without any meaningful response. On one such conference call, an advocate warned Martuscello that the epidemic of staff violence was a "ticking time-bomb."

354. Defendant Martuscello's personal knowledge of physical abuse by NYSDOCCS correctional officers dates back even further.

355. By virtue of the leadership roles that Martuscello has held in NYSDOCCS since 2012, he has been personally informed, briefed on, and updated about significant use of force incidents throughout NYSDOCCS.

356. On information and belief, during the period 2012 to 2023, Defendant Martuscello was responsible for reviewing OSI investigations and deciding whether to issue Notices of Discipline for correctional staff who engaged in physical abuse of incarcerated individuals.

357. On information and belief, during that period, and continuing through the present, Martuscello has also been personally informed about significant OSI investigations involving staff abuse and lawsuits involving abuse by correctional officers (including the lawsuits mentioned in this Complaint).

358. As described above, NYSDOCCS maintains a widespread and well-settled de facto policy of failing to hold correctional officers accountable for even the worst misconduct.

359. As part of this de facto policy, correctional officers maintain a strict and widely accepted code of silence, under which officers who become aware of abuse by officers look the

other way and actively facilitate cover ups. These de facto policies are persistent, widespread, and well-known across NYSDOCCS.

360.    This de facto policy encourages correctional officers across the system – even those who do not personally participate in brutality – to believe they are above the law because they know the chances are exceedingly slim that they will ever be held to account for even the most egregious misconduct.

361.    NYSDOCCS correctional officers know it is only in truly exceptional circumstances (for example, when officers accidentally record themselves committing murder) that NYSDOCCS leaders take meaningful action to hold abusive staff accountable.

**Events Following Robert's Killing Further
Demonstrate the De Facto Policies In This Complaint**

362.    If the officers who killed Robert had not accidentally recorded themselves, nothing would have come of Robert's death. No one in NYSDOCCS would have questioned the officers' lies about how Robert died, and everyone in NYSDOCCS would have gone about their business as usual.

363.    Because the officers accidentally recorded themselves killing Robert, video evidence emerged that stoked public outrage.

364.    By mid-February 2025, several officers who participated in Robert's killing and the subsequent cover-up of it were charged criminally. Legislators and advocacy groups mobilized over NYSDOCCS's apparent failure to control its officers, creating momentum for new laws that would threaten the de facto policy described in this Complaint.

365.    Unsurprisingly, correctional officers across NYSDOCCCS responded to these events with even more lawlessness.

366.    Over a three-week period starting in mid-February 2025, more than *ten thousand* (10,000) NYSDOCCS correctional officers abandoned their posts and engaged in a coordinated, illegal work stoppage that upended the entire state's prison system.

367.    The work stoppage clearly violated state law as well as the officers' own collective bargaining agreement.

368.    In addition to being illegal, work stoppages by correctional officers pose a clear threat to the safety of others.

369.    By abandoning their posts, correctional officers who participated in the work stoppage exposed incarcerated individuals and remaining staff behind prison walls to extreme hardship and danger.

370.    Each of the more than 10,000 correctional officers who participated in the work stoppage knew that their actions were illegal and dangerous to others, but they did it anyway because they were emboldened by the de facto policy discussed in this Complaint.

371.    Consistent with the de facto policy described in this complaint, the correctional officers knew it was exceedingly unlikely that NYSDOCCS would ever hold them accountable for their actions.

372.    Several days into the correctional officers' illegal work stoppage, a New York supreme court judge ordered the correctional officers to stop their illegal activities, but more than 10,000 NYSDOCCS correctional officers openly flouted the court order.

373.    The NYSDOCCS correctional officers were comfortable violating state law, flouting the court's order, and exposing others to danger because NYSDOCCS had a long-standing de facto policy of allowing officers to act with impunity.

374. If NYSDOCCS had an actual policy of holding correctional officers accountable for dangerous misconduct, then 10,000 of its correctional officers would not have felt emboldened to abandon their posts, violate state law, violate a court order, and expose others to grave danger.

375. At least 9 incarcerated individuals died during the correctional officers' three-week illegal work stoppage, including two men at Auburn Correctional Facility who did not receive needed medical treatment in time and one man at Sing Sing Correctional Facility who died by suicide when no one intervened.

376. One of the people who died was a man named Messiah Nantwi, an incarcerated individual at Mid-State.

377. Like Robert, Mr. Nantwi was brutally beaten and murdered by correctional officers.

378. Like the officers who killed Robert, the officers who killed Mr. Nantwi engaged in a protracted attack, continuing their violence against him when it was clear that Mr. Nantwi was in dire physical distress and needed medical intervention.

379. Like the officers who killed Robert, the officers who killed Mr. Nantwi continued their fatal beating in a prison infirmary.

380. Like the officers who killed Robert, the officers who killed Mr. Nantwi engaged in an elaborate plan to cover up their actions, concocting a scheme to write false reports and plant a weapon on Mr. Nantwi to make their actions appear justified.

381. Like the officers who killed Robert, the officers who killed Mr. Nantwi were encouraged and assisted by on-scene supervisory staff, in both their violent acts and their subsequent coverups.

382. Like the officers who killed Robert, the officers who killed Mr. Nantwi were emboldened to act in such a violent and lawless manner because they knew about the de facto

policies described in this compliant. These officers were comfortable brutalizing Mr. Nantwi and then lying about it because they knew it was exceedingly unlikely that their fellow officers would expose their misconduct or take steps to hold them accountable.

383.    If NYSDOCCS had an actual policy of holding correctional officers accountable for engaging in dangerous misconduct, then the officers who killed Mr. Nantwi would not have felt emboldened to engage in such violent, deceptive, and illegal conduct, particularly not in the aftermath of Robert's widely publicized killing.

**Count 1 – 42 U.S.C. § 1983 – Eighth Amendment**
**(Against Defendants Abreu, Caufield, Popiel, Tabor, Bankert, Bedient, Walrath, Kessler, Kieffer, Anzalone, Trombley, Farina, Mashaw, Galliher, Kingsley, Walters, Along, Schoff, Fisher, Dashnaw, and Mehmedovic)**

384.    All Paragraphs of this Complaint are incorporated by reference in this Count.

385.    As described more fully above, the defendants named in this Count violated Robert's Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to excessive force, failing to intervene to stop others from using excessive force, acting with deliberate indifference to Robert's objectively serious medical needs, and/or failing to protect him from a substantial risk of serious harm.

386.    More specifically, as described in more detail above, Defendant Abreu was subjectively aware of a substantial risk of serious harm Swift and his affiliates posed to Robert on Dorm 74B at Mohawk and she acted with deliberate indifference to that risk. As a result, Robert was beaten by Swift and his affiliates on December 8 and December 9, 2024.

387.    In addition, as described in more detail above, Defendants Walrath, Kessler, Kieffer, Anzalone, Kingsley, Farina, and Galliher used force against Robert at Marcy on December 9, 2024, that was excessive, objectively unreasonable, malicious, sadistic, served no legitimate purpose, and/or was intended to injure Robert.

388.    In addition, as described in more detail above, Defendants Caufield, Popiel, Tabor, Bankert, Bedient, Walrath, Kessler, Kieffer, Anzalone, Trombley, Farina, Mashaw, Galliher, Kingsley, Walters, Along, Schoff, and Fisher to stop Marcy correctional officers' use of excessive force against Robert at Marcy. As described above, each of these defendants was present on scene at various points while one or more Marcy correctional officers used excessive force against Robert. Each of these defendants had a duty and reasonable opportunity to intervene to stop the use of excessive force but failed to do so.

389.    In a similar vein, Defendants Caufield, Popiel, Tabor, Bankert, Bedient, Walrath, Kessler, Kieffer, Anzalone, Trombley, Farina, Mashaw, Galliher, Kingsley, Walters, Along, Schoff, Fisher, Dashnaw, and Mehmedovic failed to protect Robert from a substantial risk of objectively serious harm during Robert's time at Marcy, including but not limited to the following moments: at the conclusion of the breezeway assault, at the conclusion of the walkway assault, when Robert was brought into the Infirmary, and after Robert bit down on Farina's finger. In these moments, one or more of these defendants knew that Robert faced a substantial risk of being subjected to further excessive force if nothing was done to separate or otherwise protect him from the officers who they witnessed using excessive force on Robert, but these defendants were deliberately indifferent to that risk, and they went about their business without taking any action to protect Robert from further harm

390.    In a similar vein, Defendants Trombley, Mashaw, Farina, Anzalone, Kingsley, Walters, Schoff, Fisher, Dashnaw, and Mehmedovic acted with deliberate indifference to Robert's objectively serious medical needs. By the time Robert arrived in the Infirmary ER room and throughout his entire time in the ER room, Robert had an objectively serious need for medical attention. Although medical staff was ready and waiting to assist Robert in the Infirmary,

69

Defendant Walters told them to "hold off." As the ER room assault went on, Robert's need for urgent medical attention became even more obvious and acute, but no one provided it. Even after Robert's beating ended and Dashnaw and Mehmedovic entered the ER room and Robert was in obvious need of critical resuscitative care, defendants continued to act with deliberate indifference by delaying medical intervention or treatment.

391. All the misconduct described in this Count was undertaken willfully, wantonly, recklessly, maliciously, or with depraved and deliberate indifference to Robert's life and safety.

392. All the misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

393. The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

### Count 2 – 42 U.S.C. § 1983 – Failure to Protect
### (Against Supervisory Defendants Medbury, D'Amore, and Martuscello)

394. All Paragraphs of this Complaint are incorporated by reference in this Count.

395. As described more fully above, Supervisory Defendants Medbury, D'Amore, and Martuscello and other as yet identified supervisory individuals violated Robert's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from a substantial risk of serious harm.

396. As described more fully above, Supervisory Defendants Medbury, D'Amore, and Martuscello knew that NYSDOCCS' culture of brutalization and cover ups posed a substantial risk of serious harm to incarcerated individuals like Robert. On information and belief, they possessed this knowledge not only from their own experience in NYSDOCCS, but also through independent reports, investigative reporting, jury verdicts, and criminal prosecutions concerning NYSDOCCS correctional staff, including those at Marcy, as described above.

70

397.    On information and belief, Supervisory Defendants Medbury, D'Amore, and Martuscello acted with deliberate indifference to this risk of harm by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Robert.

398.    Supervisory Defendants Medbury, D'Amore, and Martuscello were personally responsible for ensuring the safety of incarcerated individuals under their care and custody, including Robert. They had the power and responsibility to implement and enforce policies and practices to protect incarcerated people at Marcy from the use of excessive force by staff.

399.    The Supervisory Defendants were personally involved in the attack of Robert because as a direct and proximate cause of the deliberate indifference described in this Count, other defendants were emboldened to brutalize Robert, confident in the belief that their misconduct would never be subject to any meaningful scrutiny. When Marcy correctional officers attacked and ultimately killed Robert, they reasonably believed that they could brutalize incarcerated individuals like Robert with impunity (so long as their actions were not captured on video), trusting that their fellow officers would join them in covering up any evidence of their wrongdoing.

400.    The misconduct described in this Count directly and proximately caused Robert to suffer extreme emotional terror, excruciating pain, and severe bodily injury before his death.

401.    The misconduct described in this Count directly and proximately caused Robert to die, robbing him of future enjoyment of his life.

**Count 3 – State Law**
**Negligence, Gross Negligence, and Wrongful Death**
**(Against Defendant Mehmedovic)**

402.    All Paragraphs of this Complaint are incorporated by reference in this Count.

403.    Defendant Mehmedovic owed Robert a duty of reasonable care to provide prompt medical assistance when he was fatally injured by the actions of Defendants as detailed above.

71

404. Defendant Mehmedovic breached such duty of reasonable care to Robert and acted with gross negligence and reckless indifference to his safety and his life, and failing to provide immediate medical assistance and being otherwise indifferent to his suffering and safety.

405. As a direct and proximate result of Defendant Mehmedovic's negligence, gross negligence, and reckless indifference, Robert suffered severe physical and emotional pain and suffering and was caused to die.

### Damages

406. Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr., is entitled to an award of compensatory damages for Robert's severe physical and emotional pain and suffering.

407. Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr.'s distributees, is entitled to an award of compensatory damages for causing Robert's wrongful death, including the pecuniary value of their loss of support, nurturing, and guidance incurred from the death of their father.

408. Based upon the facts and legal claims set forth above, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr. and its distributes, is entitled to an award against all Defendants of loss-of-life or hedonic damages for the death of Robert caused by the deprivation of his civil rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

409. Based upon the facts and legal claims set forth above, and specifically the intentional, reckless, and grossly negligent conduct of the individual Defendants, Plaintiff, on behalf of the Estate of Robert L. Brooks Sr. and its distributees, is entitled to an award of punitive damages against Defendants.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

### Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

Respectfully Submitted,

By: /s/ Elizabeth Mazur

Elizabeth Mazur
Kate Schwartz
HUGHES SOCOL PIERS RESNICK & DYM, Ltd.
70 W. Madison Street Suite 4000
Chicago, Illinois 60602
Tel: 312.580.0100
Fax: 312.580.1994
emazur@hsplegal.com
kschwartz@hsplegal.com

Stephen G. Schwarz
Josh Mankoff
FARACI LANGE, LLP
1822 South Winton Road, Suite 1
Rochester, New York 14618
Tel: 585.325.5150
Fax: 585.325.3285
sschwarz@faraci.com
jmankoff@faraci.com

*Attorneys for Plaintiff*

73